No. 24-1996

# In the United States Court of Appeals for the Federal Circuit

4DD Holdings, LLC, T4 Data Group, LLC,
*Plaintiffs-Appellants*,

v.

United States,
*Defendant-Appellee*

Immix Technology, Inc.,
*Third-Party Defendant.*

Appeal from the United States Court of Federal Claims,
No. 1:15-CV-00945-EGB

## NON-CONFIDENTIAL OPENING BRIEF FOR PLAINTIFFS-APPELLANTS 4DD HOLDINGS, LLC, AND T4 DATA GROUP, LLC

Angela M. Oliver
Haynes and Boone, LLP
800 17th Street N.W., Ste. 500
Washington, DC 20006
(202) 654-4552
*angela.oliver@haynesboone.com*

Daniel L. Geyser
Haynes and Boone, LLP
2801 N. Harwood Street, Ste. 2300
Dallas, TX 75201
(303) 382-6219
*daniel.geyser@haynesboone.com*

*Counsel for Plaintiffs-Appellants*
*4DD Holdings, LLC and*
*T4 Data Group, LLC*

No. 24-1996

# In the United States Court of Appeals for the Federal Circuit

4DD Holdings, LLC, T4 Data Group, LLC,
*Plaintiffs-Appellants*,

v.

United States,
*Defendant-Appellee*

Immix Technology, Inc.,
*Third-Party Defendant.*

Appeal from the United States Court of Federal Claims,
No. 1:15-CV-00945-EGB

## CERTIFICATE OF INTEREST

Pursuant to Fed. Cir. R. 47.4, counsel for Plaintiffs-Appellants 4DD Holdings, LLC, and T4 Data Group, LLC, certify that the following information is accurate and complete to the best of their knowledge:

1. **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case.

   4DD Holdings, LLC; and T4 Data Group, LLC

2. **Real Party in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

   None.

3. **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more of the stock in the entities.

   4DD Holdings, LLC, is the parent corporation for T4 Data Group, LLC.

4. **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court.

   **Robins Kaplan LLP**: Roman Silberfeld; Chris Larus; Bryan Mechell; Ron Schutz; Jessica Gutierrez; Zachary Cohen; Stephanie Quartararo; Christine Yun Sauer; and Stephen Safranski.

   **Stein Mitchell Beato & Missner**: Edward H. Meyers; Robert B. Gilmore; and Philip J. O'Beirne.

   **Boies, Schiller & Flexner LLP**: D. Michael Underhill; James P. Denvir III; Stacey Kamya Grigsby; Hamish P. M. Hume; Williams C. Jackson; and Jonathan M. Shaw.

   **Regan Zambri Long, PLLC**: Patrick M. Regan; and Salvatore J. Zambri.

   **Hausfeld LLP**: Sathya S. Gosselin.

5. **Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5?

   No.

6. **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).

   None.

Respectfully submitted.

/s/ *Daniel L. Geyser*

Daniel L. Geyser
HAYNES AND BOONE, LLP
2801 N. Harwood Street, Ste. 2300
Dallas, TX 75201
(303) 382-6219
*daniel.geyser@haynesboone.com*

*Counsel for Plaintiffs-Appellants*
*4DD Holdings, LLC, and*
*T4 Data Group, LLC*

November 1, 2024

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST .......................................................................i

INTRODUCTION ............................................................................................1

JURISDICTIONAL STATEMENT ...............................................................2

STATEMENT OF THE ISSUES ...................................................................3

STATEMENT OF THE CASE ........................................................................4

SUMMARY OF ARGUMENT .......................................................................10

STANDARD OF REVIEW .............................................................................13

ARGUMENT .....................................................................................................13

    A.    Contrary To The Trial Court's View, There Was No Need To Conduct A "Hypothetical" Negotiation When The Parties' *Actual* Negotiation Established The Real-World Value Of 4DD's Infringed Software ........13

        1.    The parties' actual negotiations dictate the controlling damages rate under 28 U.S.C. 1498(b) ...........................................................................14

        2.    There is no basis for conducting a hypothetical negotiation when the parties already reached an actual agreement in an arm's-length transaction ...................................................................25

    B.    Even If A Hypothetical Negotiation Were Permissible, Multiple Legal And Logical Errors Infected The Trial Court's Analysis—Vastly Diminishing The Value Of 4DD's Copyrighted Software ...................................................................33

        1.    There were foundational global errors in the trial court's "hypothetical" framework ......................33

# TABLE OF CONTENTS
## (continued)

2.   There were additional errors undermining the trial court's calculations for each key aspect of the "hypothetical" negotiation ....................................39

CONCLUSION....................................................................................................48

# TABLE OF AUTHORITIES

**Page(s)**

## STATEMENT OF RELATED CASES

Pursuant to Fed. Cir. R. 47.5, Plaintiffs-Appellants 4DD Holdings, LLC, and T4 Data Group, LLC, respectfully submit that (1) there have been no other previous appeals in this case, and (2) there are no related cases that will directly affect or be directly affected by the Court's decision in this case.

**INTRODUCTION**

This case presents exceptionally important questions regarding the legal standard for copyright damages—including the proper role of contracts in establishing the fair-market value of a defendant's unauthorized use. In these proceedings, the trial court found the federal government engaged in extraordinary misconduct: "government officials" "infringed" 4DD's "copyrighted computer software," made "tens of thousands of infringing copies," and "tried to hide the infringement by destroying evidence and misrepresenting their actions." Appx18. The resulting damages analysis ought to have been simple: the parties had negotiated a binding license at arm's length, and that license established the fair value of the government's unauthorized use. Yet rather than determine damages by applying the contract rate, the court instead conjured up a post-hoc, "hypothetical" negotiation to supplant the *actual* negotiations between the parties—as reflected in their *actual* binding contract.

As a result, despite 4DD's software performing a critical function with significant benefits, and despite the parties agreeing in advance on the value of that software, the trial court wiped out its value with a "hypothetical" negotiation—one discarding the actual market rate (as determined by the parties

themselves) and substituting a fictional rate divorced from reality. The outcome ultimately awarded 4DD only the tiniest fraction of the true value of the government's unlawful copying—effectively letting the government off the hook for "surreptitiously making tens of thousands of unlicensed copies of 4DD's Tetra software." Appx55.

For obvious reasons, these questions implicate legal and practical issues of surpassing importance, and their correct disposition is essential to the proper administration of the nation's copyright laws. The trial court's flawed analysis was infected by multiple legal and logical errors. It violated this Court's established precedent, and it invites a square conflict with multiple circuits. 4DD was entitled to a proper measure of compensation as a result of the government's actions. Because the trial court failed to provide it, the judgment should be reversed.

## JURISDICTIONAL STATEMENT

The court of federal claims had jurisdiction over this copyright action under 28 U.S.C. 1498(b). The court entered judgment on November 27, 2023 (Appx16), and denied 4DD's post-judgment motion on April 26, 2024 (Appx55-64). 4DD filed a timely notice of appeal on June 18, 2024. Appx19932-19933. This Court has jurisdiction under 28 U.S.C. 1295(a)(3).

## STATEMENT OF THE ISSUES

1. When parties have negotiated an actual license at arm's length in a fair market, whether the plaintiff's "reasonable and entire compensation" (28 U.S.C. 1498(b)) for any infringing use should be determined by that fair-market rate—or whether courts should instead construct a "hypothetical negotiation" to ask what the parties might have done (instead of what they actually did).

2. If a hypothetical negotiation does supplant the actual license, whether the trial court conducted a proper negotiation here—despite attributing future knowledge to the government (that did not exist at the relevant time); assigning the government leverage from a competing product (without first finding that it could perform TETRA's critical functions); presuming the government would have demanded a development license (despite twice pursuing production licenses in real-world negotiations); presuming 4DD would offer volume discounts on those development licenses (despite not offering such discounts in the only record evidence); assigning a 20% convenience fee to backup copies (based on the wrong non-backup-copy baseline rate); and attributing no value to unused TETRA studio licenses (despite settled law in multiple circuits that all copies are copies—whether the material is used or not).

## STATEMENT OF THE CASE

This case arises out of the government's infringement of "tens of thousands" of copies of 4DD's groundbreaking software, which was selected by the government as a critical component of one of the Defense Department's top policy initiatives—creating "comprehensive healthcare records for our nation's military members." Appx18; see also Appx19 (identifying this as "'easily in the top two or three programs for the Secretary of Defense'"). In the proceedings below, the court found that the government infringed 4DD's software, "then tried to hide the infringement by destroying evidence and misrepresenting their actions." Appx18. The court found the government liable for infringement, but then discarded the negotiated rates in the parties' binding licenses when determining 4DD's "reasonable and entire compensation" (28 U.S.C. 1498(b))—ultimately awarding only a tiny fraction of the amounts owed under those agreements. This appeal challenges the court's damages analysis.

1. "[F]or many decades," the Defense Department and the Department of Veteran Affairs have invested billions to create a system of "[a]ccurate medical records" for the nation's active servicemembers and veterans. Appx18. Each entity "store[s] millions of healthcare records across hundreds of poorly

connected databases," "prevent[ing] doctors and nurses from obtaining a patient's complete medical record." Appx18. And the lack of proper medical records "impedes" the "ability to provide care." Appx18.

To immediately address this problem, Congress instructed the Defense Department to "solve the data sharing problem." Appx18. This led the government to pursue an "interoperability solution"—"a program that could harmonize information from disparate data sources and produce it in a single format." Appx19. After an intense competition involving over a dozen prominent companies, 4DD's cutting-edge software was selected for the project.

In broad strokes, 4DD's software has two components: TETRA Healthcare Federator and TETRA Enterprise Studio. The former has multiple parts that perform critical tasks behind the scenes; it is licensed on a "per computer core" basis—which represents "a computer's processing power"—with each "license correlat[ing] with one core." Appx19-20. The latter is "a graphical interface and programming tool that allows software engineers to 'enable and instruct [TETRA Healthcare Federator] how to function'"; it is "licensed per 'seat' or per user." Appx19-20.

When 4DD was selected for this critical role, its published rates were included in a contract on a government database (so-called NASA SEWP). The

listing including a government certification that the rates were "fair and reasonable." See 48 C.F.R. 15.305(a)(1). For TETRA Healthcare Federator, those rates varied from "blocks of cores ranging from 8 to 512," with a "volume discount" from the list price of $24,000. Appx20. For TETRA Studio, the rates varied from "blocks of seats ranging from 25 to 500," with a "volume discount" from the list price of $6,000. Appx20.

With 4DD's software selected "as the interoperability solution," the government "licensed 64 cores of Tetra Healthcare Federator and 50 seats of Tetra Studio" at reduced rates (Appx20)—$10,447 per core for the former and $3,337 per seat for the latter (Appx21666). "The agreement also included several option years that let the government buy additional cores and seats at the same price." Appx20. The government also accepted 4DD's "End-User Licensing Agreement (EULA)"—which expressly "prohibits users from copying Tetra," with one exception—"a single backup copy in case 'the original copy is damaged or destroyed.'" Appx21.

2. During the course of the program, it turned out the government did make unauthorized copies—tens of thousands of them. Appx24. While 4DD had built-in methods for monitoring license usage, the government forced 4DD

to deactivate those methods due to "security" concerns. Appx21. 4DD was instead asked to "'rely on [the government's] honesty.'" Appx21. But that reliance ultimately proved misplaced. In an effort to adopt the fastest "software development lifecycle," the government's primary contractor "created thousands of Tetra copies"—"it regularly created backup copies that included Tetra, it cloned virtual machines that included Tetra, and it made new copies of Tetra any time that it released a code package" to the government. Appx24.

4DD eventually realized that some number of excessive copies were made, and approached the government to arrange a true-up. Appx24. "Unfortunately, the government's left hand did not know what its right hand was doing." Appx24. A chief government officer "ordered" certain copies to be "deleted"—"explain[ing] that there was 'a license issue that [he] must clear up.'" Appx24-25. Another government officer "'verified'" that 64 extra copies were made—but her verification was "not true," as no one actually looked for all the relevant copies. Appx25.

Based on the government's representations, the parties eventually agreed that the license was "exceeded" by 168 cores, and they needed to "negotiate a price" for the overage. Appx25. 4DD suggested the published rate should apply, but the government responded "it was only 'fair that [it] pay the

same price'" as the initial license—roughly $10,000 per core. Appx25. 4DD "relented" and the parties "settled at the original contract price." Appx25.

With a later change in leadership in the Defense Department, the government terminated its work with TETRA. Appx26.

3. In August 2015, 4DD initiated a copyright-infringement action against the government in the court of claims. Appx26. "Through discovery, 4DD learned that relevant evidence had been destroyed, prompting it to move for sanctions." Appx26-27. The court ultimately "held that the government intentionally destroyed the evidence to deprive 4DD from using it in litigation." Appx27. It sanctioned the government and entered a spoliation order. Appx27-28.

In the course of rejecting the government's attempts to dismiss the action, the court further established that "the government fraudulently and materially misrepresented the extent of its copying" (Appx29); "the government misrepresented facts throughout the true-up negotiation" (Appx29); the government "falsely represented" it had "'verified'" the number of excess TETRA copies made (Appx29); and "[t]he government comes before the court with unclean hands"—"[i]t has intentionally destroyed evidence and lied to 4DD about

its actions" (Appx32). See also Appx30 ("the government fraudulently misrepresented the number of Tetra copies that it had made" and wrongly "deleted Tetra copies," "severely downplay[ing] the extent of the government's license violations"); Appx31 ("[t]he government fraudulently and materially mispresented the extent of its copyright infringement").

The court ultimately found a massive campaign of copyright infringement, relying on 4DD's expert to "forensically recreate" the government's use during the project. Appx34; see also Appx37-38 (reproducing charts to illustrate the tens and hundreds of thousands of unauthorized copies). Yet despite the government's massive amount of copying, the court ultimately awarded only a vanishing fraction of the damages owed under the parties' license. Appx39-40.

Rather than apply the contract rate, the court instead constructed a "hypothetical negotiation"—asking what rates the parties would have accepted ex ante. Appx42 (so asking despite the parties' *actual* ex ante license agreement). In doing so, the court concluded that the government would have "superior" bargaining power; it charged the government with awareness that the project would end in a year (a fact unknown during most of the government's infringement); it declared that the majority of the copies were not useful to (or at least

fully used by) the government; and it ultimately decided that the parties would have agreed to a "development license" (a product 4DD did not actually offer) at volume discounts (a perk 4DD did not include). Appx44-49.

In the end, the court concluded that "4DD has shown that the government infringed its copyright thousands of times over." Appx50. But it still limited damages to approximately $12 million—despite the license rate establishing damages in the 9- or 10-figure range. Appx50.

After the court denied 4DD's motion for post-judgment relief (Appx55-64), this appeal followed.

## SUMMARY OF ARGUMENT

The trial court erred in choosing to conduct a hypothetical negotiation instead of applying the parties' real-world license rate, and then it erred again in how it conducted that fictional analysis. In the process, it eliminated the overwhelming majority of 4DD's proper compensation for the government's extraordinary misconduct. The judgment should be reversed.

1. a. Contrary to the trial court's view, there was no need to conduct a hypothetical negotiation because the parties' *actual* negotiation dictates appropriate damages under 28 U.S.C. 1498(b). That binding rate sets the "reasonable and entire compensation" owed under a live contract—and anything

short of that rate does not provide the "entire" amount due. This plain-text approach provides a clear and workable standard—all parties have fair notice of the price of unauthorized copying, and the parties' contractual rights are respected. There is no need to deviate from those binding rates.

This standard should have readily resolved this case. 4DD and the government had *two* binding agreements—each establishing the identical rates for copying software in precisely this setting. Those agreements were negotiated at arm's length, and they reflect the fair-market value of 4DD's software—which offered the government the promise of solving a multibillion-dollar "interoperability" problem. The court erred in refusing to provide that proper measure of compensation.

b. The trial court had no basis for instead conducting a hypothetical negotiation when the parties already had an *actual* negotiated agreement in place. A hypothetical negotiation is a poor substitute for a real-world contract. It may be appropriate where no agreement exists, but it is pointless to ask what the parties *might* have done when it is clear (in reality) what the parties actually did. The court simply confused cases where the litigants themselves were not bound by live agreements.

2. a. Even if a hypothetical negotiation were permissible, the trial court botched the negotiation at every turn. It failed to adopt the necessary ex-ante perspective—by letting unpredictable future events affect the terms of the parties' ex-ante agreement. It assigned the government extra leverage from the presence of a possible TETRA alternative—without first deciding if that software even offered the same critical functionality (it did not). And it repeatedly assumed the parties would take actions they did *not* take during their real-world interactions. Fiction cannot trump reality, and a hypothetical negotiation should at least respect the parties' actual decisions during their real-world bargaining.

b. On a more granular level, the trial court also committed multiple legal and logical errors with serious effects on the damages total. It assumed the government would have demanded a cheaper development license—despite the government insisting upon production licenses at every point in the actual project. It then presumed those development licenses would be subject to volume discounts—based on raw speculation disproved by unrefuted record evidence. It assessed a 20% "convenience fee" on certain backup copies—but applied that fee to a baseline rate that itself was wrong. And it refused to provide

meaningful damages for unused TETRA Enterprise Studio licenses—a legal proposition directly at odds with controlling precedent in multiple circuits.

Because the trial court's legal errors deprived 4DD of its proper measure of statutory damages, the judgment should be reversed.

## STANDARD OF REVIEW

This Court reviews the trial court's "legal conclusions de novo and [its] factual findings for clear error." *Bitmanagement Software GmBH* v. *United States*, 989 F.3d 938, 946 (Fed. Cir. 2021). Although the trial court's damages award is reviewed for an abuse of discretion (*Gaylord* v. *United States*, 678 F.3d 1339, 1342 (Fed. Cir. 2012)), the court abuses its discretion when "'(1) [its] decision is clearly unreasonable, arbitrary or fanciful; (2) the decision is based upon an erroneous construction of the law; (3) the trial court's factual findings are clearly erroneous; or (4) the record contains no evidence upon which the [trial] court could have rationally based its decision.'" *Hi-Shear Tech. Corp.* v. *United States*, 356 F.3d 1372, 1377-1378 (Fed. Cir. 2004).

## ARGUMENT

**A.    Contrary To The Trial Court's View, There Was No Need To Conduct A "Hypothetical" Negotiation When The**

### Parties' *Actual* Negotiation Established The Real-World Value Of 4DD's Infringed Software

Under settled law, the real-world license between the actual litigating parties establishes the proper benchmark for copyright damages. Yet in the proceedings below, the trial court refused to apply that negotiated rate—despite the existence of a binding contract between the parties covering the software at issue at the time of infringement. The trial court's position is baseless, and it invites a lopsided conflict on an important question of federal law—where no sound rationale supports the trial court's position. Its judgment should be reversed.

1.    *The parties' actual negotiations dictate the controlling damages rate under 28 U.S.C. 1498(b)*

a. When the United States infringes a copyright, the copyright owner is entitled to "recover[] * * * his *reasonable and entire compensation* as damages for such infringement." 28 U.S.C. 1498(b) (emphasis added).

Section 1498(b)'s specific measure of recovery—"reasonable and entire compensation"—is a perfect fit for applying an existing license rate. As here, a license reflects a rate actively negotiated and designed by the parties to "compens[ate]" the owner for its copyrighted works. 28 U.S.C. 1498(b). That compensation is set at arm's length in a fair market, and it is the amount the

government would be obligated to pay had it not simply infringed—it designates the fair "compensation" (per a binding contract) for the work. *E.g.*, *On Davis* v. *The Gap, Inc.*, 246 F.3d 152, 165 (2d Cir. 2001). Any downward adjustment of that rate (for litigation purposes alone) would necessarily *not* provide "reasonable *and entire* compensation"; by definition, it would provide *less* than that amount. Congress did not authorize the government to shortchange what it actually owes when the parties negotiated an upfront legal agreement.[1]

b. This plain-text approach has obvious benefits. It is administrable and workable for all stakeholders. Contract rates are clear. They can be easily determined and applied in most settings, and this bright-line rule provides predictability and certainty for all parties—together with fair notice of how to properly structure future behavior. Any infringing party knows precisely how

---

[1] Although Congress articulated a specific standard ("reasonable and entire compensation") for copyright suits against the government, courts also consider the Copyright Act's general "methods used to determine 'actual damages'" when "measuring" recovery under Section 1498(b). *Gaylord* v. *United States*, 678 F.3d 1339, 1343 (Fed. Cir. 2012) (so explaining); see also 17 U.S.C. 504(b) ("[t]he copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement"). Both metrics point in the same direction here: Section 504(b)'s "actual damages" are precisely the amounts 4DD ought to have been paid under the parties' binding agreement for the use of 4DD's software. Those same "damages" reflect the "entire compensation" lost on account of the government's unauthorized use.

much it will be asked to pay should it infringe. It simply holds parties to their own bargain struck at arm's length, and sets the known consequences of deliberately violating that agreement. It eliminates guesswork by the parties and the courts, and avoids the need for extensive and costly litigation over a rate already established by the parties themselves.

Nor is there any unfairness in asking parties to pay the market value dictated ex ante by their own agreement. If an infringing party is unhappy with its past dealings, it can always seek to renegotiate—*before* infringing. Those arm's-length interactions are the best measure of market value, especially when the parties have comparable bargaining power (and each can protect its own interests). But just as the law typically will not look past consideration in a contract, there is no reason to revisit appropriate "compensation" where parties act under the force of a binding agreement. *E.g.*, *On Davis*, 246 F.3d at 168 ("'a reasonable license fee for the use of [the plaintiff's work] best approximates the market injury sustained by [the plaintiff] as a result of [the defendant's] misappropriation").

In short, a license rate is the best guide for market participants, and it presents an efficient rule of decision for courts and litigants alike. It eliminates

post-hoc disputes divorced from reality, and is more reliable and less speculative than any alternative measure. So long as there is adequate basis to presume the parties were indeed negotiating in a fair and open market, there is every reason to respect the parties' own assessment of a work's value.

This is why other courts (including multiple circuit courts) have squarely held that the license rate controls where the litigating parties have negotiated a license at arm's length. *E.g.*, *Thoroughbred Software Int'l, Inc.* v. *Dice Corp.*, 488 F.3d 352, 359-360 (6th Cir. 2007); *Szekely* v. *Eagle Lion Films, Inc.*, 242 F.2d 266, 268 (2d Cir. 1957). That negotiation sets the proper value of an infringed work, and there is no basis for a court to second-guess that value post-hoc via an artificial substitute for a real-world market transaction. See also, *e.g.*, *Biodynamic Tech., Inc.* v. *Chattanooga Corp.*, 658 F. Supp. 266, 270 (S.D. Fla. 1987) ("the Court is guided by the value the parties themselves assigned to the appropriated information").

c. These settled principles dictate the proper damages award here—where each infringing act should be compensated based on the exact rates the government actually paid at all times during its multiyear program. *E.g.*, Appx19909 (so explaining).

4DD's "reasonable and entire compensation" (28 U.S.C. 1498(b)) was determined by the parties' own binding agreements. This was not merely some unilateral quote or 4DD plucking numbers out of thin air. These were the *same* rates the government negotiated (and accepted) *twice* on different occasions. Appx20327, Appx20385. It established these rates with its initial license, and it reaffirmed the same rates during the negotiated true-up—where it compensated 4DD *at the same price* for the identical type of infringing activity. Each deal was struck at arm's length in a fair market between the actual litigating parties. The deals were struck over a year apart—and yet the rates remained constant. The first addressed the software's ex ante value, and the second addressed the software's post-hoc use—with the government *twice* establishing 4DD's real-world compensation at identical rates. And these rates, if anything, reflect the *low end* of TETRA's fair market value. The government secured discounts (negotiating at arm's length) significantly *below* 4DD's published contract rates—which the government itself had already certified as "fair and reasonable." Appx19246, Appx21672-21682, Appx21692-21702, Appx24866-24873, Appx17591-17592, Appx17894-17895.

The actual parties thus engaged in a series of real-world negotiations over the appropriate compensation for 4DD's copyrighted software—including to compensate 4DD for the *identical* type of unauthorized copies at issue here. The end result: the parties established an actual market rate (twice on separate occasions), which was lower than the even-higher list prices the government *had already certified* as "fair and reasonable." It is a mystery how those concrete transactions—captured in binding contracts—could be brushed aside when setting 4DD's "reasonable and entire compensation" (28 U.S.C. 1498(b)) for the government's indistinguishable infringing use. See *Polar Bear Prods., Inc.* v. *Timex Corp.*, 384 F.3d 700, 709 (9th Cir. 2004).

d. Even if one doubts the government's negotiating ability, there is no basis to question the result it secured: the accepted license rate was fair and reasonable under any measure, and the government's assessment of TETRA's significant value was easily substantiated. Context matters, and it explains TETRA's considerable worth.

4DD is a sophisticated veteran-owned firm developing cutting-edge software. It beat out over a dozen prominent companies in a fierce bidding competition, and was deemed "the key" to solving the government's "interopera-

bility" problems (Appx15269)—a critical issue that has plagued the government for decades. *E.g.*, Appx21667. Congress's past and present appropriations alone tell the story. It already had invested *billions* in unsuccessful programs, and 4DD's software presented real promise—as a core part of another multibillion-dollar effort expected to extend possibly a decade into the future. See Appx7561-7562. It was one of the Defense Department's headline initiatives (ranked in the top three of its overall priorities). And it addressed a key issue of profound national importance: providing proper health care to our nation's military and veterans—ensuring the foundational needs of those serving our country are met. The program, in short, justified the expense—and the government's historical outlays underscored its willingness to invest in this crucial initiative.

4DD's rates are self-evidently reasonable given that backdrop (and its possible solution to a billion-dollar problem), but they are separately justified on their own terms. 4DD's winning bid was against competitors with uniformly *higher* rates—indeed, 4DD's rates were priced at a 50% reduction from its competitors. Appx21677. The government itself certified that published rate as "fair and reasonable"—even *before* any discounts. See 48 C.F.R.

15.305(a)(1); SEWP FAQs <https://www.sewp.nasa.gov/documents/SEWP_FAQs.pdf> ("prices of IT products on the SEWP catalog are determined to be fair and reasonable at the contract level"). The parties anticipated at the outset a multiyear program with a worldwide deployment. There was no indication the same upfront rates would not apply on a broader scale— just as there was no indication that any of 4DD's competitors in the bidding process anticipated massive discounts once the full project was activated. There is zero reason for the government to now question the *discounted* rates captured in its own binding agreements (twice on separate occasions)—just as it cannot explain why it deemed "fair and reasonable" a rate significantly higher than the fractional amount it now wishes to pay.

In sum, 4DD's requested damages were supported by uncontested data points: (i) its actual negotiated rate; (ii) the true-up negotiation reaffirming the same valuation; (iii) 4DD's higher published list price; (iv) the government's own certification of that (higher) price as "fair and reasonable"; (v) the competing bids on the project—all of which effectively doubled 4DD's published rates (saying nothing of 4DD's *discounted* license rate); (vi) Congress's multi-billion-dollar appropriations for these top-priority projects—of which 4DD's

technology was deemed a "key" component; and (vii) the massive amounts expended on past failed attempts to achieve the same "interoperability" objectives. *E.g.*, Appx7556-7557, Appx15269.

At its irreducible core, 4DD is pressing the exact rate as damages that the government (*twice*) accepted for its use of 4DD's software in these very circumstances. If the government did not believe the contractual rates were fair or appropriate for its expanded use, it had every opportunity to seek a modified agreement. It instead blatantly violated the license, flatly lied about its unauthorized use, destroyed evidence in an attempt to cover it up, and then insisted (after the fact) that the controlling rate it negotiated at arm's length was unfair—despite agreeing to pay that rate *post-infringement* for the *identical* category of unauthorized use.

The proper "reasonable and entire compensation" (28 U.S.C. 1498(b)) is the rate specified in the parties' own real-world agreement. See, *e.g.*, *Polar Bear Prods.*, 384 F.3d at 708 ("approving recovery of reasonable license fee"); *Propet USA, Inc.* v. *Shugart*, No. 06-186, 2007 WL 2766718, at *2 (W.D. Wash. Sept. 19, 2007). Had the government simply paid the agreed-upon rate, 4DD would receive its full and fair compensation for the unauthorized copies. 4DD

should not receive less than that "entire" compensation because the government reneged and forced 4DD to file suit. The license rate controls, and the trial court erred in refusing to hold the government to its own bargain.

e. Nor, finally, does it make any difference whether the government used all the copies or not—and a contrary holding would invite a direct circuit conflict. See, *e.g.*, *Thoroughbred Software*, 488 F.3d at 359-360; *Wall Data Inc.* v. *L.A. Cty. Sheriff's Dep't*, 447 F.3d 769, 779 (9th Cir. 2006). The government's contrary position ignores the plain text of the statute: the question is whether the copyrighted work is *copied*, not whether it is *used*. See 17 U.S.C. 106(1), 501(a). And each copy anyway *was* used in the sense that it directly enabled the government to develop and test the software in the fastest possible way— without adopting slower and less efficient means to avoid additional copying.

If the government were concerned about unused copies, it had every right to come back to 4DD and seek to renegotiate. It could have explained the context, disclosed the need for (thousands) of extra versions, and negotiated for a reduced rate (or perhaps an enterprise license). It instead opted for none of those things—and, again, chose to make unauthorized copies; lie to 4DD about its actions; destroy evidence; and then demand a jaw-dropping break on

a price (which the government itself repeatedly declared reasonable) to avoid accounting for its own misconduct.

That is not how federal copyright law works—nor is it how copyright law *ought* to work. These actions were entirely within the government's control. It should have done what any honest actor would do: approach the copyright holder and negotiate a different resolution if the government did not believe (ex ante) that the amounts it *already agreed to pay* were too high. But it is too late now to suggest the market-value established by the government's own real-world negotiations are somehow irrelevant. *Gaylord II*, 678 F.3d at 1343 ("many circuits award actual damages based on 'the fair market value of a license covering the defendant's use'") (citing decisions from the Second, Sixth, Seventh, and Ninth Circuits).

Section 1498(b) requires the payment of "reasonable and entire compensation," and the actual rate between the actual parties provides the definitive benchmark. 4DD was entitled to that proper measure of compensation, and the trial court erred in refusing to provide it.

2. *There is no basis for conducting a hypothetical nego-*
   *tiation when the parties already reached an* actual
   *agreement in an arm's-length transaction*

a. Despite the existence of an actual real-world license (following actual real-world negotiations), the trial court discarded the parties' fair-market rate and instead conjured up a "hypothetical" negotiation—to decide what rate the parties would have selected had they only negotiated in advance. Appx42-43. As they actually did. In the real world. In concrete and definitive terms. Captured by an actual, non-imaginary license (twice). Without any speculation or uncertainty. And without wasting judicial or party time and resources to reconstruct a fictional alternative universe—one designed to reject the real-world answer in a real-world agreement that in reality exists.

The trial court's action was obvious legal error. There is no need for a "hypothetical" negotiation when the parties have an *actual* negotiation in place. See, *e.g.*, *Rite-Hite Corp.* v. *Kelley Co., Inc.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995) ("The royalty may be based upon an established royalty, if there is one, or if not, upon the supposed result of hypothetical negotiations between the plaintiff and defendant."); *Herrmann Int'l, Inc.* v. *Herrmann Int'l Europe*, No. 17-cv-73, 2021 WL 861712, at *20 (W.D.N.C. Mar. 8, 2021) ("the Court does not need to engage in speculation regarding the reasonable fee that

a hypothetical buyer and seller would have negotiated"; "the royalties set forth in the License Agreement are reasonable for the purpose of calculating the Plaintiffs' damages under * * * the Copyright Act"); *Phillips Petro. Co.* v. *Rexene Corp.*, No. 90-208, 1997 WL 781856, at *21 n.8 (D. Del. Sept. 4, 1997) ("[b]ecause the Court concludes that Phillips had an established royalty," "it will not perform a hypothetical negotiation analysis"). The court still insisted a hypothetical negotiation was required, but that is appropriate only where the parties never reached an *actual* agreement. Cf. *Rude* v. *Wescott*, 130 U.S. 152, 166 (1889) (asking whether the infringer "is a stranger to the license"). This should be self-evident from the very question the hypothetical framework explicitly poses: what would the parties have done had they negotiated an agreement? There is no better or more reliable answer than the parties' *actual* deal. See, *e.g.*, *Mid-Michigan Comput. Sys., Inc.* v. *Marc Glassman, Inc.*, 416 F.3d 505, 512 (6th Cir. 2005) ("a royalty agreement" "would control, to the exclusion of all other measures, the determination of the reasonable royalty award"); *Computer Assocs. Int'l, Inc.* v. *American Fundware, Inc.*, 831 F. Supp. 1516, 1527 (D. Colo. 1993) ("damages subject to exact measurement where parties have agreed on licensing price").

As this Court has framed it, the hypothetical negotiation seeks to determine "the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Lucent Techs., Inc.* v. *Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). There is only one possible way to understand that language: if the parties *did* agree after successful negotiations to an actual agreement, that agreement controls in determining the royalty. It is pointless to replicate the real-world answer with a fictional exercise—and bizarre to supplant an *actual* negotiated rate with a post-hoc, litigation-driven substitute that rewards an infringer's bad conduct with a lower rate. *Id.* at 1325 ("[t]he hypothetical negotiation tries, as best as possible, to recreate the *ex ante* licensing negotiation scenario and *to describe the resulting agreement*") (emphasis added).

b. The court's mistake is confirmed by its own authority. The court featured a series of decisions where parties recreated a hypothetical negotiation to determine the appropriate royalty rate. Yet in each example, the relevant case involved no direct license between the actual parties; if there was *any* license at all, it existed between one litigant and a *third-party* not involved in the case. See, *e.g.*, *Bitmanagement*, 989 F.3d at 940 ("[n]o express contract or license agreement authorized the Navy's actions"). There are reasons that

courts should be (understandably) reluctant to bind a defendant to a rate it never accepted in its own direct agreement—especially if there is no proxy suggesting the third-party rate reflects a broader fair-market value. But that reasoning vanishes once the defendant itself negotiates at arm's length, accepts the rate in a binding contract, and declares it fair and reasonable. There is no reason to let a post-hoc, contrived battle of the experts replace the *actual* rate established as proper by the parties themselves when addressing the identical contemplated use. *E.g.*, *University Computing Co.* v. *Lykes-Youngstown Corp.*, 504 F.2d 518, 538-539 (5th Cir. 1974).

Compare, for example, the decision in *Oracle Corp.* v. *SAP AG*, 765 F.3d 1081 (9th Cir. 2014). There, the plaintiff identified "no history" of any comparable licenses. 765 F.3d at 1093. Here, there is a *direct* history of the *actual* license between the parties—plus a subsequent agreement reaffirming the same discounted rates. And in *Oracle*, there was no evidence of any "benchmark" licenses (765 F.3d at 1093)—again, contrary to the *actual* licenses here (plus the higher published rates certified as "fair and reasonable"; the higher competing bids by 4DD's competitors; the past commensurate amounts appropriated by Congress; and so on). In short, *every* relevant benchmark reinforces what the parties themselves (negotiating at arm's length) made clear:

the actual rate reflects the actual value of the copyrighted software (indeed, on the lower end). It is perplexing to favor revisionist guesswork over an exact measure of compensation dictated by unambiguous language in a binding legal document.

c. While a hypothetical negotiation is sometimes unavoidable (where there is no actual license), it is still an inferior method of adjudication. It necessarily invites speculation and reduces reliability—two factors that raise serious concerns when calculating damages. See, *e.g.*, *Storagecraft Tech. Corp.* v. *Kirby*, 744 F.3d 1183, 1187 (10th Cir. 2014) ("hypothetical royalty negotiation exercises themselves might be difficult to administer") (Gorsuch, then-J.); *Penda Corp.* v. *United States*, 29 Fed. Cl. 533, 575 (1993) ("the entire hypothetical negotiation is a legal fiction"); see also *Polar Bear*, 384 F.3d at 708 (damages award must be "non-speculative").

This is precisely why courts refuse to engage in "hypothetical" negotiations when the parties reached an actual deal. *E.g.*, *Shepherd Mgmt. Group, Inc.* v. *Michael Wilkov Cantoni, LP*, No. 07-cv-678, 2008 WL 11336460, at *6 (N.D. Ga. Dec. 17, 2008). There is no need to speculate what the parties might have done when a real-world contract shows what the parties actually did. And

this common-sense proposition is not isolated to copyright law—courts routinely employ the same analysis in multiple legal areas (patent law; trade-secrets law; etc.). *Thomas* v. *Hughes*, 27 F.4th 995, 1009-1010 (5th Cir. 2022) ("'[d]amages may be ascertained with precision' when 'the parties previously agreed on the value' of the relevant trade secrets"). Whenever courts must assign the value of misappropriated property, the best answer (requiring the least speculation and uncertainty) is to focus on real-world agreements between the actual litigants confirming their own assessment of market value. *E.g.*, *Ford Motor Co.* v. *Versata Software, Inc.*, No. 15-cv-10628, 2018 WL 10733561, at *9 (E.D. Mich. July 9, 2018) ("the use of the value the parties had agreed upon" is "the basis for the defendant's trade secret damages"); *Commonwealth Sci. & Indus. Research Org.* v. *Cisco Sys., Inc.*, 809 F.3d 1295, 1303 (Fed. Cir. 2015) ("comparable license valuations * * * may be the most effective method of estimating the asserted patent's value"); *Biodynamic Tech.*, 658 F. Supp. at 270 ("Where the parties have agreed to the value of the trade secrets * * * such that the damages will be subject to exact measurement, that

course should be followed"; permitting hypothetical negotiation only where "there has been no 'agreement in principle'").[2]

d. The trial court attempted to sidestep these established principles with an apparent exception: the parties' actual license does not control if only a single license exists—because a single agreement supposedly fails to establish a controlling market rate. Appx57.

The trial court is mistaken. It is *possible* that a single license might fail to establish a market rate—when it is between the copyright holder *and a third-party*. See, *e.g.*, *Trell* v. *Marlee Elecs. Corp.*, 912 F.2d 1443, 1446 (Fed. Cir. 1990). But the court (again) did not identify a single instance where an operative license was set aside because sophisticated litigants had only negotiated *one* agreement in an actual fair-market transaction. In that context, there is every reason to presume the value ascribed to a product is indeed the fair-market value—even if the parties only entered a single binding agreement over the precise work in question. There is no reason to require *two* contracts

---

[2] The trial court suggested that the parties' agreement might control if it established an "exclusive" license. Yet in a meaningful way, given the magnitude of the project, this single transaction *is* the market, and the licenses established the relevant market terms. If those terms were acceptable to the government ex ante, there is no obvious reason to abandon those same terms ex post.

before deciding the parties meant what they said—and no reason to believe that a fictional, post-hoc "hypothetical" analysis will serve as a better proxy of market rates.

In any event, the trial court is wrong that this transaction involved a single agreement. The relationship here involved *three* separate agreements: (i) the published prices certified as fair and reasonable; (ii) the original license with discounted rates; and (iii) the true-up agreement confirming those discounted rates. This readily substantiates the amounts the government in fact paid in the real world for the same infringing works—and it likewise confirms the market rate held steady over an extended period (even during the government's infringement).

The government's wishful thinking aside (and notwithstanding the creative efforts of its paid expert[3]), the value established in the fair market was the fair value of the copyrighted software. The license rate controls, and the court should have applied that established rate to determine damages—as

---

[3] Incidentally, the government's damages expert is the same expert who issued the report that prompted the pending en banc proceeding in *Ecofactor, Inc.* v. *Google LLC*, No. 2023-1101 (Fed. Cir.)—where the panel dissent recognized the expert's analysis as "flawed" and "unreliable." Slip op. 2, 11 (Prost, J., dissenting in part).

other courts routinely do. The court's contrary decision—conducting a "hypothetical" negotiation in the face of an actual license between the parties—was reversible error.

**B. Even If A Hypothetical Negotiation Were Permissible, Multiple Legal And Logical Errors Infected The Trial Court's Analysis—Vastly Diminishing The Value Of 4DD's Copyrighted Software**

The trial court erred in conducting a hypothetical negotiation in the first place—but it erred again (repeatedly) in how that analysis was conducted. Those errors infected multiple aspects of its analysis, incorrectly wiping out a devastating portion of 4DD's damages. The trial court should be instructed to correct those mistakes.

*1. There were foundational global errors in the trial court's "hypothetical" framework*

The trial court committed three global errors that distorted every aspect of its "hypothetical" analysis in the government's favor. Each of those errors should be considered in evaluating the court's specific awards—and if the court elects to remand for a do-over, the trial court should conduct a new hypothetical negotiation under the proper legal framework.

a. First and foremost, the trial court misunderstood the so-called "book of wisdom" to permit *future* events to color *ex ante* negotiations—impermissibly resetting the effective date of the hypothetical negotiation to a period well after the bulk of the government's infringement. See *LaserDynamics, Inc.* v. *Quanta Computer, Inc.*, 694 F.3d 51, 76 (Fed. Cir. 2012) ("[w]ere we to permit a later notice date to serve as the hypothetical negotiation date, the damages analysis would be skewed").

Under this Court's settled doctrine, the key moment is the date of first infringement. *E.g.*, *Interactive Pictures Corp.* v. *Infinite Pictures, Inc.*, 274 F.3d 1371, 1384 (Fed. Cir. 2001). That date controls the time of the hypothetical negotiation. At that point, the parties will bargain based on their present (read: ex ante) knowledge. They will not know if joint ventures will be successful or not; they will not know the future outcome of programs or their efforts. The ex ante position determines the value that each rational actor would assign the product at issue—it is "not * * * an after-the-fact assessment" (*Unisplay, S.A.* v. *American Elec. Sign Co., Inc.*, 69 F.3d 512, 518 (Fed. Cir. 1995)), and any future shortcomings are deemed "irrelevant" to the parties' "state of mind at the time of the hypothetical negotiation" (*Interactive Pictures*, 274 F.3d at

1385). Any other approach invites untenable results—where an infringer is essentially permitted to decide how much to bet *after* learning a game's outcome.

Despite recognizing the "date of first infringement" controls (Appx43), the trial court immediately looked into the future to discount the ex ante value of 4DD's software. The court declared the government would not invest any significant amount in TETRA because (unbeknownst to everyone at the time) the government later would abruptly terminate 4DD's involvement and "replace[] Tetra." Appx44 (deeming this "most damaging to 4DD's bargaining position"). Yet the government's own key witness testified how unpredictable that outcome was—indeed, he declared he disagreed with the decision to terminate 4DD, and he believed (roughly a *year* into the infringement) that TETRA would be successful. Appx18593.

The court's glimpse into the future badly distorted the hypothetical negotiation. The proper question is not how much the government would pay for software it knew would be (unpredictably) abandoned a year later. The question is how much it would pay for a "key" solution to an "interoperability" problem that had eluded the government for decades—despite investing billions in search of an answer. When viewed within that proper framework—what the parties knew at the *relevant* ex ante date—there is every reason to think the

government would have paid every bit as much as it *willingly paid at arm's length* in every *actual* negotiation with 4DD. The trial court offered no reason to believe the value of this "interoperability" solution would suddenly plummet in this (fictional) negotiation alone.

And, in fact, there were no such reasons. TETRA had outstanding performance scores (during the "Analysis of Alternatives" and "fly-off"); it was deemed the "key" to overcoming an intractable obstacle to one of the government's top policy priorities; it would provide essential healthcare benefits to the nation's active military and veterans for years until the government could (potentially) explore a long-term solution—one, incidentally, the government has still not managed to implement. See, *e.g.*, Appx160, Appx15268-15269. And the amounts at issue are commensurate with the government's past investments in prior (failed) attempts to solve the same "interoperability" issues.

At bottom, the trial court misunderstood the proper reference point for the hypothetical negotiation—permitting the government to bargain ex post with knowledge it never had ex ante. Had the court conducted the analysis from the correct perspective, it would have the government negotiating with the hope it had a plausible solution to a billion-dollar problem. The improper effects on the court's conclusions are palpable.

b. The trial court also found the government would have driven down 4DD's price because it had an available alternative—Rhapsody—that it could have used to replace TETRA. Appx45.

Yet as the evidence established, Rhapsody did not perform the *relevant* tasks required for interoperability. That is why the software was not considered during any of the *actual* negotiations. The same Rhapsody "alternative" was available throughout the entire period when TETRA was operational. It predated the government's bidding process (which 4DD won) and was available on the market during the NASA SEWP pricing; during the government's initial licensing order; and during the true-up negotiations. Yet at no point did anyone say this software mysteriously factored into the *actual* analysis during *actual* negotiations. It posed no threat to 4DD's role in the project or the relevant functionality, which is presumably why it was not considered.

The trial court did not necessarily disagree; it simply declared it "need not decide whether Tetra and Rhapsody perform[] all the same functions." Appx45. Yet it is bizarre to say the government would somehow have leverage by pointing to software that could *not* perform the equivalent role. If the court wished to say Rhapsody affected the calculus, it at least had to make a formal finding that Rhapsody was indeed a full and complete substitute for TETRA.

It could not properly rely on "alternative" software that was neither a real alternative nor relevant to the *actual* program—a truism that applies to both real-world and hypothetical negotiations.

c. Finally, the trial court's analysis was premised, repeatedly, on *counterfactual* presumptions—notions the parties would have done things they did *not* do in actual negotiations. Hypothetical negotiations (by necessity) have to embrace an element of fiction. But the analysis cannot flout reality—which means it cannot assume parties would take positions they refused to take during real-world bargaining. See *Gaylord II*, 678 F.3d at 1344 ("evidence of past license agreements for the work in question is certainly relevant to a hypothetical negotiation analysis").

If the government had substantial leverage, for example, why did it not invoke that leverage during actual negotiations? Why did it not demand a development license (if that is what it really wanted)? Why did it not use Rhapsody to further discount TETRA's price? And so on.

If the court wished to suggest, hypothetically, that certain outcomes made sense, the court had to explain why, non-hypothetically, the parties adopted the opposite position during their actual negotiations. This flaw again is pervasive throughout the court's analysis.

2.    *There were additional errors undermining the trial court's calculations for each key aspect of the "hypothetical" negotiation*

Aside from its global flaws, the court's individual damages calculations suffered from legal and logical errors. Each requires reversal for a different category of damages.

a. *Production versus development licenses.* The court found the government would have negotiated for a development license on the non-backup copies of TETRA. Appx46. In the court's view, "using the book of wisdom," the parties would "know that the government only used Tetra for software development"; because "[t]he project never made it to production," "it would make no economic sense for the government to buy a production license when a significantly discounted development license would suffice." Appx46.

The court's first error (again) was its imputation of *post-hoc* knowledge to the *ex-ante* negotiations. Neither side would have known the project would "never" make it to production—or presumably the government would have paid nothing at all. Instead, the government *did* buy a production license. Twice. It refused to pursue a lesser version of the software, and it never suggested it pay less for the true-up settlement based on some new "economic reality." On the contrary, the government reaffirmed the same license rate

and declared that specific rate was "fair"—and the proper measure of the government's infringing use. It was legal error to ignore these actual events—while crediting one side with knowledge of the future during ex-ante hypothetical negotiations (key term: ex ante).

The court's logic also fails for additional reasons. It is odd to focus on a development license when (i) there was *no development version* of the software; (ii) there was no formal development license for that (non-existent) development version; and (iii) the government needed a production license to ensure the software's functionality—a point its own vendor established in unrefuted testimony. Appx24897. The government needed the full-fledged product—for flexibility (so it could deploy immediately) and to ensure the *actual* software would work flawlessly—an essential step in testing and development. Appx24897.

Indeed, the government did not even insist upon a development license when it was negotiating over the *identical* (development-only) infringing uses during the true-up. If the government would have insisted upon a development rate in a hypothetical negotiation, why did it believe the *production* rate was appropriate during the *actual* bargaining? At that point, the government was

negotiating over the same pricing for the same product in the same (infringing) use—in light of the government's past experience with the actual product itself. If a rational actor would have negotiated for a development license ex ante, it assuredly would have negotiated for one when assigning value to infringing products *ex post*.

The court's analysis independently fails on each of these legal grounds. There is simply no basis for conjuring up a hypothetical alternative universe that contravenes the actual positions of the same parties in real-world negotiations.

The court's analysis fails for yet another reason: it adopted Mr. Kennedy's view of a linear discount formula—one that would continue endlessly with steeper discounts until the software price approaches zero. Kennedy's presumption was just that—a presumption. It was based on raw speculation unaccompanied by actual evidence. *Lucent*, 580 F.3d at 1327 ("'[i]t is well established that speculation does not constitute "substantial evidence"'"). Discounts rarely extend indefinitely; there is typically a breaking point, and 4DD outlined one here—at 512 cores in its published rates. And the (hypothetical) development license itself was capped at $2,400—yet Kennedy believes 4DD would have sold the full production license at a fraction of that development

price. His position was assuredly a convenient litigation position (as it reduced the value of mass purchases to virtually nothing). But more is required before revamping a discount program to a point of near-zero returns.

b. *Volume discounts on top of a pre-discounted development license.* The court further erred by applying a volume discount to the baseline development-license pricing ($2,400 down from $24,000). Appx47.

The short answer: there was no such volume discount, and the court's contrary presumption directly conflicts with the uniform record evidence. Each 4DD invoice showing (theoretical) development-license pricing showed that *no volume discount* was offered or available for a development license. *E.g.*, Appx24793. The initial 90% discount was *itself* the discount. In the pricing exercise, each and every quote thus coupled two versions of the software—the production version and the (theoretical) development version. The production version showed two line items—a list price and a volume discount. The development version also showed two items—a list price and the *same* price at every volume (with no discount). See Appx24793-24798.

It is a mystery how the court could review this evidence and assume, hypothetically, that 4DD would adopt the *opposite* approach ex ante—despite never once suggesting the same volume discount would apply in this setting.

The end result was extreme double-counting: the 90% break from the list price, with a substantial volume discount in addition to that massive baseline discount—pushing the cost down to $305.22 (from the $10,447 rate the real-world government twice agreed to pay).

The court's sole explanation for its position appeared in a footnote: "During the pricing exercise, 4DD explained that it would apply a volume discount to its development license price if the government also purchased production licenses." Appx47. Yet that single statement (captured in a single e-mail) did not say that the *standard* volume discount would apply. See Appx20994. And it did not say how many production licenses would be required for any such discount—let alone that the purchase of *any* production license would activate volume discounting on *all* development licenses (here, per the court, 232 production licenses justifying a massive discount on *30,060* separate development licenses—an absurd proposition).

The math does not add up—even in a hypothetical universe. If the trial court is to presume that the government would buy a development license at all, it must also presume the government would pay the only record evidence of a development-license price: $2,400 per computer core.

*c. 20% backup convenience fee assessed against the wrong non-backup baseline.* In the court's view, the parties in a hypothetical negotiation would not agree to pay full price on backup copies: because those copies do have some "importance" in "protect[ing] the government's work and enabl[ing] the development process," the government would pay something—but it would exercise its "superior bargaining position" to demand "a convenience fee of 20% of the purchase price." Appx47-48.

The court's math is correct based on its original damages calculation for the non-backup copies. Appx19862 (government's acknowledgement). But because the court adopted the wrong baseline for those non-backup copies, it reached the wrong amount for those copies as well—by applying the 20% fee to the *volume-discounted* development license.

Once that baseline error is corrected—recalculating amounts owed as production licenses or non-volume-discounted development licenses—it becomes necessary to reapply the 20% fee to the correct baseline. And because

the government itself acquiesced in the 20% figure below, there is no reason to revisit that percentage amount.[4]

d. *Refusal to provide actual damages for TETRA Enterprise Studio.* According to the court, 4DD is not entitled to true compensation for the government's unauthorized copying of TETRA Enterprise Studio because the government's "41,925 infringing copies" made "no economic sense" and added "no value." Appx48-49.

The court's ruling is directly contrary to law in other circuits and invites a square circuit conflict. As those other circuits hold, unused copied software is still *copied* software. *Thoroughbred Software*, 488 F.3d at 359-360; *Wall*

---

[4] If anything, the 20% fee is letting the government off easy. Backup copies were expressly prohibited by the parties' licensing agreement. Appx19916 (so explaining); Appx20318. Those copies added considerable value to the government (in terms of convenience and workability)—as the trial court itself recognized. Appx48. And the trial court wrongly excluded approximately *twice* the number of infringing copies based on a meritless waiver finding—that 4DD somehow forfeited its right to damages for any backup copies created after September 2014. Appx36-37. 4DD, of course, never forfeited those claims: its expert calculated the appropriate amounts, the court itself admitted there was "no explanation" why 4DD "should not be compensated" for those copies, and the few snippets the court isolated merely noted the *minimum* amounts 4DD should recover—as a response to the government's attempt to limit the full period of infringement. See Appx19837 (so explaining). A waiver is the voluntary relinquishment of a known right; there was nothing remotely approaching the clear statement required to find any such waiver here.

*Data*, 447 F.3d at 779. There is no basis for excusing those infringing copies, and thus no basis for excluding those copies from the hypothetical negotiation (on the irrelevant ground that they were not used). "The lost licensee fee * * * used to measure actual damages for the used software copies is also the proper measure of actual damages for the unused copies." *Thoroughbred Software*, 488 F.3d at 360.

In any event, the court was incorrect to suggest these copies added no value—which is presumably why the government did indeed make the copies. At a minimum, this enabled the government to make whatever copies it wished of any computer (and any software on that computer) without worrying about *excluding* the software (or reloading it should it become necessary). The government was under intense pressure to develop the project as quickly as possible. It deliberately structured the process to expedite its work—which included making countless copies for their own convenience.

The government cannot simply elect to copy software and later insist the copies were unnecessary because they were not used to the full extent possible.

In any event, even if these copies had reduced value, it is difficult to believe the value hovered around $1 a license—despite a negotiated rate of $3,337

per seat. The cost of convenience alone was surely higher than that—and an artificial award of statutory damages is not a rational attempt to quantify the "reasonable and entire compensation" of the government's infringement.[5]

\* \* \*

In the real world, when the parties engaged in actual negotiations (twice on separate occasions), the parties determined a fair market value that looked nothing like the trial court's hypothetical approximation. The parties' actual negotiated rate should control—and if it does not, this Court should at least modify the damages from the hypothetical negotiation to eliminate the trial court's multiple errors.

---

[5] While the court suggested that 171,000 licenses were required, the total number can be reduced to 41,000 copies—by looking at one seat-license per copy.

## CONCLUSION

The trial court's judgment should be reversed, and the case should be remanded with instructions to apply the *actual* negotiated rates in determining 4DD's damages: a $10,447 per-core license for TETRA Healthcare Federator, and a $3,337 per-seat license for TETRA Enterprise Studio. Alternatively, if the parties' actual agreement (somehow) does not control, the Court should remand with instructions to recalculate 4DD's damages under a proper "hypothetical" negotiation:

- for non-backup copies of TETRA Healthcare Federator, the trial court should presume the government would have purchased a production license, not a development license; alternatively, the trial court should price the development license at $2,400 per-core (without an additional volume discount);

- for backup copies of TETRA Healthcare Federator, the trial court should recalculate its one-time 20% convenience based on the correct baseline for non-backup copies (as specified immediately above); and

- for TETRA Enterprise Studio, the trial court should recalculate 4DD's damages based on their negotiated value (whether used or not) at a rate of one seat-license per user.

Respectfully submitted.

/s/ *Daniel L. Geyser*

Angela M. Oliver
HAYNES AND BOONE, LLP
800 17th Street N.W., Ste. 500
Washington, DC 20006

Daniel L. Geyser
HAYNES AND BOONE, LLP
2801 N. Harwood Street, Ste. 2300
Dallas, TX 75201

(202) 654-4552

*angela.oliver@haynesboone.com*

November 1, 2024

(303) 382-6219

*daniel.geyser@haynesboone.com*

*Counsel for Plaintiffs-Appellants*
*4DD Holdings, LLC, and*
*T4 Data Group, LLC*

# ADDENDUM

## INDEX TO ADDENDUM

| Document | Appx Pages |
| --- | --- |
| Judgment (Nov. 27, 2023) (Dkt. 351) | Appx16 |
| Public Trial Opinion (Aug. 22, 2023) (Dkt. 352) | Appx17–50 |
| Status Report Order (Oct. 23, 2023) (Dkt. 347) | Appx51–53 |
| Order of Nov. 20, 2023 (Dkt. 349) | Appx54 |
| Order of Apr. 26, 2024 (Dkt. 364) | Appx 55–64 |

# In the United States Court of Federal Claims

**No. 15-945 C**
**Filed: November 27, 2023**

**4DD HOLDINGS, LLC and**
**T4 DATA GROUP, LLC**
      **Plaintiffs**

    **v.**

**THE UNITED STATES**                                        **JUDGMENT**
      **Defendant**

    **and**

**IMMIX TECHNOLOGY,**
**INC.**
      **Defendant-Intervenor**

Pursuant to the court's Opinion, filed August 22, 2023, and Order, filed November 20, 2023,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that plaintiffs recover of and from the United States the amount of $12,683,065.86, which amount is inclusive of delay damages.

                                        Lisa L. Reyes
                                        Clerk of Court

                    By:    s/ Debra L. Samler

                                        Deputy Clerk

NOTE: As to appeal to the United States Court of Appeals for the Federal Circuit, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs.   Filing fee is $505.00.

# In the United States Court of Federal Claims

No. 15-945C
(Filed: August 22, 2023)
(Re-issued: November 30, 2023) [1]

* * * * * * * * * * * * * * * * * * * * * * * *

4DD HOLDINGS, LLC, and
T4 DATA GROUP, LLC,

                        *Plaintiffs*,

v.

THE UNITED STATES,

                        *Defendant*,

and

IMMIX TECHNOLOGY, INC.,

                        *Third-Party*.

* * * * * * * * * * * * * * * * * * * * * * * *

*Roman M. Silberfeld*, Los Angeles, CA, with whom were *Ronald J. Schutz*, *Christopher K. Larus*, *Bryan J. Mechell*, *Jessica Gutierrez*, *Zac Cohen*, *Stephanie A. Quartararo*, Minneapolis, MN, for plaintiff, 4DD Holdings, LLC, and T4 Data Group, LLC.

*John J. Todor*, Senior Trial Counsel, United States Department of Justice, Civil Division, with whom were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Elizabeth*

_____

[1] This opinion was originally issued under seal to afford the parties an opportunity to propose redactions of protected information.  Defendant proposed one redaction, which we have adopted.  Plaintiffs did not propose any redactions.  The redaction is indicated with the insertion of asterisks in place of the original material.

*M. Hosford*, Assistant Director, for defendant. *Scott Bolden*, Deputy Director, *Rachel Hicks*, *Andrew Hunter*, and *Stephen Smith*, of counsel.

,

OPINION

This action arises out of a software developer's claim for copyright infringement. It involves government officials who infringed a copyrighted computer software and then tried to hide the infringement by destroying evidence and misrepresenting their actions. The copyright owner, 4DD Holdings, LLC,[2] now sues the United States for infringement, seeking compensation for the tens of thousands of infringing copies made by the government.

We held a two-week trial in November 2022 with closing arguments held in June 2023. For the reasons provided below, we hold that the government infringed 4DD's copyright and, as a result, 4DD is entitled to its "reasonable and entire compensation." 28 U.S.C. § 1498(b) (2018).

BACKGROUND

**I.  The Need for Data Sharing Within the Department of Defense**

Accurate medical records are vital for doctors to provide effective healthcare. But for many decades, both the Department of Defense (DOD) and the Department of Veterans Affairs (VA) have struggled to maintain and supply comprehensive healthcare records for our nation's military members. They have struggled because they each store millions of healthcare records across hundreds of poorly connected databases. This often prevents doctors and nurses from obtaining a patient's complete medical record and impedes their ability to provide care.

To cure this data sharing problem, DOD created the Defense Health Management System Modernization (DHMSM) program. Def.'s Ex. (DX) 665A at 1–2. This "massive" and "complete refresh" of DOD's entire healthcare IT infrastructure was intended to eliminate DOD's data sharing problem because this new system would be able to create a single health

---

[2] Although there are two named plaintiffs, we refer to them as one. T4 Data Group is a subsidiary of 4DD Holdings.

record for every patient. Tr. 1505 (Christopher Miller).[3] An overhaul of this kind, however, would take many years to implement, and Congress did not share DOD's patience. Rather than wait, Congress gave DOD an ultimatum: solve the data sharing problem sooner or lose the funding for the project.

DOD understood that it could not pursue DHMSM without Congressional support. At the same time, it also did not want to abandon one of its top programs. *See* Tr. 1515 (Miller) (testifying that DHMSM was "easily in the top two or three programs for the Secretary of Defense"). To appease Congress, the Department also initiated the Defense Medical Information Exchange (DMIX) program, which would meet Congress's interoperability mandate by "improving [DOD's] near-term data sharing" problem. Tr. 1499 (Miller). Then, after Congress released the funding, DOD could return its focus to DHMSM—the program that was always its "long-term strategy." *Id.*; *accord* DX 665A at 1–2.

As the short-term interoperability solution, DMIX's purpose was to federate existing data. With information stored in hundreds of databases, DOD wanted a program that could harmonize information from disparate data sources and produce it in a single format. In essence, the program would display information as if it were coming from a single database even though it came from many.

DOD chose Systems Made Simple (SMS) as the lead contractor for the DMIX effort and tasked it with identifying and implementing a data federation solution. After considering many options—including an evaluation of competing products and their prices—SMS eventually selected Tetra Healthcare Federator, a commercial software developed by 4DD Holdings.

Tetra Healthcare Federator consists of several parts. The product's "main processing engine" is Tetra Services. Tr. 369 (Monty Myers). Tetra Services has no visual interface but is a "programming application interface" that allows computers to interact. Tr. 780 (Bennett McPhatter). Next, the record keeper is Tetra Audit. With Tetra Audit, the software maintains a history of every operation that the program runs. Tetra's final component is Tetra Snap Cache, a component that temporarily stores information, which allows it to be retrieved more quickly. Along with these components, Tetra Healthcare Federator also requires a separate program called Tetra Studio.

---

[3] Transcript references indicate the witness being cited.

Tetra Studio is a graphical interface and programming tool that allows software engineers to "enable and instruct Tetra [Healthcare Federator] how to function." Tr. 741 (Myers).

## II. 4DD Licenses Tetra to the Government

4DD licensed Tetra in the following way. For Tetra Healthcare Federator, which includes its several components, the software is licensed per computer core.[4] Computer cores represent a computer's processing power, and each Tetra license correlates with one core. For example, if a customer had a four-core computer, it would have to buy four Tetra Healthcare licenses—one for each core. Tetra Studio, on the other hand, is licensed per "seat" or per user. *See* Tr. 522 (Myers) ("A seat is synonymous with a name. It's a named user accessing that machine.").

Because 4DD had never sold its Tetra Healthcare product before, it had no established pricing. Nevertheless, its software was listed on Immix Technology's SEWP (Solutions for Enterprise-Wide Procurement) contract, and that contract adopted the following pricing scheme: One computer core of Tetra Healthcare Federator was listed at $24,000, and the software could be purchased in blocks of cores ranging from 8 to 512. To encourage larger purchases, 4DD offered a volume discount, meaning that as the number of purchased cores increased, the price per computer core decreased. Similarly, 4DD also sold Tetra Studio in blocks of seats ranging from 25 to 500. A single seat cost $6,000, but like the federator product, customers received a volume discount for larger purchases.

After SMS selected Tetra as the interoperability solution, the government licensed 64 cores of Tetra Healthcare Federator and 50 seats of Tetra Studio for roughly $1 million—the amount of other-direct-cost dollars remaining on SMS's contract.[5] This reduced price averaged to about $10,000

---

[4] In its licensing structure, 4DD did not distinguish between physical cores and virtual cores, and, as we explain below, there is no practical difference between them.

[5] The trial testimony indicated that these were the cores and seats necessary "to get started [on the project] right away, to show some progress on the project while [the government] end[ed] out the fiscal year and then [to] grow

per core and $3,000 per seat. The agreement also included several option years that let the government buy additional cores and seats at the same price.

In addition, the government also agreed to 4DD's End-User Licensing Agreement (EULA). Among many other things, 4DD's EULA prohibits users from copying Tetra. It included one exception, however, which allowed for a single backup copy in case "the original copy is damaged or destroyed." Pl.'s Trial Ex. (PTX) 5 at 5.

Within the government, only two employees seemed to know of the EULA's existence: (1) Dave Calvin, the chief engineer and contracting officer's representative for the DMIX contract; and (2) Sheila Swenson, the contracting officer's representative for the Tetra licensing agreement. Even their knowledge of the EULA's terms appears to have been limited, however. For example, Mr. Calvin did not know that the EULA prohibited copying because he "kind of . . . scann[ed] through that part" when he read the agreement. Tr. 1826 (Calvin). Neither Mr. Calvin nor Ms. Swenson told SMS that its use of Tetra was limited by 4DD's EULA.

Licensing agreements often require a method for monitoring license usage, and software companies like 4DD normally design their software to alert them when a copy of their software is activated.[6] That feature could not be used here, however, because it presented security risks to government networks. As a result, the responsibility to track license usage fell on the government, and 4DD had to "rely on [its] honesty." Joint Trial Ex. (JTX) 147 at 1.

Without any private enforcement tools, the license tracking responsibility fell to Ms. Swenson. Based on prior experience, Ms. Swenson was concerned with the government's ability to monitor its use of the license. She explained that the government "easily gets out of whack by standing up multiple [computers] for X purpose, never taking them down, and repurposing them." Then, "suddenly we need another 104 licenses." JTX 53 at 2 (cleaned up). For that reason, she asked 4DD to create a license tracking portal, hoping that it would "make the monitoring process as painless as

---

immediately after." Tr. 164 (Patrick Truxillo). Beyond that, however, the parties appeared to have conflicting expectations about how many cores and seats would be necessary for the entire project.

[6] This feature cannot detect inactive software copies, such as backups.

possible." *Id.*

The license tracking portal created by 4DD had limited enforcement value. Although it recorded Tetra installations and many other details, it suffered from serious weaknesses. First, the portal required the government to voluntarily supply information, and so dishonesty or negligence would nullify its effectiveness. Second, the portal only tracked Tetra downloads directly from 4DD; it did not contemplate other Tetra copies created by the government after the government downloaded and installed the software. Perhaps the portal's biggest flaw, however, was that Ms. Swenson never looked at it. Instead, her license tracking method essentially boiled down to one question for Mr. Calvin: "Do you need more [licenses]?" Tr. 1345 (Swenson). She never asked Mr. Calvin how many licenses were installed because she "just stupidly assumed he was under [the limit]." Tr. 1350 (Swenson).

### III.    The Software Development Lifecycle

After Tetra was selected, SMS began the software development lifecycle—the process that "includes testing, developing, and [eventually] releasing the software." Tr. 2109 (Ronald Schnell). Although Tetra is a commercial product, it was not immune from the development process because it required "code packages" or written instructions that told it "[w]hat to pull, what to push, [and] where to find things." Tr. 2126–27 (Schnell); *accord* Tr. 423 (Myers). Essentially, these code packages are wrapped around Tetra's object code, allowing the two to interact.

SMS used an "agile" software development process called "continuous integration and continuous application delivery." Tr. 407 (Myers). With continuous integration or agile development, software can be developed more quickly. Programmers no longer "wait on large releases" of software code but target "specific smaller goals." Tr. 2111 (Schnell). In doing so, code packages are tested sooner, which enables faster problem detection and correction. The process is also made quicker with applications that allow a central computer to automatically combine the work of several programmers, each of whom are working on their own piece of the software. *See* Tr. 447–48 (Myers) (explaining how programs like "Jenkins" automatically compile work).

Another critical aspect of agile development is the use of virtual machines. A virtual machine is a computer that "run[s] on top of" and resides in a physical computer. Tr. 2099 (Schnell); *accord* Tr. 424 (Myers).

Although the virtual machine exists within a physical computer, it is a distinct computer from the physical one it is running on.[7] *See* Tr. 424 (Myers). From the user's perspective, though, a virtual computer operates no differently from a physical one. *See* Tr. 2101 ("You can log into it, you can have it do tasks, [and] you can run programs on it just like it was a physical machine." (cleaned up)) (Schnell).

Virtual machines complement the agile development process because they are flexible and cheap. First, they reduce the number of physical computers needed because they can run remotely from one or several centrally located physical computers. Second, a physical computer is also static and constrained by its hardware specifications. A physical computer built with four processing cores will always have four processing cores. Virtual machines, on the other hand, are dynamic and can be created and managed however the user wants. *See* Tr. 426 (Myers). A virtual machine can begin with four computer cores but then be reconfigured within seconds to use more cores or less. This ability makes them ideal for agile software development.

The DMIX software development lifecycle started at SMS's laboratory. There, development proceeded in "sprints" or short bursts of programming and testing that lasted three weeks. Sprints began with software engineers writing code packages. Then, after the packages were written and compiled, engineers conducted three tests: (1) functional tests, which evaluated whether the code packages did what they were programmed to do; (2) performance tests, which evaluated whether the code packages functioned at full scale; and (3) integration tests, which evaluated whether the code packages communicated with the appropriate medical databases.

After a code package passed every test, it was released and transferred to a separate facility, the government's Development and Test Center (DTC).[8] Within the DTC, the government maintained two networks—".com" and ".mil"—that each had different security levels. The .com network had "practically no security," which allowed code packages to be transferred into the DTC with little risk to the government's networks. Tr. 1830 (Calvin).

---

[7] Because these virtual machines were distinct computers, software developers needed a Tetra Studio seat license for each of them.

[8] Although the DTC was a government facility, SMS remotely conducted the testing that occurred there.

Once the code packages were inside the .com network, they could then be secured or "stigged." Tr. 1831 That process often caused code packages to malfunction, however, so engineers had to continue to test and fix the packages. When a code package was fully secured and functional, it could then move to the secure .mil network. A code package completed the software development lifecycle once it could function inside the .mil network.

## IV.  The Government Violates the EULA

SMS's software development lifecycle ignored the EULA's prohibition against copying. As a result, SMS, working on DOD's behalf, created thousands of Tetra copies. Specifically, it regularly created backup copies that included Tetra, it cloned virtual machines that included Tetra, and it made new copies of Tetra any time that it released a code package to the DTC.

Using the license tracking portal—which, again, only contained the government's self-reported instances—4DD eventually determined that the government exceeded its license by at least 68 computer cores. It did not immediately alert the government, however, because it claimed that it wanted to support the project. *See* Tr. 200–01 (Patrick Truxillo). Several months later, as the end of the fiscal year approached, 4DD sent Ms. Swenson an invoice for what it believed were the excess cores. At the same time, 4DD also expressed its willingness to discuss an alternative licensing framework and to offer "unprecedented discounts for the enterprise use of Tetra." JTX 119 at 1.

Up until this point, Ms. Swenson was unaware that the government had exceeded its license. After 4DD notified her of the problem, she contacted Gina Walker, the contracting officer for the Tetra licensing agreement. Ms. Walker directed Ms. Swenson to initiate a "true-up" negotiation that would locate and pay for all the Tetra copies.

During the true-up negotiations, Ms. Swenson never allowed 4DD and SMS to communicate directly because she "didn't want a food fight between contractors." Tr. 1353 (Swenson). Instead, she independently worked with each "to make sure that [the government] had data from every place that [Tetra] could be loaded"—the SMS laboratory and the DTC. Tr. 1352 (Swenson). That process mainly entailed a convoluted exchange of spreadsheets in which the parties quarreled about how many Tetra copies existed.

Unfortunately, the government's left hand did not know what its right hand was doing. While Ms. Swenson worked to find Tetra copies, Mr. Calvin—without telling anyone—simultaneously ordered that the copies in the DTC be deleted. Although he testified that he did not order the deletions to avoid liability, his instructions at the time explained that there was "a license issue that [he] must clear up." JTX 124 at 2 (DTC Change Request). Either way, these deleted copies were never acknowledged during the true-up.

Next, after several months of exchanging spreadsheets, Mr. Calvin and Ms. Swenson "verified" that the government had installed Tetra on 64 computer cores in the DTC. JTX 130 at 1. That was not true, however, as Mr. Calvin had never looked for Tetra copies in the DTC. Tr. 1860–63 (Calvin). Instead, Ms. Swenson invented that number as a "placeholder" and conceded at trial that it was not "based on . . . any data from the DTC or SMS." Tr. 1455–56. (Swenson). Neither of them shared this knowledge with 4DD during the true up.

Several weeks later, the government and 4DD scheduled a final true-up meeting. Shortly before the meeting, Ms. Swenson and Mr. Calvin met to discuss a strategy. Mr. Calvin wanted Ms. Swenson to minimize the core number because he believed that the government was "getting screwed by 4DD's unique licensing structure." JTX 139 at 1. To that end, he suggested that she begin the negotiation with a core count of 168 and set a "ceiling" of 232. Ms. Swenson disagreed that the government was "getting screwed" but ultimately adopted Mr. Calvin's strategy.

Once the final meeting began, it "quickly became . . . very contentious." Tr. 1383 (Swenson). Arguments ensued about how many Tetra copies existed with little resolution achieved. Eventually, Ms. Swenson was "fed up" with the negotiations and screamed, "Stop!" Tr. 1384, 1425 (Swenson). She then asked, "Is [168 cores] the number? Is everybody good with this number?" Tr. 1384 (Swenson). She claims that "everybody was good with the number," *id.*, but she never told 4DD that she was "suspicious" of it because she "had no data from the DTC" and had not "evaluated all the data that was possible," Tr. 1448 (Swenson) (cleaned up).

After the parties agreed that the government exceeded the license by 168 cores, they needed to negotiate a price. To that end, 4DD met with Ms. Walker and demanded that the government buy the 168 excess cores at the SEWP price of $24,000 per core. Ms. Walker rejected that number, telling 4DD's representatives that if they wanted that price, they could "fight it out

9

**Appx25**

in court." Tr. 894 (McPhatter). She admitted that the government "made a mistake" with its copying, but she believed that it was only "fair that [it] pay the same price" of roughly $10,000 per core. Tr. 2025 (Walker). 4DD relented, and the parties settled at the original contract price for a total of $1.7 million. As part of the settlement, 4DD released the government from any further liability.[9]

## V. DOD Abandons Tetra

In 2014, shortly after Christopher Miller took charge of DOD's program office for military health systems, he ended DOD's work with Tetra, which essentially rendered the government's Tetra license worthless. In his view, SMS's work with Tetra was not "getting there in terms of the functionality and performance." Tr. 1543 (Miller). Instead, he believed that DOD could comply with Congress's interoperability mandate by simply improving its existing systems. Around that same time, DOD formally launched the DHMSM project, which it eventually awarded to a company called Leidos for a total value of $4.3 billion. The government did not tell 4DD about this decision, however, until several months later.

## VI. Procedural History

In August 2015, 4DD filed this suit for copyright infringement against the United States. Shortly after, the government moved to dismiss part of 4DD's claim for lack of subject matter jurisdiction. It argued that we lacked jurisdiction under 28 U.S.C. § 1498(b) because the United States did not authorize or consent to some of SMS's copying. We disagreed, holding that the government's "instructions, concessions, and acceptance of responsibility demonstrate that [it] authorized or consented to SMS's allegedly infringing use of the Tetra software."[10] *4DD Holdings, LLC v.*

---

[9] The release stated that "[i]n consideration of the modification agreed to herein, the contractor hereby releases the Government from any and all liability under this contract for further equitable adjustments attributable to such facts and circumstances giving rise to this particular modification." PTX 9 at 1.

[10] In addition, Mr. Calvin testified at trial that he "oversaw . . . anything to do with software engineering and development" for the DMIX project. Tr. 1741 (Calvin).

*United States*, 143 Fed. Cl. 118, 130 (2019).

With the jurisdictional question resolved, the parties proceeded with discovery.[11] Through discovery, 4DD learned that relevant evidence had been destroyed, prompting it to move for sanctions. We found that three categories of evidence had been destroyed, all of which "would have aided in determining the extent of the government's use of 4DD's software": (1) the Tetra copies in the DTC; (2) the laptops issued by the government to SMS employees; and (3) the DTC servers. *Id.* at 134.

For the first two categories, we held that the government intentionally destroyed the evidence to deprive 4DD from using it in litigation. First, in the DTC, we concluded that Mr. Calvin intentionally destroyed Tetra copies because he explained then that those copies needed to be deleted because of "a license issue." *Id.* at 133. Second, when it came to the SMS laptops, we concluded that the government lacked "any credible explanation for [why] the deletion" occurred several months after the complaint was filed and a preservation hold had been issued. *Id.* As a result, we presumed that information about these categories would be unfavorable to the government and left the application of that presumption for trial.[12] For the third category, however, we concluded that there was "not a pattern of willful behavior." *Id.* Instead, the destruction resulted from negligence and "a failure to communicate." *Id.* We declined to apply any adverse inference to the destruction of the DTC servers.

After discovery, both parties moved for summary judgment. 4DD's motion advanced four arguments: (1) that it had a valid copyright for Tetra; (2) that 4DD's EULA prohibited copying of Tetra's object code as a condition precedent; (3) that any copying that exceeded the EULA's limit would constitute copyright infringement; and (4) that the government created thousands of infringing copies. We granted 4DD's motion with respect to the first three issues. To the fourth, however, the issue was left for trial because it was unclear how many Tetra copies the government had created. *See 4DD*

---

[11] The parties completed factual discovery before we resolved the motion to dismiss. They then proceeded with expert discovery.

[12] In addition, we shifted roughly $1.1 million of 4DD's fees that were related to the government's destruction of evidence. *See 4DD Holdings, LLC v. United States*, 153 Fed. Cl. 371 (2021).

*Holdings, LLC v. United States*, 159 Fed. Cl. 337, 343–51 (2022).

The government cross-moved for summary judgment on two grounds, both of which we rejected. First, the government argued that 4DD's copyright claim was barred by the release of liability that it signed as part of the true-up. We agreed that the release, if valid, would bar 4DD's claim but held that factual questions about its validity still existed. Second, the government argued that it could make most of the Tetra copies as an owner of the software under the Copyright Act.[13] We disagreed and held that the government was not an owner but merely a licensee. *See id.* at 351–56.

DISCUSSION

## I. The Government's Affirmative Defenses

### A. Release of Liability

Before moving to whether the government infringed 4DD's copyright, a threshold issue exists. As explained above, after 4DD realized that the government made unauthorized Tetra copies, the parties engaged in a true-up negotiation. As a result, and in exchange for buying the over-installed copies, 4DD released the government from any other liability. If that release is valid, 4DD's copyright claim is barred.[14]

A release is "a contract whereby a party abandons a claim or relinquishes a right that could be asserted against another." *Holland v. United States*, 621 F.3d 1366, 1377 (Fed. Cir. 2010). "If a party's manifestation of assent" to a release "is induced by either a fraudulent or a material

---

[13] In limited circumstances, the Copyright Act allows "the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program." 17 U.S.C. § 117(a).

[14] The parties appear to use the terms "release" and "accord and satisfaction" interchangeably, but they are "separate contractual defenses." *Holland v. United States*, 621 F.3d 1366, 1377 (Fed. Cir. 2010). While an agreement could "constitute both a release and an accord and satisfaction," *id.*, we use only the terminology relating to "release" for simplicity. In the end, whether the true-up agreement is characterized as a "release" or an "accord and satisfaction" makes no difference; both are invalid if there is misrepresentation. *See, e.g.*, *Kenbridge Constr. Co. v. United States*, 28 Fed. Cl. 762, 765 (1993).

misrepresentation . . . the contract is voidable by the recipient." *C & H Com. Contractors, Inc. v. United States*, 35 Fed. Cl. 246, 256 (1996). Misrepresentation, as a contractual defense, contains four elements: (1) a party misrepresented a fact; (2) the misrepresentation was fraudulent or material; (3) the other party relied on the misrepresentation; and (4) the other party was justified in relying on the misrepresentation. *Id.*

The government argues that the release is valid for three reasons. First, the government argues that it never misrepresented any facts. Second, it claims that even if it did misrepresent facts, none of them were material. And third, it maintains that 4DD could not reasonably rely on any material misrepresentations. We disagree, and for the reasons below, hold that the government fraudulently and materially misrepresented the extent of its copying, which invalidates the release.

### 1.   Misrepresentation of Fact

First, a party engages in misrepresentation if it makes "an assertion that is not in accord with the facts." *Barrer v. Women's Nat'l Bank*, 761 F.2d 752, 758 (D.C. Cir. 1985). Unlike fraud, however, misrepresentation "does not require an intent to deceive." *First Interstate Bank of Billings v. United States*, 61 F.3d 876, 880 (Fed. Cir. 1995). Instead, "ignorance or carelessness" can suffice. *CanPro Invs. Ltd. v. United States*, 130 Fed. Cl. 320, 343 (2017). At the same time, concealment—which is "an affirmative act intended or known to be likely to keep another from learning of a fact of which he would otherwise have learned"—is "always equivalent to a misrepresentation and has [the same] effect." *Id.* In either case, though, the misrepresentation must relate to facts existing "at the time the assertion is made" and not "to future events." *Fed. Grp., Inc. v. United States*, 67 Fed. Cl. 87, 102 (2005).

The evidence shows that the government misrepresented facts throughout the true-up negotiation. First, Mr. Calvin deleted Tetra copies in the DTC to prevent 4DD from learning about them. *4DD Holdings*, 143 Fed. Cl. at 134. In doing so, he should have known that his actions were "likely to keep [4DD] from learning of a fact" that it "would otherwise have learned." *CanPro*, 130 Fed. Cl. at 343. And because he did not tell 4DD about these deleted copies, the government's representation about the number of prohibited copies was "not in accord with the facts." *Barrer*, 761 F.2d at 758.

Second, Mr. Calvin and Ms. Swenson falsely represented that they had "verified" the number of Tetra installations in the DTC. This was not

true because Ms. Swenson had instead created that number as a "placeholder" and later admitted that it was not "based on . . . any data from the DTC." Tr. 1455–56 (Swenson). In addition, Mr. Calvin testified that he never looked for Tetra copies in the DTC. Tr. 1860–63 (Calvin).

Finally, Ms. Swenson never told 4DD that she had not "evaluated all the data that was possible." Tr. 1448 (Swenson) (cleaned up). Nor did she tell 4DD about her suspicion of the final number. Thus, through her silence, she carelessly misrepresented the government's efforts and the final number's accuracy.

## 2. Materiality of the Misrepresentation

Second, a misrepresentation must either be fraudulent or material. Restatement (Second) of Contracts § 164. First, a misrepresentation is fraudulent if the maker (1) "knows or believes that the assertion is not in accord with the facts," (2) "does not have the confidence that he states or implies in the truth of the assertion," or (3) "knows that he does not have the basis that he states or implies for the assertion." *Id.* § 162. Second, a misrepresentation is material if "it would be likely to induce a reasonable person to manifest his assent," or "if the maker knows that it would be likely to induce the recipient to do so." *AT&T Commc'n, Inc. v. Perry*, 296 F.3d 1307, 1312 (Fed. Cir. 2002).

Here, the government fraudulently misrepresented the number of Tetra copies that it had made. Because Mr. Calvin deleted Tetra copies, he knew that the government's representations about the number of copies were untrue. Similarly, Mr. Calvin and Ms. Swenson both knew that the government never "verified" the number of cores in the DTC. Thus, in each case, the government "kn[ew] . . . that [its] assertion[s] [were] not in accord with the facts." Restatement (Second) of Contracts § 162.

In addition, the government's misrepresentations were also material. The purpose of the true-up negotiation was to "identify every [Tetra] instance." Tr. 1351 (Swenson). Thus, an accurate copy count is a basic fact that lies at the heart of the true-up agreement. The government should have known that its misrepresentations—which severely downplayed the extent of the government's license violation—"would be likely to induce" 4DD to agree to the release. *AT&T Commc'ns*, 296 F.3d at 1312.

## 3. Reliance on the Misrepresentation

Third, a misrepresentation must also be "causally related to the

14

recipient's decision to agree to the contract." *Barrer*, 761 F.2d at 759. Reliance on the misrepresented fact "need not, however, be the sole or predominant factor influencing the recipient's decision." *Id.* Because the government presented no evidence to the contrary, we conclude that its misrepresentations were "causally related" to 4DD's "decision to agree to the" release. *Id.*

### 4.   Justifiable (or Reasonable) Reliance

Finally, "[o]ne of the central elements of the doctrine of misrepresentation is that the injured party's reliance upon the statement must have been innocent or reasonable." *Gregory Lumber Co. v. United States*, 11 Cl. Ct. 489, 503 (1986). Here, 4DD reasonably relied on the government's misrepresentations. The government requires software providers to disable most features that allow for license enforcement, and in doing so, the government understands that those software providers must trust the government. *See* JTX 147 at 1 ("[T]he [software] vendors rely on the honesty of the government.") (email from   Mr. Calvin to Ms. Walker). In circumstances such as these, where the government forces software providers to remain in the dark, it cannot later claim that those software providers have unreasonably relied on government misrepresentations.

The government offers two main reasons for why 4DD could not rely on the government's misrepresentations, neither of which we find persuasive. First, the government argues that 4DD knew the investigation in the DTC was unfinished when it agreed to the release. While we find that implausible based on the government's other representations, it makes no difference because there was not an ongoing investigation in the DTC. Tr. 1860–63 (Calvin). Second, the government reminds us of a contractual clause that allowed 4DD to *request* to examine DTC computers, but that is also irrelevant. In the unlikely event that the government allowed 4DD to search the DTC, that search would have been futile because the government had already deleted the Tetra copies in the DTC.

We also note that the government made little effort in its factual presentation at trial to establish 4DD's knowledge of the government's copying. Although some 4DD employees were part of SMS's team, the government offered us no real basis for understanding the role those employees played. Indeed, the only 4DD employee that the government called as a witness, Mr. Duane Epperly, remembered almost nothing about his time working with SMS.

We therefore hold that the release does not bar 4DD's claim. The government fraudulently and materially misrepresented the extent of its copyright infringement, and it cannot now invoke that agreement to bar 4DD's copyright claim.

### B.  Equitable Estoppel

Even without the release, 4DD's copyright claim is still estopped, the government argues, because 4DD delayed suit after it knew about the government's over-installations.[15] Equitable estoppel, as its name suggests, is an equitable defense that applies "when a copyright owner engages in intentionally misleading representations concerning his abstention from suit, and the alleged infringer detrimentally relies on the copyright owner's deception." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 684 (2014).

Equitable defenses, however, require "clean hands." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). While "[c]lean hands" does not mean that those who "assert[] equitable defenses" must have lived "blameless lives," it does require that they "act[] fairly and without fraud or deceit as to the controversy in issue." *Melrose Assocs., L.P. v. United States*, 43 Fed. Cl. 124, 150 (1999). That makes sense given that courts should not be "the abett[ors] of iniquity." *Precision*, 324 U.S. at 814. To that end, then, courts have a "wide range . . . of discretion in refusing to aid the unclean litigant." *Id.* at 815.

The government comes before the court with unclean hands. It has intentionally destroyed evidence and lied to 4DD about its actions. Thus, it has not "acted fairly and without fraud or deceit," and so we will not apply the doctrine to bar 4DD's claim. *Melrose*, 43 Fed. Cl. at 150.

Even setting that aside, equitable estoppel would still not apply. Equitable estoppel includes three elements: (1) "misleading conduct, which may include not only statements and actions but silence and inaction, [that]

---

[15] The government's briefing is unclear as to what behavior by 4DD gives rise to this defense. If the justification is solely delay, the appropriate defense is laches. "The test for estoppel is more exacting than the test for laches, and the two defenses are differently oriented." *Petrella*, 572 U.S. at 684. When it comes to estoppel, "[d]elay may be involved, but [it] is not an element of the defense." *Id.* at 684–85.

lead[s] another to reasonably infer that rights will not be asserted against it"; (2) "reliance upon th[e] [misleading] conduct"; and (3) "material prejudice" because of the party's reliance. *Mabus v. Gen. Dynamics C4 Sys., Inc.*, 633 F.3d 1356, 1359 (Fed. Cir. 2011).

The government claims that it was misled because 4DD never objected to the government's over-installations. To begin with, we find that the government failed to prove that 4DD fully understood or should have fully understood the extent of the government's infringement. But regardless, the government cannot rely on 4DD's failure to object as evidence of misleading conduct because 4DD's EULA contained a non-waiver clause. *See Long Island Sav. Bank, FSB v. United States*, 503 F.3d 1234, 1252–53 (Fed. Cir. 2007) (stating that "a failure to object does not amount to evidence of waiver" when an agreement contains a non-waiver clause).

In any event, the government did not offer any proof that it relied on conduct from 4DD. Indeed, the government presented no evidence that a government official believed his or her actions were unlawful yet continued copying because of misleading conduct by 4DD. If anything, the opposite is true as government employee witnesses testified that they did not believe their actions violated 4DD's EULA (with some who appear to still hold that belief). To argue that government employees were somehow duped is disingenuous at best. Thus, we hold that 4DD is not estopped from bringing its copyright infringement claim.

## II. Copyright Infringement

### A. Copyright Act

Under the Copyright Act, "the owner of [a] copyright" has "the exclusive right[]" to "reproduce the copyrighted work in copies." 17 U.S.C. § 106(1). A "copy," the Act tells us, is a "material object[] . . . in which a work is fixed by any method . . . and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." § 101. And within that definition, a material object is "fixed," when it is "sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." *Id.*

While the Act gives the copyright owner the right "to publish, copy, and distribute the author's work," *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 547 (1985), "[n]ot all copying . . . is copyright

infringement," *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). A "copy" is only infringing if it contains "constituent elements of the work that are original." *Id.* In other words, the portions copied by the alleged infringer must contain protected elements of the copyrighted work. In the computer software context, that refers to portions of a software's coding that are original to the author. *See Atari Games Corp. v. Nintendo of Am., Inc.*, 975 F.2d 832, 840 (Fed. Cir. 1992).

Often, determining which portions of a copyrighted work contain protectable expression under the Copyright Act is difficult. *See, e.g.*, *Tanksley v. Daniels*, 902 F.3d 165, 174–75 (3d Cir. 2018). And that is especially true when the copyrighted work is computer software. *See, e.g.*, *SAS Inst., Inc. v. World Programming Ltd.*, 64 F.4th 1319, 1326–27 (Fed. Cir. 2023) (explaining the "abstraction-filtration-comparison method"). Fortunately, we need not undertake that challenging task here because every Tetra copy created by the government contained Tetra's complete object code, and "verbatim copying is infringement." *Atari Games*, 975 F.2d at 840.

When it comes to a license agreement, however, the issue is more nuanced. That is because these agreements often contemplate some form of permissible copying, and so the scope of the license agreement defines what constitutes unlawful reproduction under the Copyright Act. Infringement in this context, then, requires that "the copying [is] beyond the scope of a license possessed by the" licensee. *Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307, 1315–16 (Fed. Cir. 2005); *accord MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 940 (9th Cir. 2010) (stating that "copyright infringement based on breach of a license agreement" requires "copying [that] exceed[s] the scope of the defendant's license").

From these cases, we can distill the following rule. Copies of computer software subject to a license agreement infringe a copyright if two things are true: (1) the copies include original software code, and (2) the copying exceeds the scope of the license agreement.

## B. Tetra Copies

To answer the liability question, we must determine how many Tetra copies the government created in excess of the license. Because the government destroyed much of the direct evidence, 4DD's computer science expert, Mr. Monty Myers, attempted to forensically recreate the DMIX

project.[16] As a result, all the copies he identifies are inferred from about 2 million documents related to the government's plans, communications, and procedures.

Using these documents, Mr. Myers searched for any evidence of complete copies of Tetra's object code. Object code is also known as "machine code" and is the code that runs on the computer. Tr. 368–69 (Myers). If Mr. Myers found evidence that an SMS or DTC environment contained the complete object code of at least one of the Tetra components (e.g., Tetra Services), he counted it as a copy. For Tetra Studio, however, which is licensed per seat, Mr. Myers used a different approach and only counted Tetra Studio instances that were installed on a machine with at least one other Tetra Healthcare Federator component.

Next, as Mr. Myers identified Tetra copies, he categorized them into seven groups: (1) deployed virtual machine copies, (2) deployed update copies, (3) distribution open virtual access (OVA) copies, (4) deployed OVA copies, (5) full reserve virtual machine copies, (6) full backup operating system copies, and (7) Random Access Memory (RAM) copies. These categories have no legal or technical significance, but we adopt them as a convenient way to conceptualize the copies created by the government.

First, a deployed virtual machine copy is the most basic form of Tetra copy and reflects a Tetra copy that SMS installed on an active virtual machine. Second, the deployed update category includes all the copies that SMS made during the continuous integration software development process. In other words, these were the Tetra copies embedded in SMS's code packages that moved through the software development lifecycle. Third, the distribution OVA category refers to copies that were made when the government transferred code packages from the SMS lab to the DTC. Because an "air gap" existed between these two locations, the government used physical transfer mediums like Universal Service Buses to release the code packages to the DTC.

Fourth, the deployed OVA category covers backup copies produced

---

[16] Mr. Myers testified that the following destroyed evidence would have enabled this court to determine the exact number of Tetra copies created by the government: (1) the source code control history; (2) the automated build systems; (3) the computers containing Tetra; and (4) historical records about image repositories, media transfer systems, and backup copies.

in the DTC's "library repository." Tr. 545 (Myers). The library repository was "the master brain of the DTC" and retained "a copy of every" virtual machine. *Id.* Fifth, the full reserve virtual machine category included all the virtual machine backups created by SMS. Sixth, the last backup category encompasses the full backup operating systems copies, which were copies that contained a backup of "everything on [a particular] system." Tr. 555 (Myers). Essentially, these copies were a failsafe or "a backup approach to the backup." Tr. 560 (Myers).

The last category consists of RAM copies. These were distinct Tetra copies created by a virtual machine anytime Tetra was activated. When a program is activated, a computer creates a second copy of the program and loads it into the RAM. These copies are only temporary, however, because the RAM is emptied whenever the computer shuts down.

After categorizing Tetra copies into these groups, Mr. Myers attempted to associate these copies with computer cores and seats—a task relevant to both infringement and damages. While the EULA prohibited all copying of Tetra's object code (except for one backup copy), a copy's value is relative to the number of cores or seats associated with it. To illustrate, one copy associated with four computer cores would require the customer to buy four Tetra licenses. Yet if that same copy was instead associated with 64 computer cores, the customer would now need to buy 64 Tetra licenses. Thus, the copy's value increases or decreases with the number of associated cores or seats. At the same time, the number of associated cores and seats also tells us by how many cores and seats the government exceeded the license.

Mr. Myers had several methods for associating computer cores with Tetra copies. First, many virtual machines had documented Internet Protocol addresses, which allowed Mr. Myers to learn how many computer cores belonged to those machines. Second, some SMS documents recorded the core counts for other virtual machines. And third, for Tetra copies like backups, the virtual machine's core count was also saved along with the Tetra code. For Tetra Studio, however, Mr. Myers associated seats with each person "that had access to" a Tetra Studio copy. Tr. 708 (Myers).

Mr. Myers's analysis led to these results[17]:

---

[17] These results do not include any backup copies (or their associated cores) created after September 2014. Although the government continued to create backup copies until July 2015—and even though 4DD claims in its brief that

| Tetra Healthcare Federator | | |
|---|---|---|
| Category | Copies | Cores |
| Deployed Virtual Machine | 162 | 1,296 |
| Deployed Update | 7,223 | 29,308 |
| Deployed OVA | 162 | 1,296 |
| Distribution OVA | 213 | 1,584 |
| Full Reserve Virtual Machine | 33,306 | 228,770 |
| Full Backup Operating System | 958 | 6,952 |
| RAM | 5,006 | 21,128 |
| **Total:** | 47,030 | 290,334 |

| Tetra Studio | | |
|---|---|---|
| Category | Copies | Seats |
| Deployed Virtual Machine | 162 | 2,473 |
| Deployed OVA | 162 | 0 |
| Distribution OVA | 213 | 0 |

---

it "is entitled to damages for each of the infringing copies made by the Government"—4DD appears to have voluntarily relinquished its claim to damages for backup copies created after September 2014. *See* Pl.'s Post-Trial Br. at 18–19. For example, Mr. Myers testified that he identified 64,386 full reserve virtual machine copies and that he associated them with 477,410 computer cores. Yet 4DD seeks compensation for only 33,000 of those copies and 228,000 of those cores, and it offers no explanation for why it should not be compensated for the other infringing copies. Thus, it appears to have excluded these copies, and we abide by its decision.

21

**Appx37**

| Deployed Update | 7,222 | 168,948 |
|---|---|---|
| Full Reserve Virtual Machine | 33,208 | 0 |
| Full Backup Operating System | 958 | 0 |
| **Total:** | 41,925 | 171,421 |

In response, the government offered its own computer science expert, Mr. Ronald Schnell. Unlike Mr. Myers, however, Mr. Schnell did not attempt to independently count Tetra copies. Instead, he only addressed why, from a computer science perspective, certain categories did not infringe.

First, Mr. Schnell disputes the deployed virtual machine category because he claims that these copies were not "runnable" or functional. Tr. 2186 (Schnell). As he defines it, a copy is runnable or functional if it can "run in its present configuration." Tr. 2282 (Schnell). Second, Mr. Schnell also disputes four other categories—the deployed OVA copies, the distribution OVA copies, the full reserve virtual machine copies, and the full backup operating system copies—because these copies did not "have any [computer] cores that [could] run Tetra." Tr. 2181 (Schnell). In his view, any copy that could not run or use computer cores cannot count against a software license.[18]

We cannot adopt Mr. Schnell's criticisms. To his point that only runnable software copies should count, there is nothing in copyright law to support that position. Indeed, the government cites no case (and we have found none) in which a court shielded one party's otherwise infringing

_____

[18] Mr. Schnell also disputes the RAM category, but his reasoning lacked a scientific basis. We cannot count these copies, he says, because doing so would "basically make[] every computer user a software pirate." Tr. 2147 (Schnell). Whether or not that is true, courts have uniformly held that RAM copies can infringe. *See Storage Tech. Corp.*, 421 F.3d at 1311 (acknowledging that RAM copies can infringe under the Copyright Act); *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 519 (9th Cir. 1993) (same). We cannot exclude RAM copies simply because Mr. Schnell believes that doing so would be good policy.

behavior because that party happened to save those infringing copies in a non-runnable state.

In addition, excluding non-runnable copies would contradict the Copyright Act's text. As always, "[w]hen a statute includes an explicit definition, we must follow that definition," even if it varies from a term's ordinary" or even computer science meaning. *Dig. Realty Tr. v. Somers*, 138 S. Ct. 767, 776 (2018). The Copyright Act defines a "copy" as any "material object[] . . . in which a work is fixed by any method . . . and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." § 101. Non-runnable copies can be "perceived" or "reproduced" in a fixed state, and that is enough to be a "copy" under the Copyright Act.[19]

Nor can we exclude Tetra copies that Mr. Schnell claims had no associated cores. Again, when a licensing agreement exists, a copy is infringing if it is "beyond the scope of [the] license." *Storage Tech. Corp.*, 421 F.3d at 1315–16. Here, the license generally prohibited copying, and it made no exception for copies that lacked any associated cores.

Thus, we hold that each category contains infringing Tetra copies. First, these copies all include protected object code of at least one Tetra component. And second, these copies all exceed the license's scope. As for the number of infringing copies, we must accept Mr. Myers's count. The government provided no contrary proof, and each category falls squarely within our spoliation order, so we must presume that any missing evidence is unfavorable to the government. While the adverse inference does not mean that we must rubber stamp Mr. Myers's opinion, we find nothing unreasonable about it. Although some portions contain some amount of speculation, the government must live with the consequences of its evidence destruction.

## III.   Damages

With the extent of the government's copyright infringement

---

[19] Even if runnability had legal significance, the government destroyed these copies. As we noted in our spoliation order, if runnability was "relevant, [4DD] effectively cannot combat the assertion because the copies no longer exist." 143 Fed. Cl. at 133. Thus, the adverse inference would attach, and we would presume that the evidence is unfavorable.

established, the only remaining question is the amount of 4DD's damages. Congress, through 28 U.S.C. § 1498(b), waived sovereign immunity to allow copyright owners to recover from the United States their "reasonable and entire compensation" for copyright infringement. 28 U.S.C. § 1498(b); *Gaylord v. United States*, 777 F.3d 1363, 1367 (Fed. Cir. 2015) (*Gaylord III*). The computation of "reasonable and entire compensation" under Section 1498(b) is essentially identical to "actual damages" under the Copyright Act. *Gaylord v. United States*, 678 F.3d 1339, 1343 (Fed. Cir. 2012) (*Gaylord II*).

### A. Established Royalty Rate

In 4DD's view, the Copyright Act entitles it to anywhere from $3 to $5 billion as compensation for the government's infringement. It arrives at this range by adopting Mr. Myers's computer core count of 290,334 and pricing them as high as $17,000 per core (its volume discounted SEWP price). That staggering amount should not concern us, it maintains, because Abraham Lincoln once famously said that "[i]t is as much the duty of government to render prompt justice against itself in favor of citizens, as it is to administer the same between private individuals." Pl.'s Post-Trial Br. at 96. On that basis, 4DD urges us to treat the government like any private party and require it to pay 4DD's "established royalty rate" for what it took.

An "established royalty rate" does not spring into existence any time ink hits the page in a licensing agreement, however. *See Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995). Among other things, it requires "general acquiescence" by a significant "number of persons." *Sun Studs, Inc. v. ATA Equip. Leasing, Inc.*, 872 F.2d 978, 993 (Fed. Cir. 1989), *overruled on other grounds*, *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020 (Fed. Cir. 1992). Here, 4DD has never sold its Tetra Healthcare product to any entity other than the government, and so with only one customer and effectively one sale, it can hardly claim that it has an established royalty rate that entitles it to $5 billion. Nor do we think President Lincoln would have been sanguine about 4DD's claim.

### B. Non-Infringing Alternative

The government argues that another software called Rhapsody was available as a non-infringing alternative to Tetra and that its existence should cap 4DD's damages. We are hesitant, however, to incorporate this patent law concept into copyright law. "The two areas of the law, naturally, are not identical twins . . . ." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 439 n.19 (1984). And so, "[w]hile it may often be useful to look to

patent law decisions for guidance in the resolution of questions of copyright law, the inquiry must take into account differences between these aspects of intellectual property." *Wechsberg v. United States*, 54 Fed. Cl. 158, 162 (2002) (citation omitted).

We decline to apply the non-infringing alternative analysis as a mechanical damages cap for two reasons. First, the relevance of a non-infringing alternative has more force in patent law. Patent law requires novelty and protects only "genuine invention[s] or discover[ies]." *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 230 (1964). In other words, a patent's value is found largely in the idea that nothing else like the product or process exists. *See Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1350–51 (Fed. Cir. 1999). The novelty induces the purchase, so the value decreases when alternative products exist. *See id.*

These patent principles, however, do not apply with equal force to copyrights. Unlike patents, copyrighted works need only be "original"—not novel. *Feist*, 499 U.S. at 345 ("Originality does not signify novelty."). And "the requisite level of creativity" for originality is "minimal" or "extremely low." *Id.* Thus, by inserting originality instead of novelty, copyright law contemplates that many expressions of the same idea will exist.

Because a purchaser does not a pay a "novelty premium" for a copyrighted work, the existence of other non-infringing alternatives is irrelevant; it does not affect the copyrighted work's protection. While the nature of computer software may be somewhat opaque, a simpler example from literature proves the point. If someone infringed the copyright of an author's mystery novel, we would not reduce the value of his book simply because thousands of other mystery novels exist. In fact, it would be nonsensical to think that the value of that novel depended on how many other mystery novels there were. Instead, we value the novel by the quality of the author's expression. That principle is no less true in the more complex world of computer software.

Second, we are not convinced that a "non-infringing alternative" to a copyright even exists. Copyrights and patents are not analogous on this point. Imagine an inventor who created a new process for achieving a particular outcome that meets all the requirements for a valid patent. Patent law protects the inventor's idea, which in our example is a particular process that achieves a specific result. Sometime later, however, another individual discovers an entirely different process for achieving that same result. In that case, we could properly classify the second process as a non-infringing alternative

25

method for obtaining the desired result.

If we try to import this same sequence into the copyright context, absurd results follow. Consider again our hypothetical author who writes mystery novels. Copyright law does not protect the underlying idea—in this example, the mystery concept itself—but protects the author's particular expression of that idea (*his or her* mystery novel). For a supposed alternative to be "non-infringing" in the copyright context, then, another person must be able to express the author's expression without copying that expression. That does not appear possible, yet that is what the law would require.

In the end, while an alternative software product can be a relevant consideration in a hypothetical negotiation, *Gaylord III*, 777 F.3d at 1370, it cannot cap damages in the way that the government asks. In effect, what the government seeks is a "name your own price tool," through which it can mix and match the software it wants with the price it wants. It would no longer need to pay higher prices for better software because, according to the government, it can just engage in mass copying of its preferred software, and if the copyright owner sues for infringement, it can simply point to a cheaper, unused software and declare that price to be the limit of infringement. We decline the government's invitation to limit damages in this way.

### C. Hypothetical Negotiation

Normally, a copyright owner proves its entitlement to damages under the Copyright Act through evidence of lost sales or diminished copyright value. But when, as here, copyright infringement has not produced lost sales or opportunities or diminished the copyright's value, damages are instead calculated based on a reasonable license fee, which we determine using a hypothetical negotiation. *Id.* We use this method to prevent the "infringer [from] get[ting] his taking for free" and to ensure that copyright owners are not "left uncompensated for the illegal taking of something of value." *E.g.*, *On Davis v. The Gap, Inc.*, 246 F.3d 152, 164 (2d Cir. 2001).

In conducting this hypothetical negotiation, we look to the economic realities using the factors suggested in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970). *See Gaylord III*, 777 F.3d at 1367–68 (endorsing the use of objective factors from patent law in copyright cases). We also consider all the relevant facts—not just those known by the parties at the time. *E.g., Sinclair Refin. Co. v. Jenkins Petrol. Process Co.*, 289 U.S. 689, 698 (1933) (explaining how the facts between infringement and trial establish a "book of wisdom that courts may not

neglect").

We must assume that this negotiation is between a willing buyer and a willing seller. *Gaylord III*, 777 F.3d at 1367. This means that sellers cannot charge what they would like to as if "unconstrained by reality," *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1088 (9th Cir. 2014), and buyers cannot simply name a price that they "would prefer to pay," *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1555 (Fed. Cir. 1995). While we need not assess the license fee with "mathematical exactness," we must be able to reasonably approximate it. *Gaylord III*, 777 F.3d at 1367. Still, "[s]ome difficulty in quantifying the damages attributable to the infringement should not bar recovery." *Id.* at 1368.

### 1.   Date of Hypothetical Negotiation

Before we can conduct this hypothetical negotiation, we must first establish when it would have occurred. That is because our hypothetical negotiation is generally limited by the information available to the parties on that date. That said, we can consider some information that would come to light after the hypothetical negotiation. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1331 (Fed. Cir. 2009) (discussing the book of wisdom). The date of the hypothetical negotiation is the same as the date of first infringement. *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 75 (Fed. Cir. 2012).

The parties dispute the date of first infringement. According to 4DD, the government installed its first infringing Tetra copy on August 27, 2013. The government disagrees, and claims that its infringement did not begin until several months later around December 2013. Yet again, the government's spoliation prevents us from answering this question. If it had not destroyed or reimaged the machines containing Tetra, we could determine when it created the first infringing copy. As a result, we presume that this evidence was unfavorable to the government and would have proven that its infringement began on August 27, 2013.

### 2.   *Georgia-Pacific* Factors

With the date of negotiation now set, our next task is to evaluate the parties' bargaining strength based on the *Georgia-Pacific* factors. On the one hand, 4DD's damages expert, Ms. Elizabeth Dean, believes that 4DD holds the superior bargaining position because of Congress's immense pressure for DOD to solve its interoperability problem and because every Tetra

alternative was more expensive. *See* PTX 905 at 40 (Ms. Dean's Expert Report) (explaining that the next best software cost $31,197 per core). Ms. Dean does not, however, reference the *Georgia-Pacific* factors nor explain their application to this case.

On the other hand, the government's damages expert, Mr. David Kennedy believes that the government enjoys the superior bargaining position because he contends that the government could have used a cheaper software called Rhapsody and because Tetra has had little economic success. Ultimately, for the reasons below, we agree with Mr. Kennedy that the government holds a significantly stronger bargaining position.

We view three *Georgia-Pacific* factors as most relevant to assessing the hypothetical negotiation's outcome here: (1) the infringer's use of the copyrighted software and its associated value, (2) the "established profitability" of the copyrighted software, and (3) the "rates paid" by the government for the use of other similar software. 318 F. Supp. at 1120. We note that Mr. Kennedy claims that a fourth factor—the commercial relationship between the parties—would apply downward pressure in this hypothetical negotiation. Essentially, he believes that the commercial relationship between 4DD and the government is akin to the relationship between an inventor and a promoter. We disagree and do not believe that this factor has any relevance in the hypothetical negotiation here.

First, most damaging to 4DD's bargaining position is that the government's use of Tetra provided it with little value. Tetra never made it beyond the development stage and, as a result, never solved the government's interoperability problem. In addition, even if Tetra had provided interoperability, it would have been replaced by DHMSM shortly after. In other words, the government had little to no incentive to commit to any long-term use of Tetra. Still, before the government replaced Tetra, it did benefit from its infringing use because it could "easily and rapidly deploy, clone, relocate or restore instances necessary to keep the [DMIX] project on track." PTX 905 at 51; *accord* Tr. 1576 (Miller). Nevertheless, we agree with Mr. Kennedy that this minimal value would have weakened 4DD's bargaining position; the government would not pay billions of dollars for what would have been, at best, an interim solution.

Second, 4DD's Tetra Healthcare Federator has no established profitability. In fact, other than its agreement with the government, 4DD has never sold its healthcare product. Because this project was the product's only source of revenue, we think it is likely that 4DD would feel pressure to

accede to reasonable government demands. *See, e.g.*, Tr. 804 (McPhatter) (explaining that, although 4DD did not have a development license, it would create one for the government); Tr. 273 (Truxillo) (testifying that 4DD would offer an enterprise license); JTX 119 (expressing an "intent to offer unprecedented discounts for the full enterprise use of" Tetra). For this reason, we agree with Mr. Kennedy that 4DD's lack of commercial success would have weakened its negotiating position.

Finally, we turn to DHMSM, where the government bought a cheaper software called Rhapsody * * * * * * *. The parties dispute whether Rhapsody can perform the same functions as Tetra. In 4DD's view, Rhapsody is only an Enterprise Service Bus (ESB) and not a data federator like Tetra. The government agrees that an ESB is different from a federator, but it maintains that an ESB could achieve the same result.

Ultimately, for purposes of the *Georgia-Pacific* factors, we need not decide whether Tetra and Rhapsody performs all the same functions. The evidence shows that ESBs like Rhapsody perform at least some of the same functions as Tetra—even if not all. For that reason, Rhapsody's lower price and similar functionality would have constrained to some extent 4DD's ability to make demands in this hypothetical negotiation. Thus, we conclude that these three objective factors demonstrate that the government possesses a substantially superior bargaining position.

### 3.   Royalty Base

The next step is to establish the royalty base. We believe that the proper royalty base is all infringing copies. As stated above, the government created 47,030 infringing copies of Tetra Healthcare Federator that were associated with 290,334 computer cores. In addition, the government also created 41,925 infringing copies of Tetra Studio that were associated with 171,421 seats.

### 4.   Royalty Rate

We now reach the final stage of the hypothetical negotiation— choosing the royalty rate. As part of that effort, we separate the infringing copies into four categories: (1) non-backup copies, (2) backup copies, (3) RAM copies, and (4) Tetra Studio copies. For each group, we believe that the parties would have agreed to a different licensing fee. *See Gaylord II*, 678 F.3d at 1344 (explaining that a hypothetical negotiation may lead to "different license fees" for different categories).

29

**Appx45**

### a. Non-Backup Copies

First, for the non-backup copies,[20] we conclude that the parties would have agreed to a development license. Typically, development licenses are heavily discounted software versions that are restricted to development (or non-production) use. When software is in the development stage, this reduced cost often outweighs the software's restricted abilities.

Here, using the book of wisdom, the parties know that the government only used Tetra for software development. The project never made it to production, and, given that reality, it would make no economic sense for the government to buy a production license when a significantly discounted development license would suffice. To demand anything more would be unreasonable. *See Oracle Corp.*, 765 F.3d at 1088 (explaining that sellers cannot charge what they "would like to have charged if unconstrained by reality").

Despite this economic reality, 4DD insists that the government unnecessarily buy a more expensive production license. It maintains that it did not offer a development license for Tetra and claims that fact precludes the government from purchasing one. That is not dispositive, however, because 4DD told the government that it would consider creating a development license. It also submitted several development license price quotes along with explanations for how the license would work. *See, e.g.*, PTX 187 at 4 ("Developer licenses are not tied to production licenses[] and can be installed on any number of machines in any combination."); *id.* ("[D]evelopment licenses are restricted to processing only non-production data that's used for development purposes."); *id.* at 5 ("[W]e typically do a direct 90% discount from the production list price."). This evidence, combined with the government's stronger bargaining position, proves that 4DD would have been willing to offer the government a development license.

We also believe this development license would have been assessed on a per-computer-core basis. As Ms. Dean's testimony demonstrated, a license's scope and duration are two important factors that induce a seller to

---

[20] The non-backup copies include deployed virtual machine copies and deployed update copies.

**Appx46**

offer an enterprise (or unlimited core) license. Here, however, those factors are both missing as the government terminated its use of Tetra after roughly one year, which eliminated any potential for increased or prolonged deployment. As a result, that licensing structure offers no benefit to 4DD. Thus, for all non-backup copies, a development license assessed on a per-computer core basis makes the most economic sense.

To calculate the non-backup license fee, we begin with the core count. When combined, the non-backup copy categories total 30,604 computer cores. Using that number, we next apply the development license discount. The evidence shows that 4DD discounted its development license by 90% from the production license price of $24,000 per core. After applying the 90% development license discount, the price comes to $2,400 per computer core.

With the development license price established, we can now calculate the volume discount.[21] According to both damages experts, 4DD used the following volume discount formula: [Base Rate] x [Units]$^{(-0.05 \text{ x [Tier Level]})}$ = [Discounted Rate Per Core]. As the exponent in the formula reveals, the volume discount increased with the number of purchased cores. But contrary to Mr. Kennedy's expert testimony, the evidence shows that 4DD only offered four discount tiers. A purchaser obtained this fourth-tier discount when, as here, they bought licenses for at least 64 computer cores. Using the volume discount formula, then, we calculate that the discounted rate per core is $305.22.[22] Thus, at that volume discounted price, the total cost to buy 30,060 Tetra licenses is $9,174,922.88.

### b. Backup Copies

Second, for the backup copies[23]—which represent the bulk of 4DD's copyright claim—we are unconvinced that the parties would have agreed to

---

[21] During the pricing exercise, 4DD explained that it would apply a volume discount to its development license price if the government also purchased production licenses. Because the government has already purchased 232 production licenses, we apply 4DD's volume discount.

[22] $2,400 \text{ x } 30,060^{(-0.05 \text{ x } 4)} = 305.22$.

[23] The backup copies include the deployed OVA copies, the distribution OVA copies, the full reserve virtual machine copies, and the full backup operating system copies.

a per-computer-core license. That is because any benefit these backup copies offer is far outweighed by the financial cost imposed by a per-core model. Indeed, for this category of copies alone, 4DD demands $4 billion as compensation. For context, that is $3.5 billion more than 4DD demands for the copies that the government actually used for testing and development. It is also the same amount that the government allotted for the entire DHMSM project. There is no reality in which that licensing structure makes economic sense.

We therefore conclude that the parties would have agreed to a convenience fee, something that the government acknowledged as a possible solution in its closing argument. During this hypothetical negotiation, the parties know through the book of wisdom that the government intends to generate thousands of backup copies. At the same time, they also understand the unreasonableness of paying $4 billion under a per-core license. Still, the government needs the right to create these backups because they protect the government's work and enable the development process. *See* Tr. 2153–54 (Schnell) (explaining the importance of backup copies in software development). Thus, a convenience fee strikes the appropriate balance between these competing concerns. Based on the evidence, the economic realities, and the government's superior bargaining position, we conclude that a convenience fee of 20% of the purchase price—or $1,834,984.57—establishes a fair licensing agreement and represents a reasonable compromise by both parties.[24]

### c. RAM Copies

Third, the evidence proves that 4DD would not have charged the government for RAM copies. Indeed, 4DD admits that it does not charge for RAM copies generated by licensed Tetra copies. It would only change that policy for this negotiation to exploit the government's infringement—not to reach a reasonable licensing agreement. Thus, we conclude that 4DD is not entitled to compensation for any RAM copies.

### d. Tetra Studio

Finally, we arrive at Tetra Studio. In the context of a hypothetical negotiation, Tetra Studio presents a challenging hurdle. That is because, on the one hand, the government created 41,925 infringing copies of Tetra

---

[24] $9,174,922.88  x 0.20 = $1,834,984.57.

Studio, which Mr. Myers associated with 171,421 seats.[25] Yet on the other hand, the SMS team only comprised about 60 employees. That means, in other words, that the government would be buying over 171,000 seat licenses for nonexistent people. Under normal circumstances, that purchase makes no economic sense because a "buyer will not ordinarily pay more for a license than its anticipated benefit." *Oracle*, 765 F.3d at 1089. Still, regardless of the economic realities, the law requires an artificial negotiation between two willing parties, and the government cannot leave the table.

But even with the government shackled to the negotiating table, 4DD is only entitled to its "reasonable and entire compensation"—not a windfall. 28 U.S.C. § 1498(b). Yet a windfall is what 4DD would receive if—for a team of fewer than 100 people—the government purchased 171,000 licenses on a per-seat basis. These negotiations may be artificial, but they are not irrational, and we do not believe that the law compels the government to pay $184 million for seat licenses with no value. Instead, we conclude that the government would have paid no more than $150,000 to compensate 4DD for what would have been willful infringement—an amount equivalent to statutory damages under the Copyright Act.

Thus, in sum, the hypothetical negotiation would have produced the following licensing agreement: (1) for non-backup copies of Tetra Healthcare Federator, the government agrees to pay $9,174,922.88; (2) for backup copies of Tetra Healthcare Federator, the government agrees to pay a 20% convenience fee or $1,834,984.57; and (3) for Tetra Studio, the government agrees to pay $150,000 as compensation for willful infringement.[26]

---

[25] Once again, we must note a discrepancy between Mr. Myers's expert testimony and 4DD's post-trial brief. At trial, Mr. Myers testified that he associated seats with only two categories of Tetra Studio copies: (1) deployed virtual machine copies and (2) deployed update copies. In its brief, however, 4DD appears to disregard its own expert's testimony about associated seats and instead seeks damages for every Tetra Studio category. In fact, the bulk of 4DD's Tetra Studio damages claim (79%) rests on full reserve virtual machine copies—a category to which Mr. Myers associated no seats. This departure from Mr. Myers's testimony also comes with little explanation, and so we decline to follow it.

[26] If any imprecision within these damages calculations remains, the

CONCLUSION

4DD has shown that the government infringed its copyright thousands of times over. Conversely, the government failed to prove its affirmative defenses. As a result, 4DD is entitled to these damages:

1. $9,174,922.88 for all non-backup copies of Tetra Healthcare Federator.

2. $1,834,984.57 for all backup copies of Tetra Healthcare Federator.

3. $150,000 for all copies of Tetra Studio.

4. In addition, 4DD is entitled to delay compensation on the entire amount running from the date of first infringement.

The parties are directed to confer and attempt to agree on the final amount of 4DD's judgment, including the correct calculation for delay compensation and any government credit for the true-up payment. To that end, the parties must submit a joint status report on or before September 22, 2023.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge

---

government cannot complain when its wrongful actions "prevent[] a more precise computation." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946). Indeed, "[a]ny other rule would enable the wrongdoer to profit by [its] wrongdoing at the expense of [its] victim." *Id.*

Appx51 to Appx54

REDACTED PURSUANT TO PROTECTIVE ORDER

# In the United States Court of Federal Claims

No. 15-945C
(Originally filed: April 26, 2024)
(Re-issued: May 17, 2024)[1]
NOT FOR PUBLICATION

* * * * * * * * * * * * * * * * * * * * * * * *

4DD HOLDINGS, LLC, and
T4 DATA GROUP, LLC,

     *Plaintiffs*,

v.

UNITED STATES,

     *Defendant,*

     and

IMMIX TECHNOLOGY, INC.,

     *Third-Party Defendant.*

* * * * * * * * * * * * * * * * * * * * * * * *

<u>ORDER</u>

     We issued our post-trial opinion in this case on August 22, 2023.  169 Fed. Cl. 164 (2023).  We found that defendant had infringed 4DD's copyright by surreptitiously making tens of thousands of unlicensed copies of 4DD's Tetra software.  On November 20, 2023, we ordered that defendant pay plaintiffs a total of $12,683,065.86 in damages and directed entry of final judgment.  ECF No. 349.  On December 19, 2023, plaintiffs filed a supplemental motion for fees and costs related to our earlier spoliation order, and on December 26, 2023, plaintiffs filed a motion under Rule 59 for reconsideration or a new trial.  After directing a response to the

---

[1] This order was issued under seal to give the parties an opportunity to propose the redaction of any protected material.  They did not propose any redactions, and thus the order is released in its original form.

reconsideration motion, both motions are fully briefed. Oral argument is unnecessary. We begin with the motion for reconsideration.

I. Reconsideration

Rule 59 of the United States Court of Federal Claims provides that the court may entertain a motion for reconsideration under certain circumstances. We may generally only "'grant a motion for reconsideration when there has been an intervening change in the controlling law, newly discovered evidence, or a need to correct clear factual or legal error or prevent manifest injustice.'" *Biery v. United States*, 818 F.3d 704, 711 (Fed. Cir. 2016) (quoting *Young v. United States*, 94 Fed. Cl. 671, 674 (Fed. Cl. 2011)).

"[M]otions for reconsideration are seldom appropriate," and must be supported "by a showing of extraordinary circumstances which justify relief" to succeed. *Cully Corp. v. United States*, 165 Fed. Cl. 737, 739 (2023); *Caldwell v. United States*, 391 F.3d 1226, 1235 (Fed. Cir. 2004). They "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Behrens v. United States*, 135 Fed. Cl. 66, 69 (2017) (quoting *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008)). In other words, "a motion for reconsideration is not intended . . . to give an 'unhappy litigant an additional chance to sway' the court," nor to allow a party to "re-hash[] the same arguments already considered by the court." *Behrens*, 135 Fed. Cl. at 69 (quoting *Matthews v. United States*, 73 Fed. Cl. 524, 525 (2006)).

Plaintiffs argue that our trial opinion contained four errors, one legal and three of a factual nature. We begin with the asserted legal error and then turn to factual disagreements.

A. There Was No General Acquiescence And No Legal Error

Plaintiffs urge that the court committed a "fundamental legal error in determining damages" by constructing a hypothetical negotiation to value defendant's unauthorized use rather than simply applying the license rates originally agreed to by the Department of Defense. Pl.'s Mot. for Recons. 4. Plaintiffs argue that we are legally compelled to apply the parties' license agreement when calculating damages for the infringing software copies, and thus any consideration of whether there was any general acquiescence to those rates was unnecessary and erroneous.

2

**Appx56**

In our trial opinion, we found that the originally agreed-upon rate did not constitute an established royalty because this rate was only used in a single agreement, which could not demonstrate the necessary "'general acquiescence' by a significant 'number of persons'" necessary under Federal Circuit caselaw.  169 Fed. Cl. at 184 (citing *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995), quoting *Sun Studs, Inc. v. ATA Equip. Leasing, Inc.*, 872 F.2d 978, 993 (Fed. Cir. 1989), *overruled on other grounds*, *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020 (Fed. Cir. 1992)).  Plaintiffs contend that this requirement does not apply because the defendant itself, rather than a third party, acquiesced to the rate in the original license agreement.  Thus, it ought not have to prove anything beyond a pre-existing license, aver plaintiffs.  Just as we did after trial, again, we disagree.

As cited in our trial opinion, the Federal Circuit explained that, for a pre-existing, or "established rate," to be controlling for damages purposes it must have been, *inter alia*,

> one, . . . agreed to prior to the infringement; two, . . . paid by such a number of persons as to indicate a general acquiescence in its reasonableness by those who use the invention or was paid by an exclusive licensee who had such a significant amount of sales volume as to indicate a general acquiescence in its reasonableness by those who use the invention . . . .

*Sun Studs, Inc. v. ATA Equip. Leasing, Inc.*, 872 F.2d 978, 993 (Fed. Cir. 1989).  We found that a single, non-exclusive license to one licensee could not and did not meet this standard.  169 Fed. Cl. at 184.  Although not explicitly expounded in our trial opinion, we think it is implicit in our explanation for the rejection of the license rate that the usage contemplated by that agreement is not analogous to the infringing use.  As the *Sun Studs* court further explained, the established royalty must also be paid for "comparable rights of activity under the patent."  872 F.2d at 993.  The 64-core license bought by the government in this case is not comparable to the infringing use (tens of thousands of copies).  *See also Bitmanagement Software GmbH v. United States*, 989 F.3d 938, 950–51 (Fed. Cir. 2021) (holding that, despite the existence of a license for a limited number of copies, the proper measure of damages was a hypothetical negotiation covering the "actual usage.").  The established royalty rubric is inapposite here.

Nor do the cases cited by 4DD in its motion require a different result.  In *Rude v. Westcott*, the Supreme Court laid out the test for an established

royalty much as was echoed in *Sun Studs*, cited above, noting that, in order to apply a pre-existing license rate against an infringer, that rate must have been commonly paid by sufficient persons such that a "market price" was established.  130 U.S. 152, 165 (1898).  There is nothing approaching such a situation here.

As defendant points out, the courts in *Micro Data Base System v. State Bank of India* and *Herrmann International, Inc. v. Hermann International Europe* applied the parties' agreed-upon royalty when calculating damages because the defendants did not contest the use of that royalty rate.  *Micro Data Base Sys. v. State Bank of India*, 177 F. Supp. 2d 881, 888 (N.D. Ind. 2001); *Herrmann Int'l, Inc. v. Herrmann Int'l Eur.*, No. 17-cv-00073, 2021 U.S. Dist. LEXIS 42277, at *1–2 (W.D.N.C. Mar. 6, 2021).  Neither case expresses a rule to contrary to the result here.

Other cases plaintiffs cite serve to weaken its position.  As defendant rightly noted in its post-trial brief, in *Szekely v. Eagle Lion Films, Inc.*, 242 F.2d 266 (2nd Cir. 1957), the damages award was based on a "reasonable license fee on which a willing buyer and a willing seller would have agreed for the use taken by the infringer"—precisely what we did here.  *On Davis v. The Gap, Inc.*, 246 F.3d 152, 167–68 (2d Cir. 2001) (explaining the holding in *Szekely*).

Neither does the district court decision in *Propet USA, Inc. v. Shugart* suggest a different outcome.  The district court relied on actual invoices from the copyright holder to establish a reasonable fee for unlicensed use.  No. C06-0186, 2007 WL 2766718, at *2 (W.D. Wash. Sep. 19, 2007).  There, the infringer had a history of paying the copyright holder when it, and third parties who the infringer distributed the images to, used the copyrighted images outside of the terms of their existing license.  That circumstance is quite distinct from the evidence in this case. Further, the trial court in *Propet* and plaintiffs now, cite *Thoroughbred Software International, Inc. v. Dice Corp.*, 488 F.3d 352, 359 (6th Cir. 2007), for support.  In that case, the issue on appeal was whether the plaintiff had proven a causal connection between the infringing use and the actual damages claimed.  The circuit court held that the Dealer Agreement (license) between the parties established that nexus because, pursuant to that agreement, the dealer owed a license fee for every copy purchased and additional copies were expressly prohibited.  *Id.* at 359–60.  Thus it did not matter that the unlicensed copies were never used.  Using the Dealer Agreement's existing rate structure was an appropriate measure of damages in that case.  *Id.* at 360.  It is important to note, however, that the court relied on *Davis v. Gap, Inc.*, wherein the Second Circuit stated that "actual damages may include in appropriate cases the reasonable license

4

**Appx58**

fee on which a willing buyer and a willing seller would have agreed for the use taken by the infringer." 246 F.3d 152, 166–67 (2d Cir. 2001).  In the case at bar, however, we found the opposite.  These holdings are grounded in a finding of reasonableness of the license fee in the particular circumstances of those cases.  In *Thoroughbred*, the unlicensed use was merely dozens of copies, wholly unanalogous to the tens and hundreds of thousands claimed here.  *See* 246 F.3d at 360 (noting 17 copies of one software program and 31 of another).

A similar result is found in the trade secret cases cited by plaintiffs.  In those cases, the pre-existing agreements contemplated the type and scope of the infringing use.  *See Ford Motor Co. v. Versata Software, Inc.*, No. 15-11624, 2018 WL 10733561, at *8–9 (E.D. Mich. July 9, 2018); *Biodynamic Techs., Inc. v. Chattanooga Corp.*, 658 F. Supp. 266, 269 (S.D. Fla. 1987).  It was a straightforward exercise to apply the rates the parties had already negotiated to the facts of those cases.  That was not the case here.

The other trade secret decision cited by plaintiffs supports the use of a hypothetical negotiation to calculate damages, as we did here, by endorsing the proposition that "[a] reasonable royalty award attempts to measure a hypothetically agreed value of what the defendant wrongfully obtained from the plaintiff."  *Mid-Michigan Comp. Sys. v. Marc Glassman, Inc.*, 416 F.3d 505, 511 (6th Cir. 2005) (citing and quoting *Vermont Microsys., Inc. v. Autodesk, Inc.*, 88 F.3d 142, 151 (2d Cir. 1996)).

As explained after trial, and above, the license between 4DD and the Department of Defense was not sufficient evidence of a generally-acquiesced-to rate paid.  Such an application would have been unjust because the use was not analogous.  Our task was thus to construct a hypothetical negotiation.  Plaintiffs have not shown a legal error and thus no manifest injustice.  We turn then to plaintiffs' challenge to our hypothetical negotiation.

B.  The Court's Hypothetical Negotiation Was Not Flawed Factually

Plaintiffs now attempt to convince us that our calculation of damages using a hypothetical negotiation resulted in multiple factual errors.  We note that the common theme is that plaintiffs disagree with the outcome of our damages analysis.  They read the facts differently but cannot show that we ignored any crucial piece of evidence nor the law.

5

**Appx59**

1.  Developmental License, Volume Discount, and Backup Copies

First, plaintiffs take issue with our judgment that the government would have purchased development licenses rather than production licenses. Second, plaintiffs assert that we erroneously applied 4DD's volume discount in the context of the hypothetical negotiation. Third, plaintiffs dispute our method of awarding damages for backup copies. Each of these amount to naught but disagreements with the outcome. Plaintiffs have not shown a plain error of fact evincing a manifest injustice.

The issue of whether a production license or a developmental license would be appropriate was litigated and decided at trial. We have ignored neither plaintiffs' argument nor their evidence but found a different outcome than they prefer. That is not grounds for reconsideration. Likewise, the opportunity to argue whether the volume discount formula should be applied to development licenses has also passed. We made a factual finding that a volume discount would have been made available to the government. The issue was argued extensively at trial and afterwards in briefing. The matter is closed, and reconsideration unavailable.

Plaintiffs' argument that we erroneously awarded a convenience fee for backup copies likewise fails. Defendant argued in its post-trial brief, and we agreed, that 4DD would not have insisted on a per-unit royalty for backup copies of Tetra, an assertion to which plaintiffs mounted no response in their briefs. If plaintiffs wished to convince us to apply a per-unit royalty rather than a blanket convenience fee for backup copies, they had ample opportunity to do so before judgment was entered. Instead, plaintiffs waited until now to respond to defendant's argument on that point. Plaintiffs may not now "raise arguments that could have been raised prior to the entry of judgment."[2] *Behrens*, 135 Fed. Cl. at 69.

---

[2] Plaintiffs also raise a point about our recognition that they did not include in their damages tally of backup copies those made after September 2014. Though it was unexplained, we took Mr. Myers' figures at face value and declined to consider backup copies after September 2014. *See* 169 Fed. Cl. at 182 n.17. Plaintiffs now, inappropriately, argue for the first time that we ought to have considered that a floor figure or some sort of conservative estimate. The time for making such a distinction has passed. In any event, we note that the issue is moot given our application of a 20-percent convenience fee for backup copies.

6

**Appx60**

### 2. Damages Awarded for Tetra Studio

Lastly, plaintiffs urge us to reconsider our decision to award a $150,000 convenience fee for the infringing copies of Tetra Enterprise Studio. Instead, plaintiffs again argue that we must award them more than $3,000 (and likely at least $4,397) for each of the more than 171,000 infringing copies of Tetra Studio made by the government. Like the other arguments plaintiffs advance in its motion for reconsideration, this one is familiar to us because it was thoroughly ventilated by the parties during trial and after it in briefing.

We found no evidentiary basis to award plaintiffs the per-seat figures they sought because it made no economic sense to pay for hundreds of thousands of seats for a team of 100 people. 169 Fed Cl. at 189–90. We had to consider the intended use, as the parties would have at the hypothetical negotiation table. Without evidence of some better metric upon which to base damages for this infringing use, we applied statutory damages. *Id.* at 190. There is nothing in plaintiffs' request for reconsideration that would change our mind and that we have not already considered. Reconsideration must therefore be denied.[3]

## II. Fees and Costs

Turning then to the supplemental request for fees and costs, we begin with what we previously held: that the government failed to preserve and, in some instances, knowingly destroyed evidence; thus we found that a spoliation sanction was warranted. 143 Fed. Cl. 118 (2019). As part of that sanction, we shifted costs and fees to defendant, and asked plaintiffs to file an "appropriately supported" motion seeking their recovery. *Id.* at 134. Plaintiffs did so, seeking not only attorney fees but also expert and consultant costs as well.

We held that expert and consulting fees were permissible as a general matter under Rule 37. 153 Fed. Cl. 371, 375–76 (2021). As to plaintiffs' expert, Mr. Monty Myers, we found the request unreasonable, however, because his fees were unsupported by sufficiently detailed contemporaneous

---

[3] In defendant's response, it argues that the court should not have awarded maximum statutory damages because those only apply when the use was "willful" and "wrongful," neither of which can be applied against the United States. We do not reach that issue, however, because it is improper to use the opposing party's Rule 59 motion as an opportunity to raise new arguments. Defendant's time for filing its own such motion has passed.

billing records.  *Id.* at 376–77.  Plaintiffs also sought reimbursement for the work of Tetra Engineering, a subsidiary of 4DD that worked with Mr. Myers to quantify defendant's infringement.  Although we found the rate reasonable and the hours supported, the court deferred awarding Tetra Engineering's costs because it was unclear whether and how much of the work performed was due to the missing evidence.  It was also unclear whether all of the work was in pursuit of well-founded legal claims.  *Id.* at 378 (citing *Hensley v. Eckerhart*, 461 U.S. 424, 435–36 (1983) (holding that partial or legal success is relevant to the reasonableness of claimed fees)).

Trial was held in 2023, resulting in an award to plaintiffs, exclusive of delay compensation and any offset for copies already paid for, of $9,307,594.52 for non-backup copies of 4DD's software, $1,834,984.57 for backup copies, and $150,000 statutory damages for the related Tetra Studio software.  Then, after the court resolved the parties' differences regarding delay compensation, the parties stipulated to a final judgment amount of $12,683,065.86.  Plaintiffs now seek again $1,284,850 for Mr. Myers' work in the case and $836,955 for Tetra Engineering's work assisting him.  The government opposes both sums in whole.  We take each in turn.

A.  Mr. Myers' Fees

We denied plaintiffs' request for those fees in 2021 because they were unsupported.  153 Fed. Cl. 371 (2021).  The gross tally of hours expended by Mr. Myers and his company was insufficient to establish whether the work was in pursuit of information missing due to the government's failure to preserve evidence and even insufficient to establish whether those hours had been billed to and paid for by the plaintiffs.  *Id.* at 376–77.

Plaintiffs believe that it has solved these issues primarily through Mr. Myers' detailed testimony at trial and deposition regarding the work he performed and how the spoliated evidence severely impacted it.  Plaintiffs also offer, for the first time, additional billing records from Mr. Myers.  We agree with the government, however, that the opportunity to support its request for these fees was in the motion seeking them.  *Id.* at 377 n.5.  Contrary to plaintiffs' present assertion, we did not invite a renewed request for these fees.[4]  What remained undecided was only the appropriateness of the engineering fees.  *Id.* at 378.  We turn now to that issue.

---

[4] Nor is it unfair to have ruled as we did prior to hearing Mr. Myers' testimony at trial or reading his deposition transcript.  Plaintiffs supported their original request for fees with an affidavit from Mr. Myers' and one from Mr. McPhatter.  The work was complete at this point.  Mr. Myers' had every

B.  Tetra Engineering's Fees

With respect to Tetra Engineering's[5] fees, we have no problem knowing what Tetra did and why.  The billing records are sufficiently fulsome to support their reasonableness, as we held in 2021.  The remaining issues were whether and how much of the engineering work could be apportioned to the government's spoliation and whether the hours were spent in pursuit of meritorious claims.  *Id.*

After our spoliation sanction, we have learned more concerning the engineering efforts expended by Tetra Engineering through Mr. Myers' depositions and his testimony at trial.  The main takeaway from those testimonies, and as highlighted in plaintiffs' supplemental motion for fees, is that the engineering work centered on the need to create a simulation of DOD's systems in order to see how 4DD's software would have operated, especially with respect to RAM copies.  Plaintiffs were entitled to undertake the technical effort needed to explore the extent of potential infringement, and we know now that the engineering work was largely, if not entirely, the result of the spoliation in that it was an effort to fill in the blank left by the government's missing and destroyed evidence.  And we know that, as we held previously, the billing records are sufficient to support the reasonableness of the number of hours expended.  What was also apparent from Mr. Myers' testimony is that, in the end, these simulations were not his principal method of counting RAM copies, although they did buttress, or in his own words "validate" his conclusions, Myers' Dep. at 20 (ECF No. 354 at 33), and the court considered them in its analysis.  They were meritorious in the sense that they supported a plausible claim of infringement.

_____

opportunity to provide detail in his affidavit supporting the request for fees. In any event, the principal omission was detailed billings from Mr. Myers with which we could test the accuracy of plaintiffs' assertions regarding the necessity and costs of the work he performed.  Further, the invoices now submitted, although indicative of work likely performed and paid for, similarly lack any detail as to what Mr. Myers' was doing outside of providing expert services.  *E.g.*, Pl.s Ex. C in support of Supp. Motion for Fees at 1 (ECF No. 354 at 43–44).

[5] We reject defendant's concern that the work is ineligible for reimbursement because Tetra Engineering is a subsidiary of plaintiffs.  There is no suggestion that Tetra Engineering is not a separate entity and that plaintiff did not incur the charges.

What is not clear is whether these hours were reasonably expended in pursuit of well-founded claims.  We now know that although infringing, plaintiffs were not awarded compensation for the RAM copies because the evidence showed that plaintiffs would not have charged for them when negotiating a hypothetical license for the government's use.  169 Fed. Cl. at 189.  We think plaintiffs are chargeable with knowledge of that fact.  Although RAM copies are infringing and theoretically could form the basis of a damages award, here they did not.  Further, even if they had been the basis for some award of damages, the engineering work was not strictly necessary to come up with a figure for those copies.  We thus believe that an award of all of Tetra Engineering's fees would be improper because plaintiffs have not established that they were all necessary to support a meritorious claim for damages.  They were, however, supported by detailed billing records, not wholly unnecessary to plaintiffs' presentation of evidence of infringement, and, in the final analysis, we conclude that, in light of the uncertainty generated by defendant's destruction of evidence, it is not unfair to give plaintiffs some benefit of the doubt in pursuing the claim with respect to RAM copies.  We thus believe a 50 percent reduction is appropriate to balance these considerations.

III.  Conclusion

As explained above, plaintiffs have not shown that reconsideration or a new trial is warranted.  Further, plaintiffs request for Mr. Myers' fees is denied, but their request for Tetra Engineering's fees is granted in part.  They will recover 50 percent of those fees.  Accordingly, the following is ordered:

1.  Plaintiffs' motion (ECF No. 355) for reconsideration or a new trial is denied.

2.  Plaintiffs' supplemental motion (ECF No. 354) is granted in part as outlined above.

3.  Plaintiffs are awarded $418,477.50 dollars as a further spoliation sanction.


s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF CONFIDENTIAL MATERIAL</u>

**Case Number:** <u>24-1996</u> ⊞

**Short Case Caption:** <u>4DD Holdings, LLC v. US</u>

---

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).

- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

---

The foregoing document contains <u>0</u> number of unique words (including numbers) marked confidential.

☑ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☐ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: <u>11/01/2024</u>

Signature: <u>/s/ Daniel L. Geyser</u>

Name: <u>Daniel L. Geyser</u>

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE
## REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. Cir. R. 32(b)(1) because it contains 9,655 words, as determined by the word-count function of Microsoft Word 2016, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Expanded BT font.

Respectfully submitted.

/s/ *Daniel L. Geyser*
Daniel L. Geyser
HAYNES AND BOONE, LLP
2801 N. Harwood Street, Ste. 2300
Dallas, TX 75201
(303) 382-6219
*daniel.geyser@haynesboone.com*

*Counsel for Plaintiffs-Appellants*
*4DD Holdings, LLC, and*
*T4 Data Group, LLC*

November 1, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2024, an electronic copy of the foregoing Opening Brief was filed with the Clerk of Court for the U.S. Court of Appeals for the Federal Circuit, using the appellate CM/ECF system. I further certify that all parties in the case are represented by lead counsel who are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

I further certify that the confidential version of this filing is being served simultaneously via electronic mail to Scott Bolden, U.S. Department of Justice, at Scott.Bolden@usdoj.gov, per his consent to electronic service

Respectfully submitted.

/s/ Daniel L. Geyser
Daniel L. Geyser
HAYNES AND BOONE, LLP
2801 N. Harwood Street, Ste. 2300
Dallas, TX 75201
(303) 382-6219
daniel.geyser@haynesboone.com

Counsel for Plaintiffs-Appellants
4DD Holdings, LLC, and
T4 Data Group, LLC

November 1, 2024