# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

**4DD HOLDINGS, LLC, T4 DATA GROUP, LLC,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

**IMMIX TECHNOLOGY, INC.,**
*Third-Party Defendant*

APPEAL FROM THE UNITED STATES COURT OF FEDERAL CLAIMS,
IN 1:15-CV-00945-EJD, SENIOR JUDGE ERIC G. BRUGGINK

## BRIEF OF THE DEFENDANT-APPELLEE UNITED STATES

BRIAN M. BOYNTON
**Principal Deputy Assistant Attorney General**

SCOTT BOLDEN
**Director**
**Department of Justice, Civil Division**
**950 Pennsylvania Avenue, NW**
**Washington, DC  20530**
**Email:  Scott.Bolden@USDOJ.gov**
**Telephone:     (202) 307-0262**

Of Counsel:
ELIZABETH M. HOSFORD
Department of Justice

January 14, 2025

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ iii

STATEMENT OF RELATED CASES .................................................... 1

INTRODUCTION .................................................................................. 1

COUNTER-STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ........ 3

COUNTER-STATEMENT OF THE CASE ............................................ 3

   I.   FACTUAL BACKGROUND .................................................................. 3

      A.   The Department of Defense Establishes the DMIX Program to
Enhance Interoperability of Health Records ....................................... 3

      B.   DHA and SMS Analyze Alternatives for Use With DMIX ...................... 4

      C.   4DD Competes on Price to have TETRA Selected for DMIX ................. 6

      D.   DHA Licenses TETRA and Begins Developing DMIX ........................... 8

      E.   The Department of Defense Ends Work with TETRA ............................ 9

      F.   DHA and 4DD Negotiate a "True-Up" Modification ............................. 10

   II.   PROCEDURAL HISTORY .................................................................. 11

      A.   Discovery and Summary Judgment ......................................... 11

      B.   Trial and Judgment .................................................................. 13

      C.   The CFC Denies 4DD's Request for Reconsideration ........................... 15

SUMMARY OF THE ARGUMENT .................................................... 16

STANDARD OF REVIEW .................................................................. 18

ARGUMENT ....................................................................................... 19

   I.   THE CFC CORRECTLY REJECTED 4DD'S ESTABLISHED ROYALTY THEORY
AND CONSIDERED ALL EVIDENCE RELEVANT TO FAIR MARKET VALUE ............... 20

A.  4DD's Interpretation of "Entire" Compensation is Contrary to the *En Banc* Interpretation in <u>Leesona</u> ..........................................................20

B.  The <u>Gaylord</u> Cases Require Consideration of All Relevant Evidence ....21

C.  No Authority Mandates that a Prior Rate Between the Parties Must Control Without Considering Relevant Context................................................23

D.  4DD's Argument is Waived and Inconsistent with the Rule it Advances ........................................................................................26

E.  4DD's Asserted Prices were not Established and Not Directly Comparable ....................................................................................28

II.  THE CFC CORRECTLY CONSTRUCTED A HYPOTHETICAL NEGOTIATION BASED ON THE PROPER LAW AND FACTS................................................31

A.  The CFC Properly Used the Book of Wisdom ........................................31

B.  The CFC Correctly Considered Rhapsody as an Available Alternative..34

C.  The CFC's Approach was not Counterfactual ........................................36

D.  The CFC Correctly Used a Development License Rate .........................37

E.  The CFC Properly Discounted the Development License Rate ..............38

F.  4DD does not Challenge the CFC's 20% Fee for Backups ....................40

G.  The CFC Erred in Justifying its Hypothetical License Fee for TETRA Studio, but the Fee is Justifiable by Record Evidence......................................41

CONCLUSION ........................................................................................44

# TABLE OF AUTHORITIES

**Cases**

4DD Holdings, LLC v. United States,
    143 Fed. Cl. 118 (2019) .....................................................................................11

4DD Holdings, LLC v. United States,
    153 Fed. Cl. 371 (2021) .....................................................................................12

4DD Holdings, LLC v. United States,
    159 Fed. Cl. 337 (2022) ............................................................................. *passim*

A.C. Aukerman Co. v. R.L. Chaides Const. Co.,
    960 F.2d 1020 (Fed. Cir. 1992)..........................................................................14

Badowski v. United States,
    278 F.2d 934, 935 (Ct. Cl. 1960) ................................................................ 28, 29

Biodynamic Tech., Inc. v. Chattanooga Corp.,
    658 F. Supp. 266 (S.D. Fla. 1987) .....................................................................25

Bitmanagement Software GmbH v. United States,
    No. 23-1506, __ F.4th __, 2025 WL 37051 (Fed. Cir. Jan. 7, 2025) .......... *passim*

Bluebonnet Sav. Bank, F.S.B. v. United States,
    466 F.3d 1349 (Fed. Cir. 2006)..........................................................................27

Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.,
    No. Civ 09-290, 2012 WL 3686748 (W.D. Pa. Aug. 24, 2012)..........................30

Cohen v. United States,
    105 Fed. Cl. 733 (2012), aff'd 528 F. App'x 996 (Fed. Cir. 2013)....................43

CSIRO v. Cisco Sys., Inc.,
    809 F.3d 1295 (Fed. Cir. 2015)..........................................................................25

Dash v. Mayweather,
    731 F.3d 303 (4th Cir. 2013) ..............................................................................42

Ericsson, Inc. v. D-Link Sys., Inc.,
 773 F.3d 1201 (Fed. Cir. 2014)..............................................................26

Finjan, Inc. v. Secure Computing Corp.,
 626 F.3d 1197 (Fed. Cir. 2010)..............................................................25

Ford Motor Co. v. Versata Software, Inc.,
 No. 15-cv-10628, 2018 WL 10733561 (E.D. Mich. July 9, 2018).....................25

Fromson v. W. Litho Plate & Supply Co.,
 853 F.2d 1568 (Fed. Cir. 1988)..............................................................32

Gaylord v. United States,
 678 F.3d 1339 (Fed. Cir. 2012).................................................... *passim*

Gaylord v. United States,
 777 F.3d 1363 (Fed. Cir. 2015).................................................... *passim*

Georgia-Pacific Corp. v. U.S. Plywood Corp.,
 318 F. Supp. 1116 (S.D.N.Y. 1970) ....................................... 14, 32, 33

Grain Processing Corp. v. American Maize-Prod. Co.,
 185 F.3d 1341 (Fed. Cir. 1999)..............................................................36

Hanson v. Alpine Valley Ski Area, Inc.,
 718 F.2d 1075 (Fed. Cir. 1983)..............................................................28

Hi-Shear Tech. Corp. v. United States,
 356 F.3d 1372 (Fed. Cir. 2004)..............................................................19

Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.,
 383 F.3d 1337 (Fed. Cir. 2004)..............................................................32

Leesona Corp. v. United States,
 599 F.2d 958 (Ct. Cl. 1979) ............................................. 17, 20, 21, 43

Lucent Techs., Inc. v. Gateway, Inc.,
 580 F.3d 1301 (Fed. Cir. 2009)................................................... 32, 37

Mars, Inc. v. Coin Acceptors, Inc.,
    527 F.3d 1359 (Fed. Cir. 2008)...........................................................................35

On Davis v. The Gap, Inc.,
    246 F.3d 152 (2d Cir. 2001).................................................................................42

Polar Bear Prods., Inc. v. Timex Corp.,
    384 F.3d 700 (9th Cir. 2004) ................................................................ 24, 25, 42

Prism Techs. LLC v. Sprint Spectrum L.P.,
    849 F.3d 1360 (Fed. Cir. 2017)...........................................................................28

Rude v. Wescott,
    130 U.S. 152 (1889)............................................................................................28

S. Corp. v. United States,
    690 F.2d 1368 (Fed. Cir. 1982)...........................................................................21

Shepherd Mgmt. Group, Inc. v. Michael Wilkov Cantoni, LP,
    No. 07-cv-678, 2008 WL 11336460 (N.D. Ga. Dec. 17, 2008) ..........................25

Sinclair Refining Co. v. Jenkins Petroleum Process Co.,
    289 U.S. 689 (1933)............................................................................................32

SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.,
    926 F.2d 1161 (Fed. Cir. 1991)...........................................................................34

Standard Havens Prods., Inc. v. Gencor Indus., Inc.,
    953 F.2d 1360 (Fed. Cir. 1991)...........................................................................35

Sun Studs, Inc. v. ATA Equip. Leasing, Inc.,
    872 F.2d 978 (Fed. Cir. 1989)................................................................ 14, 28, 29

Szekely v. Eagle Lion Films, Inc.,
    242 F.2d 266 (2d Cir. 1957)...................................................................... 24, 25

Thoroughbred Software Int'l, Inc. v. Dice Corp.,
    488 F.3d 352 (6th Cir. 2007) .................................................................... 23, 25

Trell v. Marlee Elecs. Corp.,
　　912 F.2d 1443 (Fed. Cir. 1990)...............................................................28

Unisplay, S.A. v. Am. Elec. Sign Co.,
　　69 F.3d 512 (Fed. Cir. 1995)........................................................ 13, 28

United States v. U.S. Gypsum Co.,
　　333 U.S. 364 (1948)...............................................................................18

VirnetX, Inc. v. Cisco Sys, Inc.,
　　767 F.3d 1308 (Fed. Cir. 2014).............................................................26

Wordtech Sys., Inc. v. Integrated Networks Sols., Inc.,
　　609 F.3d 1308 (Fed. Cir. 2010)..............................................................30

**Statutes**

17 U.S.C. § 504 ........................................................................... 21, 43

28 U.S.C. § 1498 .................................................................... *passim*

**STATEMENT OF RELATED CASES**

No appeal has been previously before this or any other appellate court under the same or similar title. To counsel's knowledge, no other cases pending before this Court or any other court will directly affect or be directly affected by the Court's decision in this appeal.

**INTRODUCTION**

In 2013, Plaintiff-Appellant 4DD Holdings, LLC ("4DD")[1] competed for months to license its TETRA software to the Defense Health Agency ("DHA")[2] to enhance health record interoperability. To win the competition, 4DD quoted licenses tailored to development work, disclosed a discount formula that provided progressively higher discounts as the sales volume increased, and offered to match the competition's prices for backup copies "all the way to totally free." Appx20993-20994. After 4DD won the competition based on projected cost, DHA licensed TETRA for approximately $861,000 – an amount based on 4DD's competitive quotations and its volume discount formula. DHA began development work with

---

[1] Plaintiff-Appellant T4 Data Group is a subsidiary of Plaintiff-Appellant 4DD Holdings, LLC; both are collectively referred to as 4DD. See Appx18 n.2.

[2] DHA is a combat support agency that provides health services for the United States military. Prior to DHA's establishment, case-relevant activities were undertaken by the TRICARE Management Activity and the Interagency Program Office; all are collectively referred to as DHA.

TETRA, but later elected to discontinue use of the software in 2014, less than one year after licensing it. 4DD failed to license TETRA to any other customers.

One year later, 4DD filed this suit in the United States Court of Federal Claims ("CFC"), claiming entitlement to more than $5 billion due to copyright infringement. To justify its demand, 4DD directed its expert to assume that the CFC would use 4DD's list price rates to assess damages, without engaging in a hypothetical negotiation. The CFC refused to adopt 4DD's list price approach, constructed a hypothetical negotiation based on DHA's use and 4DD's competitive representations, and awarded 4DD approximately $12.7 million as the fair market value of a hypothetical license encompassing DHA's different uses of TETRA.

In this appeal, 4DD argues that the Court should reverse the CFC's sound judgment and remand with instructions to calculate a billion-dollar award. 4DD incorrectly contends that an alleged pre-existing agreement between the parties – no matter how incomparable in scope – must always control. 4DD improperly asserts a non-existent legal rule that precludes economically relevant context. 4DD's asserted rule is contrary to this Court's precedent and factually unsupported.

4DD alternatively asserts that seven (7) different legal and fact errors "infected" the CFC's hypothetical negotiation, 4DD Br. at 33, but each asserted error is flawed as a matter of law and fact. The Court should affirm the CFC's well-reasoned and well-supported judgment.

# COUNTER-STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

Section 1498(b) of Title 28 provides that the Government shall pay "reasonable and entire compensation as damages" for infringing a copyright. The copyright owner can recover "a reasonable royalty representing the fair market value of a license covering the defendant's use." Gaylord v. United States, 777 F.3d 1363, 1367 (Fed. Cir. 2015) ("Gaylord III") (citation omitted). "[P]ast arms-length licensing practices" can "be useful," but a trial court "must always take account of economically relevant differences." Id. at 1368. Here, the following issues are presented:

1. Whether the CFC correctly rejected 4DD's established royalty theory in favor of considering all evidence relevant to fair market value.

2. Whether the CFC correctly constructed a hypothetical negotiation using the relevant law and facts.

# COUNTER-STATEMENT OF THE CASE

## I. FACTUAL BACKGROUND

### A. The Department of Defense Establishes the DMIX Program to Enhance Interoperability of Health Records

For decades, the Department of Defense ("DoD") and the Department of Veterans Affairs ("VA") struggled to share comprehensive healthcare records for military members because the records were stored in different formats across hundreds of databases. See Appx18. To address this problem, the Secretary of

Defense directed a two-pronged approach: (1) a "near-term" effort "to develop data federation [] and interoperability"; and (2) a "longer-term goal of health record information technology (IT) modernization." Appx25121-25122; Appx18-19 (citing). DoD's near-term effort – the Defense Medical Information Exchange ("DMIX") program – sought to enhance interoperability between existing systems. See id. DoD's long-term effort – the Defense Health Management System Modernization ("DHMSM") program – sought to create a new system using a single health record for every patient, eliminating the data-sharing problem. See id.

### B. DHA and SMS Analyze Alternatives for Use With DMIX

For the near-term DMIX effort, DoD chose Systems Made Simple ("SMS") as the prime contractor and tasked it with identifying and implementing a data federation solution. See Appx19. DHA and SMS used a three-phase competitive approach to identify a potential solution ("the DMIX Competition"). In the first phase of the DMIX Competition – the "Build or Buy Analysis of Alternatives" – SMS considered whether DHA should build or buy interoperability software. See Appx24476; Appx18464-18469; Appx20498, Appx20501. Upon SMS's recommendation, see Appx20650, DHA "elected to buy a commercial solution rather than build its own federation software," 4DD Holdings, LLC v. United States, 159 Fed. Cl. 337, 341 (2022).

In the second phase of the DMIX Competition – the "Initial Down-Select Analysis of Alternatives" – SMS analyzed 10 different commercial software products for data interoperability, including products offered by IBM, SAP, and Oracle. See Appx21039-21040. SMS also considered software products provided by two of its subcontractors, including 4DD. See id. (describing 4DD as a "TeamSMS partner"). During this phase, SMS excluded the products offered by IBM, SAP, and Oracle because of "high price" and "high cost" perceptions. Appx20665; Appx20667; Appx21139-21140; Appx25328. SMS questioned each of the remaining candidates on their relevant capabilities, before selecting 4DD and Information Builders iWay ("IBI") as finalists. See Appx25328, Appx25330.

In the third phase of the DMIX Competition – the "Vendor Fly-Off" – SMS and DHA competitively evaluated the software offered by 4DD and IBI. 4DD and IBI competed on performance and cost. See Appx25331. SMS selected 4DD as the "fly-off winner" with "[c]ost of ownership [as] the most significant factor." Appx25332; see also Appx19 ("After considering many options—including an evaluation of competing products and their prices—SMS eventually selected [TETRA]."); 4DD, 159 Fed. Cl. at 341 (SMS "selected 4DD and one other finalist . . . to compete in a flyoff, which 4DD subsequently won.").

### C. 4DD Competes on Price to have TETRA Selected for DMIX

4DD's TETRA software comprised: (1) TETRA Healthcare Federator, the software component that processed data; and (2) TETRA Enterprise Studio, a graphical interface for software engineers to operate TETRA Federator. See Appx19-20; 4DD Br. at 5. 4DD licensed TETRA Federator on a "per computer core" basis and licensed TETRA Studio on a "per 'seat' or per user" basis. Id.

During the DMIX Competition, 4DD submitted more than 30 pricing quotes to sell different configurations of TETRA to DHA ("4DD's Competitive Quotes"). See, e.g., Appx25255-25257 (summarizing); Appx24793-24798; Appx24802-24804; Appx24822-24833. 4DD sought to persuade DHA to select TETRA with its Competitive Quotes. See Appx17711-17713; Appx17720-17721 ("Q. [Y]ou wanted the government to consider . . . these quotes in evaluating your software proposal against . . . other competitors? A. Absolutely."); Appx24805 ("I've created 12 new quotes based on ranges that would be meaningful to [DHA].").

4DD's Competitive Quotes offered both development and production licenses for DHA's use. See, e.g., Appx24796. Production licenses allowed processing of both "production" and "non-production data," whereas development licenses were "restricted to processing only non-production data [] used for development purposes." Appx20993. DHA and SMS considered both development and production licenses during the Vendor Fly-Off. See Appx21186-21187.

Subject to the number of processing cores used to run the software, 4DD's licenses allowed TETRA to be installed "on any number of machines in any combination." Appx20993; <u>see also</u> Appx24876 (advertising that "[p]rocessor core licenses for TETRA [] can be distributed across any number of physical or virtual machines, with no upper or lower limits"). When SMS requested quotes for "hot standby" and "fail over machines," Appx20995-20996, 4DD explained that it did not "have established pricing for hot spares," but was willing to "match the other vendor's quote for hot spares, all the way to totally free if that's what they do," Appx20994.

4DD also disclosed that it calculated its Competitive Quotes using a volume discount formula that provided progressively higher discounts as the sales volume increased. <u>See</u> Appx20994 (describing the formula). For example, 4DD quoted a discounted per-core rate of $4,666.06 for a TETRA Federator production license for 3,600 cores. <u>See</u> Appx24804.[3] 4DD applied its formula to offers to sell both TETRA Federator and TETRA Studio. <u>See</u> Appx20; Appx17719-17720.

---

[3] 4DD used the following discount formula:

$$[\text{Base rate}] * [\text{Units}]^{(-0.05 * [\text{Tier Level}])} = [\text{Per-unit discount rate}]$$

<u>See</u> Appx47. The formula reveals the discounted per-core rate described above:

$$[\$24,000] * [3,600]^{(-0.05 * 4)} = [\underline{\$4,666.06}]$$

### D. DHA Licenses TETRA and Begins Developing DMIX

Separately, ImmixTechnology, Inc. ("Immix") and NASA had entered into a Solutions for Enterprise-Wide Procurement ("SEWP") contract through which Immix offered to resell, *inter alia*, 4DD's TETRA software to federal agencies. 4DD presented suggested retail licensing prices for its TETRA software to Immix, who listed the prices in connection with the SEWP Contract ("the SEWP List Prices"). See Appx20; Appx21207 (listing the prices in the "msrp" column); Appx20038. On September 26, 2013, DHA executed a contract with Immix to license 64 cores of TETRA Federator and 50 seats of TETRA Studio for $860,870.01. See 4DD, 159 Fed. Cl. at 341; Appx20327. DHA paid $10,447 per-core for the 64 cores of TETRA Federator and $3,337 per-seat for the 50 seats of TETRA Studio ("Contract License Prices") – prices identical to 4DD's Competitive Quotes for the same volume, rather than 4DD's SEWP List Prices. Compare Appx20329-20330 with Appx24795, Appx24785, Appx21207.



**Figure 1. DHA licensed TETRA at the rates that 4DD quoted during the DMIX competition. Appx24795, Appx20329; see also Appx24785, Appx20330.**

DHA and SMS began developing code packages[4] to configure TETRA to operate with the Government's databases. See Appx22. DHA and SMS first tested TETRA code packages at SMS's laboratory. DHA and SMS then transferred the packages to the Government's Development and Testing Center ("DTC") for further testing. See Appx23.

DHA experienced significant difficulty in monitoring the use of TETRA within SMS's laboratory and within the DTC. At DHA's request, 4DD created a license tracking portal, but the portal failed to effectively track TETRA's use. See Appx21.

In February 2014, 4DD began to suspect that DHA and SMS's use of TETRA exceeded the licensed limits. See Appx24; 4DD, 159 Fed. Cl. at 342. 4DD notified SMS of the potential overuse, see Appx20111, but 4DD did not alert DHA, claiming that "it wanted to support the project," Appx24 (citing Appx16970-16972).

## E. The Department of Defense Ends Work with TETRA

During the summer of 2014, DoD decided to end further work with TETRA, having concluded SMS's work with TETRA was not "getting there in terms of the functionality and performance." Appx18317. On September 3, 2014, DHA told

---

[4] "Code packages" are "written instructions that told [TETRA] '[w]hat to pull, what to push, [and] where to find things'" within the Government's computer networks. Appx22.

SMS "[t]here will be no data integration engine" and DoD would be "done with" TETRA after buying licenses for one more year. Appx21417. Instead of using TETRA, DoD pursued interoperability by improving existing systems. See Appx26; Appx18590-18592. Ultimately, DoD never used any aspect of SMS's work on DMIX, including TETRA, in "operational production." Appx18315; see also Appx46 ("The project never made it to production.").

## F. DHA and 4DD Negotiate a "True-Up" Modification

On August 29, 2014, 4DD contacted DHA to request payment for "68 additional cores" based on 4DD's estimate of the use of TETRA in DMIX. Appx20225. On September 3, 2014 – the same day that DHA told SMS that "[t]here will be no data integration engine" and that DoD was "done with" TETRA – 4DD communicated to DHA an "intent to offer unprecedented discounts for the full enterprise use of the TETRA Healthcare Federator . . . within DMiX (unlimited cores)." Appx21417; Appx20224; see also Appx24967 (explaining 4DD's reasoning for proposing an enterprise license). On September 15, 2014, 4DD sought to discuss "a more flexible and highly discounted pricing model that would replace the 'per core' model." Appx25340; see also Appx17648-17649.

DHA and 4DD's negotiations over the asserted overuse turned contentious and became further aggravated by DHA's difficulties in monitoring TETRA's use. See Appx24-25. The parties ultimately agreed that DHA should purchase a "true-

up" license from Immix for 168 additional cores.  See id.  4DD demanded that DHA

"buy the 168 excess cores at the SEWP [list] price," but DHA rejected the demand,

"4DD relented, and the parties settled at the original contract price."  Id.  4DD

released DHA from further liability.  See Appx25-26; Appx20385.

Beyond the licenses purchased by DHA through Immix, 4DD never sold

licenses of TETRA to any other customer.  See Appx40; Appx17956.

## II.    PROCEDURAL HISTORY

On August 28, 2015, 4DD filed its suit in the CFC pursuant to 28 U.S.C.

§ 1498(b).  Although DHA had licensed originally licensed TETRA for $860,870.01

and paid $1,762,921.12 for the "true-up" license, 4DD asserted entitlement to more

than $5 billion in compensation.  See Appx111.  4DD asserted DoD infringed 4DD's

copyright by over-installing its TETRA software.  See Appx103-104.

### A.    Discovery and Summary Judgment

The parties engaged in lengthy fact and expert discovery.  In response to

motions from both parties, the CFC concluded that DHA had authorized and

consented to SMS's copying of TETRA and that DHA had spoliated evidence.  See

4DD Holdings, LLC v. United States, 143 Fed. Cl. 118, 121-22 (2019).  The CFC

subsequently considered the reasonableness of 4DD's request for fees due to the

spoliation.  See 4DD Holdings, LLC v. United States, 153 Fed. Cl. 371, 373 (2021).[5]

In response to the parties' cross-motions for summary judgment, the CFC held, *inter alia*, that 4DD had a valid copyright for TETRA and that 4DD's "true-up" release – if valid – encompassed the asserted infringement.  See 4DD, 159 Fed. Cl. at 340-41. The CFC deferred the remaining issues for trial.

With respect to expert discovery on damages, 4DD's expert, Elizabeth A. Dean ("Dean"), opined that a royalty rate should be calculated "using (1) the SEWP [list] pricing for TETRA [] and, in the alternative, (2) the willing licensor, willing licensee framework for TETRA."  Appx21657 ¶ 6.  Dean used the first approach – an approach that does not use a hypothetical negotiation – at the instruction of 4DD's counsel.  See Appx21672-21673 ¶¶ 40-41.  Dean described the SEWP list pricing as "established."  Id.; Appx21663 ¶ 22; Appx21681-21682 ¶ 57.  In response, the Government expert, David Kennedy ("Kennedy"), constructed a comprehensive hypothetical negotiation between the parties.  See Appx25161, Appx25189-25191 ¶¶ 87, 154-62 (citing, *inter alia*, Gaylord v. United States, 678 F.3d 1339 (Fed. Cir. 2012) ("Gaylord II")).  The parties each moved *in limine* on these differing approaches.  See Appx15761 ("4DD's instruction to Ms. Dean on the 'actual license fees' theory is legal error and therefore unreliable."); Appx15967 ("a hypothetical

---

[5] The CFC awarded 4DD $1,596,443.96 in fees, see Appx6360, Appx64, and applied adverse inferences against the Government, see Appx32, Appx39.

negotiation analysis is inapplicable where ... the parties engaged in actual negotiations and reached an agreed-upon license price"). The CFC denied both motions. See Appx16374.

### B.    Trial and Judgment

The parties participated in a two-week trial in November 2022 and the CFC heard testimony from Dean and Kennedy. Both experts testified that 4DD never sold any licenses at the SEWP List Prices. See Appx17948; Appx19091. After trial, 4DD again asserted "the [CFC] should not resort to a hypothetical negotiation" in favor of "established" SEWP list prices of $17,569 per core for TETRA Federator. Appx19243-19245; Appx19250. 4DD claimed entitlement "to anywhere from $3 to $5 billion as compensation." Appx40; see Appx19251-19252; Appx19327.

On August 22, 2023, the CFC issued its Opinion finding the Government liable under Section 1498(b) and awarding compensation. See Appx17-50. With respect to damages, the CFC rejected 4DD's established royalty theory because authority held that such a rate

> requires "general acquiescence" by a significant "number of persons."
> Here, 4DD has never sold its Tetra Healthcare product to any entity
> other than the government, and so with only one customer and
> effectively one sale, it can hardly claim that it has an established royalty
> rate that entitles it to $5 billion.

Appx40 (citing Unisplay, S.A. v. Am. Elec. Sign Co., 69 F.3d 512, 517 (Fed. Cir. 1995), quoting Sun Studs, Inc. v. ATA Equip. Leasing, Inc., 872 F.2d 978, 993 (Fed.

Cir. 1989), overruled on other grounds, A.C. Aukerman Co. v. R.L. Chaides Const. Co., 960 F.2d 1020 (Fed. Cir. 1992)).  Having rejected 4DD's established royalty theory, the CFC assessed damages by constructing a hypothetical negotiation between the parties.  First, the CFC determined that the date of the hypothetical negotiation would have been August 27, 2013.  See Appx43.  Second, the CFC considered the objective factors and concluded "that the government possesse[d] a substantially superior bargaining position" in the hypothetical negotiation.  Appx43-45.  Citing the Georgia-Pacific factors, the CFC concluded that DHA would have held the superior bargaining position because:  (1) TETRA "provided [DHA] with little value"; (2) "other than its agreement with the government, 4DD [] never sold" TETRA to others; and (3) the "lower price and similar functionality" of a non-infringing software program named Rhapsody "would have constrained to some extent 4DD's ability to make demands" in a negotiation.  Appx44-45 (citing Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116 (S.D.N.Y. 1970)).  Third, citing the approach endorsed in Gaylord II, the CFC concluded that the parties would have negotiated different royalties for three categories[6] of infringement by DHA:

---

[6] The CFC summarily rejected an award for a fourth category claimed by 4DD, infringement through RAM copies, as inherently subsumed within the licenses for the first category.  See Appx48.

1. **Non-Backup Copies of TETRA Federator.** The parties would have negotiated a per-core royalty for 30,604 cores by using 4DD's development license prices and discount formula. <u>See</u> Appx45-47.

2. **Backup Copies of TETRA Federator.** The parties would have negotiated a convenience fee of 20%, assessed against the royalty for the first category. <u>See</u> Appx47-48.

3. **Copies of TETRA Studio.** The parties would have negotiated a flat fee of $150,000 "to compensate 4DD for what would have been willful infringement—an amount equivalent to statutory damages under the Copyright Act." Appx48-49.

Based on these hypothetical royalties, DHA's earlier true-up payment, and delay compensation, the CFC awarded 4DD $12,683,065.86. <u>See</u> Appx54; Appx16.

## C. The CFC Denies 4DD's Request for Reconsideration

On December 26, 2023, 4DD moved for reconsideration, arguing the CFC "profoundly misapprehend[ed] the 'established royalty' analysis" by requiring proof of "general acquiescence" where the infringer allegedly acquiesced to the rate. Appx19825. 4DD alternatively argued the CFC committed "at least three clear factual errors" in constructing the hypothetical negotiation. Appx19822-19823. The CFC denied 4DD's motion. <u>See</u> Appx55-61. With respect to 4DD's established royalty argument, the CFC concluded that 4DD's legal authority did not support its

argument, and that the royalty base of DHA's prior license was not directly analogous to the royalty base of the infringement. See Appx56-59. With respect to 4DD's hypothetical negotiation arguments, the CFC concluded that 4DD "read the facts differently but cannot show that [the CFC] ignored any crucial piece of evidence nor the law." Appx59-61.

On June 18, 2024, 4DD filed a notice of appeal. See Appx19932. 4DD requests that the Court: (1) reverse the CFC's judgment awarding $12.7 million to 4DD; and (2) instruct the CFC to award at least $955.7 million to 4DD on remand, based on 4DD's asserted royalty rates. See 4DD Br. at 48.[7]

## SUMMARY OF THE ARGUMENT

After a full trial, the CFC awarded 4DD $12.7 million in compensation for DHA's infringement of 4DD's TETRA software. Following the principles identified by the Court in Gaylord II and Gaylord III, the CFC calculated its award based on the value of a three-part hypothetical license covering DHA's different

---

[7] 4DD does not identify the total value of its demand on appeal – other than asserting "damages in the 9- or 10-figure range," 4DD Br. at 10 – but the total value can be calculated based on its contentions and the law of the case:

| | |
|---|---|
| TETRA Federator Non-Backup | $10,447 x 30,604 |
| TETRA Federator Backup | 20% x $10,447 x 30,604 |
| TETRA Studio | +          $3,337 x 171,421 |
| (See 4DD Br. at 48). | $955,695,862.60 |

uses.  The CFC's approach was legally correct, and its fact findings were supported by the record and entitled to deference.

4DD advances two flawed arguments to support its claim for a reversal and a billion-dollar award.  First, 4DD asserts that the pre-existing rate DHA paid for a 64-core license of TETRA Federator must "control" as a matter of law for the compensation owed for DHA's 30,604-core infringement.  4DD offers that its rule is purportedly supported by a "plain-text" interpretation of 28 U.S.C. § 1498(b), but the *en banc* Leesona decision directly refutes 4DD's premise.  4DD's asserted legal rule is not supported by any other authority, and the Court's Gaylord and Bitmanagement cases directly undermine the purported rule.  In particular, Gaylord II requires that a trial court consider all relevant evidence, and Gaylord III requires that a trial court consider economically relevant differences when using a pre-existing license to assess reasonable compensation.  In addition, 4DD's argument on appeal is inconsistent with the argument it presented to the CFC – resulting in waiver – and inconsistent with the rule it asserts.  Nevertheless, 4DD failed to prove that any asserted rate was commercially established and applicable to the scope of the infringement.  The CFC correctly rejected 4DD's asserted legal rule, both after trial and again after reconsideration.

Second, 4DD alternatively asserts that seven (7) different legal and fact errors "infected" the CFC's hypothetical negotiation, 4DD Br. at 33, but each asserted error

is flawed as a matter of law and fact. The CFC properly used the Book of Wisdom doctrine to consider **how** DHA used the infringing copies of TETRA, so that the hypothetical license could cover and fairly compensate 4DD for the value of DHA's use. The CFC correctly exercised its discretion in considering how a non-infringing alternative would have affected the hypothetical negotiation. The CFC appropriately used 4DD's quoted development licenses – together with 4DD's standard volume discount formula – to determine the royalty for DHA's development work with TETRA Federator. Finally, although the CFC erred in justifying the hypothetical royalty for TETRA Studio, the CFC's error is harmless because the amount of the royalty is independently justifiable by DHA's use of the software and the evidence of record. The Court should affirm the CFC's judgment.

## STANDARD OF REVIEW

In appeals from the CFC, the Court reviews "legal conclusions de novo and [] factual findings for clear error." Bitmanagement Software GmbH v. United States, No. 23-1506, __ F.4th __, 2025 WL 37051, *3 (Fed. Cir. Jan. 7, 2025) (citing Gaylord II at 1342). A finding is clearly erroneous where the Court "is left with the definite and firm conviction that a mistake has been committed." Id. (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)).

The Court reviews a damages award by the CFC for an abuse of discretion. See id. (citing Hi-Shear Tech. Corp. v. United States, 356 F.3d 1372, 1377 (Fed. Cir.

2004)); see also Gaylord III at 1367 ("In the patent context, we have treated the royalty determination as a factual finding but certain methodological questions for determining a fair market value as subject to abuse-of-discretion review."). "A court abuses its discretion when (1) the court's decision is clearly unreasonable, arbitrary or fanciful; (2) the decision is based upon an erroneous construction of the law; (3) the trial court's factual findings are clearly erroneous; or (4) the record contains no evidence upon which the trial court could have rationally based its decision." Hi-Shear Tech., 356 F.3d at 1377-78 (citation omitted).

## ARGUMENT

The Government's limited waiver of sovereign immunity for copyright infringement allows an owner to recover "reasonable and entire compensation as damages for such infringement." 28 U.S.C. § 1498(b). That section allows the owner to recover actual damages based on the theory of an eminent domain taking of the fair market value of a license covering the Government's use. See Gaylord II at 1342-43.

At their core, 4DD's arguments on appeal improperly seek to preclude consideration of relevant evidence of fair market value of a license for the copyrighted work. 4DD's first argument asserts that a purported agreement between parties prohibits use of a hypothetical negotiation to determine damages, even though no authority supports such a rule. 4DD's asserted rule would preclude

economically relevant differences in scope between the prior license and the infringement, contrary to the Court's precedent. 4DD's second argument takes issue with the CFC's consideration of other directly relevant evidence – how DHA used TETRA, the effect of a non-infringing alternative, 4DD's volume discount formula – but such evidence establishes the fair market value of a nonexclusive license for 4DD's software. The CFC used the proper approach to assess compensation and its judgment should be affirmed.

## I. THE CFC CORRECTLY REJECTED 4DD'S ESTABLISHED ROYALTY THEORY AND CONSIDERED ALL EVIDENCE RELEVANT TO FAIR MARKET VALUE

For its first issue on appeal, 4DD asserts that the pre-existing rates that DHA paid to license TETRA must always "control" as a matter of law, even though the scope of the license and the scope of the infringement are incomparable. As explained below, the Court's authority and other authority reject 4DD's assertion.

### A. 4DD's Interpretation of "Entire" Compensation is Contrary to the *En Banc* Interpretation in <u>Leesona</u>

4DD argues that its "plain-text" interpretation of the phrase "entire compensation" in 28 U.S.C. § 1498(b) requires an award based on "an existing license rate," 4DD Br. at 14-15, 23, but binding precedent contradicts 4DD's interpretation. In <u>Leesona Corp. v. United States</u>, an *en banc* panel of the Court of Claims concluded that Congress added "entire" to the precursor of Section 1498 "to underscore the exclusivity of the remedy of suit." 599 F.2d 958, 967-68 (Ct. Cl.

1979) (explaining that legislative history and precedent supported this conclusion). In doing so, the Court of Claims expressly rejected the view that "entire compensation" provided relief beyond "reasonable compensation." See id. ("no further liability . . . can be assumed" beyond "just compensation"). In Gaylord II, this Court adopted the Leesona "analysis [] with equal force in the § 1498(b) context, where courts must determine just compensation for the plaintiff's loss when the government takes what is essentially a compulsory, non-exclusive license on the plaintiff's copyright." Gaylord II at 1343; see also S. Corp. v. United States, 690 F.2d 1368, 1370-71 (Fed. Cir. 1982) (adopting the decisions of the Court of Claims). Accordingly, "reasonable and entire compensation" in Section 1498(b) allows recovery of reasonable compensation exclusively in the CFC; the word "entire" does not command use of a particular benchmark to determine reasonable compensation.

**B.    The Gaylord Cases Require Consideration of All Relevant Evidence**

4DD cites to Gaylord II in its Opening Brief, but it fails to fully appreciate the reasoning of the precedential decision. In Gaylord II, the Court held that the methods used to determine "actual damages" under 17 U.S.C. § 504 were appropriate for assessing "reasonable [] compensation" under 28 U.S.C. § 1498(b). See Gaylord II at 1343. In particular, the Court concluded that a successful plaintiff could recover "the fair market value of a license covering the defendant's use." Id. (citations

omitted); <u>see also</u> <u>Gaylord III</u> at 1367 (discussing <u>Gaylord II</u>); <u>Bitmanagement</u>, 2025 WL 37051 at *4 (same).

Even though 4DD acknowledges that compensation must be based on the fair market value of a license covering the Government's actual use of TETRA, <u>see</u> 4DD Br. at 3, 11, 18, 24, 4DD erroneously argues that an alleged license between the parties automatically precludes a trial court's consideration of other relevant evidence. 4DD's argument is directly at odds with <u>Gaylord II</u>, which held that the trial court erred by "limit[ing] its inquiry" to particular licenses "without considering other evidence." <u>Gaylord II</u> at 1344. In remanding the case, the Court directed the trial court to "consider *all* evidence relevant to a hypothetical negotiation rather than limiting its analysis to [particular] licenses or . . . policies." <u>Id.</u> (emphasis in original).

A preexisting license between the parties for the asserted work is undoubtedly relevant. But such a license, by itself, cannot preclude consideration of other evidence, especially evidence relevant to the context of the license. In <u>Gaylord III</u>, the Court endorsed using license agreements to assess reasonable compensation, but cautioned that a trial court "must always" consider "economically relevant differences" between the license and the infringement:

> For example, past arms-length licensing practices by the copyright owner or the infringer for similar uses and "benchmark" licenses by others in the industry may be useful. But the use of past licenses as evidence must always take account of economically relevant

differences between the circumstances of those licenses and the circumstances of the matter in litigation—as we have said in the related patent-law context.

Gaylord III at 1368.

C.    **No Authority Mandates that a Prior Rate Between the Parties Must Control Without Considering Relevant Context**

4DD asserts that "multiple circuit courts" have "squarely held" that a pre-existing license rate between the parties-in-suit "controls" as a matter of law, 4DD Br. at 17, but no authority supports 4DD's asserted rule. At most, as described below, some courts have held that such a rate might inform the proper compensation, if economically relevant differences are properly considered.

For example, Thoroughbred does not support 4DD's view that a previously-negotiated rate must control in all cases without considering relevant context. See Thoroughbred Software Int'l, Inc. v. Dice Corp., 488 F.3d 352, 358-60 (6th Cir. 2007). There, the court affirmed a previously-negotiated per-copy royalty where the defendant surreptitiously and intentionally copied the plaintiff's software. See id. at 355-57. The defendant's conduct and business strongly suggested that it benefited from the use of copies it characterized as "unused," and the parties' license agreement "provide[d] that a license fee [was] due for each copy," even if not used. See id. at 355-59; see also Bitmanagement, 2025 WL 37051 at *5 ("the Sixth Circuit relied on explicit provisions in the applicable license agreement"). In Thoroughbred, the parties' pre-existing agreement appeared to encompass the same scope as the

defendant's infringement.  Thoroughbred does not involve economically relevant differences.

Similarly, Polar Bear fails to support 4DD's rule that a prior rate always controls.  See Polar Bear Prods., Inc. v. Timex Corp., 384 F.3d 700, 708-09 (9th Cir. 2004).  In that case, the plaintiff quoted the defendant a price to produce a promotional video featuring images from the plaintiff's copyrighted work, but the defendant nevertheless created the video without plaintiff's knowledge or permission.  See id. at 704.  The Ninth Circuit affirmed damages based on plaintiff's quote, inherently recognizing that the scope of the quote was identical to the scope of the infringement.  See id. at 709.

The Second Circuit used the same approach in Szekely v. Eagle Lion Films, Inc., 242 F.2d 266 (2d Cir. 1957).  There, a film producer contracted with an author to write a screen play for $35,000, but the producer only paid the author $10,000. See id. at 267.  When a subsequent distributor[8] published the film, the Second Circuit affirmed actual damages of $25,000, because the scope of the partially-paid contract was identical to the scope of the infringement.  See id. at 268-69.

---

[8] 4DD asserts that Szekely "squarely held" that a prior license rate between litigating parties "controls," 4DD Br. at 17, but Szekely did not involve a prior rate between litigating parties.  Instead, the author and the producer contracted to the prior rate; the author and the distributor litigated the case.

Ultimately, Thoroughbred, Polar Bear, and Szekely illustrate that 4DD derived the wrong rule based on incomplete criteria. The appellate courts upheld the relevance of those prior licenses and quotes because they generally encompassed the same parties, the same work-in-suit, **and** the same scope as the later infringement.[9] The decisions in those cases are consistent with this Court's precedent in patent damages cases. For example, 4DD cites CSIRO as allegedly supporting a "focus on real-world agreements between the actual litigants," 4DD Br. at 30, but 4DD ignores that the Court directed an approach that expressly "account[s] for differences in the technologies and economic circumstances of the contracting parties" when considering the comparability of other licenses, CSIRO v. Cisco Sys., Inc., 809 F.3d 1295, 1303 (Fed. Cir. 2015) (quoting Finjan, Inc. v. Secure Computing Corp., 626 F.3d 1197, 1211 (Fed. Cir. 2010)). And, as discussed *supra*, the Court described the same approach for using licenses to determine compensation pursuant to Section 1498(b): the trial court "must always take account of economically relevant differences between the circumstances of those licenses and the circumstances of the matter in litigation." Gaylord III at 1368 (citing Finjan, 626 F.3d at 1211-12;

---

[9] The other cases cited by 4DD for its asserted rule all involved agreements with the same scope as the infringement. See, e.g., Biodynamic Tech., Inc. v. Chattanooga Corp., 658 F. Supp. 266, 270 (S.D. Fla. 1987); Ford Motor Co. v. Versata Software, Inc., No. 15-cv-10628, 2018 WL 10733561 (E.D. Mich. July 9, 2018); Shepherd Mgmt. Group, Inc. v. Michael Wilkov Cantoni, LP, No. 07-cv-678, 2008 WL 11336460 (N.D. Ga. Dec. 17, 2008).

Ericsson, Inc. v. D-Link Sys., Inc., 773 F.3d 1201, 1227-28 (Fed. Cir. 2014); VirnetX, Inc. v. Cisco Sys, Inc., 767 F.3d 1308, 1327 (Fed. Cir. 2014)); see also Bitmanagement, 2025 WL 37051 at *5 (explaining that "every case . . . requires consideration of the particular facts and circumstances" in rejecting the argument that Thoroughbred established a legal rule that precludes the same).

Accordingly, 4DD's asserted rule is inconsistent with the authority it cites and with the Court's precedent. Prior licensing arms-length licensing practices – even those involving both parties in suit – are relevant to a hypothetical negotiation, but a trial court must always consider the relevant context of the prior practices, including their scope.

### D. 4DD's Argument is Waived and Inconsistent with the Rule it Advances

4DD argues that "[t]here is no need for a 'hypothetical' negotiation" because the Contract License Prices were established through "the parties hav[ing] an *actual* negotiation in place." See 4DD Br. at 25; id. at 17-18 (asserting "the exact rates the government actually paid" were "established" in the Contract and "reaffirmed" in the true-up). 4DD waived this argument by failing to properly present it to the CFC. 4DD now argues that the **Contract License Prices** were established, but it argued to the CFC that the **SEWP List Prices** constituted established rates before, during, and after trial. See Appx15290; Appx17943-17944; Appx17957-17958; Appx19244. In its Opening Brief, 4DD suggests that it presented its current

argument in its motion for reconsideration, <u>see</u> 4DD Br. at 17 (citing Appx19909), but "an argument made for the first time in a motion for reconsideration comes too late, and is ordinarily deemed waived and not preserved for appeal," <u>Bluebonnet Sav. Bank, F.S.B. v. United States</u>, 466 F.3d 1349, 1361 (Fed. Cir. 2006). Accordingly, the Court should deem the argument waived.

But even if the argument is not waived, 4DD fundamentally mischaracterizes the Contract License Prices as sourced from an agreement directly between the Government and 4DD. <u>See, e.g.</u>, 4DD Br. at 11 ("4DD and the government had *two* binding agreements"); <u>id.</u> at 15 n.1 ("the parties' binding agreement"); <u>id.</u> at 16 ("their own agreement"); <u>id.</u> at 18 ("the parties' own binding agreements"); <u>id.</u> at 22 ("the parties' own real-world agreement"); <u>see also</u> <u>id.</u> at 25, 31 n.2. Contrary to 4DD's characterizations, **none** of the relevant contracts in this litigation directly involved the Government and 4DD as parties to the same contract. Immix and NASA were parties to the SEWP contract – 4DD did not have privity with NASA. <u>See</u> <u>id.</u> at 5 ("so-called NASA SEWP"); Appx20. DHA and Immix were parties to the contract procuring the TETRA licenses – 4DD did not have privity with DHA. <u>See</u> Appx20327. Thus, even assuming *arguendo* the validity of 4DD's asserted rule, 4DD's rule cannot apply to this case because the Government and 4DD were never direct parties to the same pre-existing agreement.

### E.    4DD's Asserted Prices were not Established and Not Directly Comparable

Finally, the CFC correctly concluded that 4DD's asserted prices were neither established nor comparable to the infringement.  Compare 4DD Br. at 17-18, 25 with Appx40, Appx56-59.  As the CFC held, 4DD's asserted rates could not have been established because they lacked "'general acquiescence' by a 'significant number of persons.'"  Appx40; Appx56-59 (quoting Unisplay, 69 F.3d at 517; Sun Studs, 872 F.2d at 993).  Although an established rate may obviate a hypothetical negotiation in some cases, the proponent must prove that the rate is commercially established.  See Hanson v. Alpine Valley Ski Area, Inc., 718 F.2d 1075, 1078 (Fed. Cir. 1983); see also Badowski v. United States, 278 F.2d 934, 935 (Ct. Cl. 1960).  Judicial and legislative authority have increasingly favored use of a hypothetical royalty over an established royalty.  See Prism Techs. LLC v. Sprint Spectrum L.P., 849 F.3d 1360, 1371-72 (Fed. Cir. 2017) (discussing the historical context of Rude v. Wescott, 130 U.S. 152 (1889)).  On appeal, 4DD argues that a single agreement between parties could establish fair-market value, see 4DD Br. at 31, but "[a] single licensing agreement, without more, is insufficient proof of an established royalty," Trell v. Marlee Elecs. Corp., 912 F.2d 1443, 1446 (Fed. Cir. 1990); see also Hanson, 718 F.2d at 1078; Appx40 ("4DD has never sold [TETRA] to any entity other than the government, and so with only one customer and effectively one sale, it can hardly claim that it has an established royalty rate that entitles it to $5 billion.").

Beyond the absence of general acquiescence, the rates asserted by 4DD are incomparable in scope with the infringement. On appeal, 4DD argues that the CFC was legally obligated to use the $10,447 per-core Contract License Price for **64 cores** of TETRA Federator to calculate compensation for the **30,604 cores** held to infringe, and that the CFC was obligated to use the $3,337 per-seat Contract License Price for **50 seats** of TETRA Studio to calculate compensation for the **171,421 seats** 4DD asserted. See id.; id. at 48.[10] At a minimum, 4DD's argument improperly ignores that its rates were based on its exponential volume discount formula, and that the rate for 30,604 units would be substantially lower than the rate for 64 units. See generally Appx20994 ("we have a formula that gives progressively higher discounts"). The CFC understood this and correctly rejected 4DD's asserted rates as established because "the usage contemplated . . . is not analogous to the infringing use." Appx57; see also id. ("The 64-core license . . . is not comparable to the infringing use (tens of thousands of copies)."). A trial court must consider differences between the scope of an asserted established royalty and the scope of the infringement. See Sun Studs, 872 F.2d at 993; Badowski, 278 F.2d at 935-36 (rejecting use of alleged established pricing because of differences in customers,

---

[10] As noted above, 4DD argued to the CFC that the SEWP List Prices were established, not the Contract License Prices. See supra Section I.D.; Appx40 (citing 4DD's assertion of "$17,000 per core," 4DD's "volume discounted SEWP price," as the asserted established rate).

terms, and volume with respect to the Government's infringement); see also Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd., No. Civ 09-290, 2012 WL 3686748, at *3 (W.D. Pa. Aug. 24, 2012) (rejecting an asserted royalty as established because of differences in character and scope with a patent license). Indeed, the economically relevant context of an asserted rate – whether claimed as established or not – should always be considered. See Gaylord III at 1368; Wordtech Sys., Inc. v. Integrated Networks Sols., Inc., 609 F.3d 1308, 1320 (Fed. Cir. 2010) ("If Wordtech's previous licensee paid $350,000 to produce one thousand devices, for example, INSC would not have agreed ex ante to pay $250,000 if it expected to make only fifty-six units.").

At trial, even Dean, 4DD's damages expert, refused to describe 4DD's asserted rates as "comparable"; instead, she conceded that a different scope between the asserted rates and the infringement would have caused the parties to explore "other prices":

> Q. [W]ould you consider the SEWP price for 512 cores to be comparable to [a license for] 500,000 cores?
>
> A. I guess it would depend on why they were taking a license for 500,000 cores. If it was a full worldwide deployment, there might be reasons to look at other prices. I . . . think in a situation where it was a full worldwide deployment, like 4DD's talked about, they would be willing to talk to the government about other pricing.
>
> THE COURT: Including enterprise licensing?

THE WITNESS: For a full production license deployment, it sounded like . . . [4DD] would have been willing to engage in that.

Appx17962-17963.  Accordingly, the law and the record fully support the CFC's rejection of 4DD's established royalty argument.[11]

## II. THE CFC CORRECTLY CONSTRUCTED A HYPOTHETICAL NEGOTIATION BASED ON THE PROPER LAW AND FACTS

4DD alternatively challenges the CFC's construction of the hypothetical negotiation with seven (7) scattershot arguments, asserting "three global errors," 4DD Br. at 33-38, and four category-specific errors, see 4DD Br. at 39-47.  None of 4DD's arguments have merit.

### A. The CFC Properly Used the Book of Wisdom

For its first asserted "global error," 4DD argues that the CFC improperly used "the so-called 'book of wisdom' to permit *future* events to color *ex ante* negotiations."  4DD Br. at 34-36 (emphasis in original).  Contrary to 4DD's argument, the Court and the Supreme Court have repeatedly endorsed the use of the Book of Wisdom doctrine, and the CFC's application of the same is consistent with and supported by precedent.

---

[11] 4DD asserts that it makes no difference "whether the government used all the copies or not" in the concluding section of its first argument, 4DD Br. at 23-24, but 4DD never sold TETRA on a per-copy basis.  Instead, 4DD's per-core and per-seat licenses were premised on use by the licensee.  Ultimately, "[t]he law does not require that every award of copyright damages be on a per-copy basis." Bitmanagement, 2025 WL 37051 at *3.

Pursuant to the Book of Wisdom, the Supreme Court directed courts to consider relevant developments that occur after the date of a hypothetical negotiation. See Sinclair Refining Co. v. Jenkins Petroleum Process Co., 289 U.S. 689, 698 (1933) (explaining that post-infringement "[e]xperience is . . . a book of wisdom that courts may not neglect"). The Court has long endorsed use of Book of Wisdom "to look to events and facts . . . that could not have been known to or predicted by the hypothesized negotiators." Fromson v. W. Litho Plate & Supply Co., 853 F.2d 1568, 1575-76 (Fed. Cir. 1988)[12] (citing Sinclair, 289 U.S. at 698-99). For example, the Court has cited the Book of Wisdom as relevant to the eleventh Georgia-Pacific factor, which considers "the extent to which the infringer has made use of the invention; and any evidence probative of the value of that use." Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1333 (Fed. Cir. 2009) (quoting Georgia-Pacific, 318 F. Supp. at 1120).[13]

In the context of a Section 1498(b) copyright claim, the Court's Gaylord cases illustrate use of the Book of Wisdom to construct a hypothetical negotiation. In Gaylord II, the Court directed the CFC "to determine the fair market value of a

---

[12] Overruled on other grounds by Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp., 383 F.3d 1337 (Fed. Cir. 2004).

[13] The Book of Wisdom inherently informs many of the other Georgia-Pacific factors as well. See generally Georgia-Pacific, 318 F. Supp. at 1120.

license for the full scope of the Postal Service's infringing use" by suggesting that the trial court consider how the stamps were used after the infringement. <u>See</u> <u>Gaylord II</u> at 1344-45. The Court cited many subsequent-use facts as relevant to the hypothetical negotiation in <u>Gaylord II</u> and <u>Gaylord III</u>, including many that the parties could not have known (or estimated) at the time of their hypothetical negotiation. <u>See</u> <u>Gaylord II</u> at 1344 (citing the Postal Service's licenses for use of the image on retail goods); <u>id.</u> at 1344 n.3 (citing Gaylord's post-litigation agreement with the photographer); <u>id.</u> at 1345 (citing the Postal Service's revenue on unused stamps sold); <u>Gaylord III</u> at 1371 (citing the Postal Service's decision to print more stamps); <u>id.</u> at 1372 (citing the Postal Service's subsequent survey data).

The CFC's use of the Book of Wisdom is justified by these authorities. The CFC looked to evidence after the hypothetical negotiation to determine the number of TETRA copies made and the associated cores and seats, <u>see</u> Appx36-38, and how DHA and SMS used those copies, <u>see</u> <u>id.</u>; Appx46; Appx48. Thus, the CFC's use of the Book of Wisdom was entirely encompassed by the eleventh <u>Georgia-Pacific</u> factor. 4DD inherently advocates that the Book of Wisdom can only be used in an asymmetric and self-serving way: namely, that the hypothetical negotiators can only consider the extent of the infringing use after the negotiation but cannot consider any evidence of the value of that use. The CFC correctly rejected 4DD's argument and

properly used the Book of Wisdom to consider how DHA used TETRA and the value of that use.

## B. The CFC Correctly Considered Rhapsody as an Available Alternative

For its second asserted global error, 4DD argues that the CFC erred by considering the effect of the Rhapsody software, a non-infringing alternative, in the hypothetical negotiation without "a formal finding that Rhapsody was indeed a full and complete substitute for TETRA." 4DD Br. at 37. 4DD cites no authority for its argument and no authority requires such a finding.

Indeed, 4DD's argument is contrary to the Court's precedent. The CFC properly considered the non-infringing alternative in the context of assessing reasonable compensation pursuant to 28 U.S.C. § 1498(b). See Gaylord III at 1370 ("We do not question the government's suggestion that alternatives available to a potential licensee provide an important constraint in a hypothetical negotiation."); Bitmanagement, 2025 WL 37051 at *6-7 (citing software alternatives as relevant to assessing compensation for Section 1498(b)). 4DD asserts that Rhapsody could not have been considered unless it was "a full and complete substitute," 4DD Br. at 37, but the Court squarely rejected such a rule in SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.:

> [Plaintiff-Appellant] argues . . . that the noninfringing products lacked one or more features of the patented invention . . . . However, by definition, noninfringing products do not represent an embodiment of

> the invention. Thus, the district court properly considered the realities of the marketplace . . . .

926 F.2d 1161, 1166 (Fed. Cir. 1991). To prove that Rhapsody was not an acceptable non-infringing substitute for TETRA, 4DD needed to show that TETRA's distinct and protectible features drove the purchasing decisions in the marketplace. See <u>Standard Havens Prods., Inc. v. Gencor Indus., Inc.</u>, 953 F.2d 1360, 1373 (Fed. Cir. 1991). 4DD failed to do so.

The CFC's approach was correct and entitled to deference. Rhapsody was available at the time of the hypothetical negotiation. <u>See</u> 4DD Br. at 37; Appx15301 (conceding that "Rhapsody had been used in public health programs since at least 2006"). Rhapsody was an acceptable alternative – indeed, DHA eventually used Rhapsody "to fulfill the function that TETRA was meant to fulfill." Appx18981-18983. The CFC found that Rhapsody's "similar functionality would have constrained to some extent 4DD's ability to make demands in [the] hypothetical negotiation." Appx45. The CFC's consideration and use of Rhapsody in the hypothetical negotiation is entitled to discretion. <u>See generally</u> <u>Mars, Inc. v. Coin Acceptors, Inc.</u>, 527 F.3d 1359, 1372-73 (Fed. Cir. 2008)[14] (upholding a royalty rate

---

[14] <u>Mandate amended on other grounds</u> by 557 F.3d 1337 (Fed. Cir. 2009).

reduction due to the "possibility that [the defendant] could have come up" with an acceptable non-infringing alternative).[15]

## C.    The CFC's Approach was not Counterfactual

For its third asserted global error, 4DD broadly argues that the CFC "repeatedly" premised its hypothetical negotiation on "*counterfactual* presumptions," 4DD Br. at 38, but the record amply supports the CFC's analysis. 4DD questions DHA's superior bargaining strength, but the facts demonstrated that 4DD fiercely competed to sell TETRA to DHA and that DHA was 4DD's only customer for the product. Compare id. with Appx40; Appx17956. 4DD questions why DHA did not "demand a development license (if that is what it really wanted)," 4DD Br. at 38, but the facts showed that DHA required 4DD to quote development licenses and that DHA considered them in the DMIX Competition, see Appx20993, Appx21186-21187. 4DD questions why DHA did not specifically leverage Rhapsody's availability to discount TETRA, see 4DD Br. at 38, but the facts demonstrated that 4DD directly competed on price and performance against at least

---

[15] During trial, the Government argued that the amount paid for Rhapsody would have capped the hypothetical royalty for TETRA. The CFC declined to adopt this argument, see Appx40-42, but the Court has held that a trial court has sufficient discretion to use an alternative to "effectively cap[] the reasonable royalty award." Grain Processing Corp. v. American Maize-Prod. Co., 185 F.3d 1341, 1347 (Fed. Cir. 1999); see also Gaylord III at 1370 ("The buyer will not ordinarily pay more for a license than its benefit . . . measured relative to available alternatives.") (citations omitted).

nine (9) other software solutions during the DMIX Competition, see Appx21039-21040, and that 4DD offered to match its competitors' quotes "all the way to totally free," Appx20994. Ultimately, the CFC's fact findings are well-supported and entitled to deference. 4DD's unsupported questions and vague arguments, see 4DD Br. at 38 ("And so on."), do not establish clear error.

### D. The CFC Correctly Used a Development License Rate

For its first asserted category-specific error, 4DD argues that the CFC should not have used the Book of Wisdom to conclude that the parties would have based the hypothetical royalty for TETRA Federator on 4DD's development license rate, instead of 4DD's production license rate. See 4DD Br. at 39-42. 4DD asserts that "*post-hoc* knowledge" of how DHA used TETRA cannot be incorporated into "*ex-ante* negotiations" as a matter of law. Id. As described above, 4DD's assertion is directly refuted by the Court's precedent. See *supra* Section II.A.; see also Lucent, 580 F.3d at 1333-34 (validating "[c]onsideration of evidence of usage after infringement . . . under appropriate circumstances").[16]

4DD's remaining arguments are factual disputes that the CFC correctly rejected. 4DD asserts that "there was *no development version* of [TETRA

---

[16] Lucent is the only authority cited by 4DD for this particular argument, but Lucent expressly rejects 4DD's premise. Compare 4DD Br. at 39-41 with Lucent, 580 F.3d at 1333-34 ("The damages award out to be correlated, in some respect, to the extent the infringing method is used by consumers.").

Federator]" and "no formal development license," 4DD Br. at 40, but 4DD repeatedly **offered and quoted** development licenses during the DMIX Competition, <u>see</u> Appx17712-17713, Appx20993, Appx24793, and the CFC reasonably held 4DD to its representations, <u>see</u> Appx46; Appx60. 4DD asserts that "the government needed a production license" based on an email sent by an SMS employee seeking to ensure "high capacity" performance of the software, 4DD Br. at 40; Appx24897, but at most, the email represents the anecdotal belief of a contractor based on other software.[17] Other evidence contradicted the view that 4DD configured development versions for lower performance. <u>See</u> Appx20993-20994. The CFC's use of a development license rate is supported by the record and by precedent.

### E. The CFC Properly Discounted the Development License Rate

For its second asserted category-specific error, 4DD argues that the CFC "further erred by applying a volume discount to the baseline development-license pricing." 4DD Br. at 42-43; <u>see also</u> <u>id.</u> at 41. 4DD's volume discount formula is legally relevant. <u>See, e.g.</u>, <u>Bitmanagement</u>, 2025 WL 37051 at *6 ("Bitmanagement

---

[17] No DHA employee participated in this exchange. <u>See</u> Appx24897. Notably, the SMS employee sent the email more than five months after the date of the hypothetical negotiation. <u>See</u> <u>id.</u> Thus, 4DD's reliance on this email undermines its own argument that the CFC cannot legally consider alleged "*post-hoc* knowledge*" in a hypothetical negotiation. 4DD Br. at 39.

offered licensees discounts as the number of licenses the licensees purchased increased."). 4DD's argument is solely premised on factual disputes. The CFC twice rejected 4DD's argument, see Appx46-47; Appx60, and its conclusions are strongly supported by the record.

First, 4DD asserts that the CFC erred by adopting Kennedy's "presumption" and "raw speculation" of a discount formula "that would continue endlessly with steeper discounts," 4DD Br. at 41, but that is how 4DD described its formula during the DMIX Competition. 4DD's CEO explained that 4DD had

> a **formula** that gives **progressively higher discounts** even within a given tier. So, the price per unit is less expensive when purchasing 320 cores than when purchasing 64 cores, even though it's in the same tier.

Appx20994 (emphasis added). Kennedy derived the formula from 4DD's explanation and from 4DD's Competitive Quotes. See Appx25180-25182; Appx25202. 4DD's damages expert conceded the accuracy of the formula. See Appx17930-17931 ("I don't dispute how [Kennedy's] broken down the formula . . . . We agree on that."). 4DD's CEO admitted the existence of the formula. See Appx17719-17720. 4DD's exponential discount formula is amply supported by the record. See Appx47 (finding and identifying the formula).

Second, 4DD asserts that "4DD outlined" a "breaking point" for the formula "at 512 cores," 4DD Br. at 41, but the evidence refutes this assertion. 4DD's description of the formula implies no limit. See Appx20994 (explaining that

"volume level IV" applied to "64++ units").  4DD used the formula to calculate a quote for a TETRA Federator production license for 3,600 cores – far exceeding 4DD's assertion of a 512-core limit.  See Appx24804; *supra* n.3.

Third, 4DD asserts that the base development license price "was capped at $2,400," 4DD Br. at 41, but 4DD's assertion is again contradicted by the record.  During the DMIX Competition, 4DD's CEO explained that 4DD was willing to provide "a deeper discount":

> we typically do a direct 90% discount from production list price, but if you purchase the production licenses at the same time, **I can do a deeper discount on the development licenses**.

Appx20994 (emphasis added).  4DD's enterprise license offers also support the conclusion that 4DD was willing to offer "unprecedented discounts" for a significant purchase.  See id. (offering to "come up with a model that has unlimited cores and seats"); Appx24876 ("[c]ustom pricing . . . may include unlimited cores or seats"); Appx20224 (expressing an "intent to offer unprecedented discounts for the full enterprise use"); Appx25340 (seeking to discuss "a more flexible and highly discounted pricing model that would replace the 'per core' model").

## F.     4DD does not Challenge the CFC's 20% Fee for Backups

For its third asserted category-specific issue, 4DD asserts the CFC correctly assessed a 20% convenience fee for infringing backup copies of TETRA Federator, but the fee should be reapplied against 4DD's asserted royalty for the infringing non-

backup copies.  See 4DD Br. at 44-45 ("there is no reason to revisit that percentage").

Thus, although the parties significantly dispute the royalty for the infringing non-backup copies, the parties present no dispute on appeal regarding the CFC's assessed hypothetical fee for infringing backup copies.  See Appx47-48; Appx60.[18]

### G.   The CFC Erred in Justifying its Hypothetical License Fee for TETRA Studio, but the Fee is Justifiable by Record Evidence

For its fourth and final asserted category-specific error, 4DD argues that the CFC erred by refusing to award damages for unused copies of TETRA Studio.  See 4DD Br. at 45-47.  The CFC concluded that DHA would not have "purchased 171,000 licenses on a per-seat basis" for "a team of fewer than 100 people" in a hypothetical negotiation.  Appx49; see also Appx61.[19]  The CFC appropriately considered DHA's use of TETRA Studio in assessing damages.  "The law does not require that every award of copyright damages be on a per-copy basis." Bitmanagement, 2025 WL 37051 at *3.  The Court's Gaylord cases explain and

---

[18] Accordingly, the Court can ignore 4DD's moot and disputed arguments in a footnote, see 4DD Br. at 45 n.4, which the CFC twice considered and rejected, see Appx47-48; Appx60.

[19] The record supports the CFC's conclusion that DHA would have needed, at most, 100 seat licenses of TETRA Studio.  See Appx48-49 ("the SMS team only comprised about 60 employees"); Appx17479 ("There's a team of 20 some-odd people working on the project.").

illustrate that the Government's use of a copyrighted work is critical in determining the value of a hypothetical license:

> [M]any circuits award actual damages based on the fair market value of a license covering **the defendant's use**. . . . [T]he [trial] court's task is to determine the reasonable license fee on which a willing buyer and a willing seller would have agreed **for the use taken** by the infringer.

Gaylord II at 1343 (citations omitted, emphasis added); Gaylord III at 1367 ("[W]e held [in Gaylord II] that actual damages for copyright infringement may be based on a reasonable royalty representing the fair market value of a license **covering the defendant's use**.") (citations omitted, emphasis added). Contrary to 4DD's assertion, there is no "square circuit conflict" because other circuits necessarily consider the defendant's use in determining actual damages under Title 17. Compare 4DD Br. at 45-46 with On Davis v. The Gap, Inc., 246 F.3d 152, 166 n.5 (2d Cir. 2001) ("the fair market value to be determined is not [] the highest use for which plaintiff might license but the use the infringer made"); Dash v. Mayweather, 731 F.3d 303, 313 (4th Cir. 2013) ("the objective inquiry focuses on the fair market value of the work . . . contemplating the use the infringer made"); Polar Bear, 384 F.3d at 708 (courts determine actual damages "by the loss in the fair market value of the copyright, measured by . . . the value of the use of the copyrighted work to the infringer"); see also Bitmanagement, 2025 WL 37051 at *4-5 (explaining that the Court's fact-specific approach for reasonable compensation under Section 1498(b) is consistent with other circuits' approaches for actual damages under Title 17).

Having concluded that the parties would not have negotiated licenses "for nonexistent people," the CFC elected to award "$150,000 to compensate 4DD for what would have been willful infringement—an amount equivalent to statutory damages under the Copyright Act." Appx49; see also id. at n.26 (describing the actions as "wrongful"). The CFC's characterization of the infringement and its use of maximum statutory damages is legal error. Established precedent holds that the Government's infringement of copyrights is akin to eminent domain and can never be "willful" or "wrongful." See Gaylord II at 1342-43; Leesona, 599 F.2d at 968-69. Furthermore, when statutory damages are awarded under the limited waiver of sovereign immunity for copyright infringement, a plaintiff can only recover, at most, "the **minimum** statutory damages as set forth in section 504(c) of title 17": $750. 28 U.S.C. § 1498(b) (emphasis added); see also 17 U.S.C. § 504(c); Cohen v. United States, 105 Fed. Cl. 733, 750-54 (2012), aff'd 528 F. App'x 996 (Fed. Cir. 2013).

Nevertheless, the CFC's award of $150,000 for TETRA Studio is independently justifiable by the record. DHA had already procured 50 seat licenses for TETRA Studio for $166,830.62. See Appx20330. As a result, the cost for 50 additional seat licenses would have ranged between $72,000 and $167,000. [20]

---

[20] If combined and calculated together with the licenses obtained through the contract, the total cost of a 100-seat license for TETRA Studio would have been $238,864.30 (100 x ($6000 x 100$^{(-0.05 \text{ x } 4)}$)), resulting in a $72,033.68 incremental royalty for the 50 additional seats beyond the $166,830.62 originally paid for a 50-

Accordingly, although the CFC improperly characterized the infringement and used maximum statutory damages, the error is harmless, and the Court should uphold the $150,000 award for TETRA Studio.

## CONCLUSION

For the above reasons, the Court should affirm the CFC's judgment.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

s/Scott Bolden
SCOTT BOLDEN
Director
Of Counsel:                    Department of Justice, Civil Division
ELIZABETH M. HOSFORD          950 Pennsylvania Avenue, NW
Department of Justice          Washington, DC 20530
                               Email: Scott.Bolden@USDOJ.gov
                               Telephone: (202) 307-0262
                               Facsimile: (202) 307-0345
January 14, 2025

*Attorneys for Defendant-Appellee*

---

seat license. If calculated separately, the parties would have agreed to another payment of $166,830.62.

# CERTIFICATE OF SERVICE

I hereby certify that, on January 14, 2025, I electronically filed the foregoing BRIEF OF THE DEFENDANT-APPELLEE UNITED STATES with the Clerk of Court using the CM/ECF System. All parties are represented by registered CM/ECF users and will receive notice through the appellate CM/ECF system.

s/Scott Bolden
SCOTT BOLDEN
Director

January 14, 2025

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATIONS**

Pursuant to the type-volume limitation of Federal Circuit Rule 32, I hereby

certify that the foregoing Brief contains no more than 14,000 words, proportionally

spaced, as recorded in the document statistics for this document in Microsoft Word

for Microsoft 365, which provides the following information:

Typeface:          Times New Roman, proportionally spaced, 14 point

Word Count:     9,999 (excluding the parts of the Brief exempted by the

Federal Rules of Appellate Procedure and Federal Circuit Rules)


s/Scott Bolden
SCOTT BOLDEN
Director

January 14, 2025