No. 24-1996

# In the United States Court of Appeals for the Federal Circuit

4DD HOLDINGS, LLC, T4 DATA GROUP, LLC,
*Plaintiffs-Appellants,*

v.

UNITED STATES,
*Defendant-Appellee*

IMMIX TECHNOLOGY, INC.,
*Third-Party Defendant.*

Appeal from the United States Court of Federal Claims,
No. 1:15-CV-00945-EGB

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS 4DD HOLDINGS, LLC, AND T4 DATA GROUP, LLC

Angela M. Oliver
HAYNES AND BOONE, LLP
800 17th Street N.W., Ste. 500
Washington, DC 20006
(202) 654-4552
*angela.oliver@haynesboone.com*

Daniel L. Geyser
HAYNES AND BOONE, LLP
2801 N. Harwood Street, Ste. 2300
Dallas, TX 75201
(303) 382-6219
*daniel.geyser@haynesboone.com*

*Counsel for Plaintiffs-Appellants*
*4DD Holdings, LLC and*
*T4 Data Group, LLC*

No. 24-1996

# In the United States Court of Appeals for the Federal Circuit

---

4DD HOLDINGS, LLC, T4 DATA GROUP, LLC,
*Plaintiffs-Appellants*,

v.

UNITED STATES,
*Defendant-Appellee*

IMMIX TECHNOLOGY, INC.,
*Third-Party Defendant.*

---

Appeal from the United States Court of Federal Claims,
No. 1:15-CV-00945-EGB

---

## CERTIFICATE OF INTEREST

---

Pursuant to Fed. Cir. R. 47.4, counsel for Plaintiffs-Appellants 4DD Holdings, LLC, and T4 Data Group, LLC, certify that the following information is accurate and complete to the best of their knowledge:

1. **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case.

   4DD Holdings, LLC; and T4 Data Group, LLC

2. **Real Party in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

   None.

3. **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more of the stock in the entities.

   4DD Holdings, LLC, is the parent corporation for T4 Data Group, LLC.

4. **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court.

   **Robins Kaplan LLP**: Roman Silberfeld; Chris Larus; Bryan Mechell; Ron Schutz; Jessica Gutierrez; Zachary Cohen; Stephanie Quartararo; Christine Yun Sauer; and Stephen Safranski.

   **Stein Mitchell Beato & Missner**: Edward H. Meyers; Robert B. Gilmore; and Philip J. O'Beirne.

   **Boies, Schiller & Flexner LLP**: D. Michael Underhill; James P. Denvir III; Stacey Kamya Grigsby; Hamish P. M. Hume; Williams C. Jackson; and Jonathan M. Shaw.

   **Regan Zambri Long, PLLC**: Patrick M. Regan; and Salvatore J. Zambri.

   **Hausfeld LLP**: Sathya S. Gosselin.

5. **Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5?

   No.

6. **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).

   None.

Respectfully submitted.

/s/ Daniel L. Geyser

Daniel L. Geyser
HAYNES AND BOONE, LLP
2801 N. Harwood Street, Ste. 2300
Dallas, TX 75201
(303) 382-6219
daniel.geyser@haynesboone.com

Counsel for Plaintiffs-Appellants
4DD Holdings, LLC, and
T4 Data Group, LLC

March 10, 2025

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST..........................................................................i

REPLY BRIEF FOR PLAINTIFFS-APPELLANTS.....................................1

      A.    There Was No Need To Conduct A "Hypothetical" Negotiation When The Parties' *Actual* Negotiation Established The Real-World Value Of 4DD's Infringed Software—And The Government's Contrary Arguments Are Meritless.......................................1

          1.    The government's attempts to short-circuit this Court's review fall woefully short.................................1

          2.    The parties' actual negotiations dictate the controlling damages rate—and there is no reason to conduct a hypothetical negotiation when the parties' actual negotiation establishes fair-market value in an arm's-length transaction.....................................................8

      B.    Even If A Hypothetical Negotiation Were Permissible, Multiple Legal And Logical Errors Infected The Trial Court's Analysis—And The Government's Contrary Arguments Are Meritless............15

          1.    Multiple overarching errors undermine the trial court's "hypothetical" framework......................15

          2.    Additional errors infect each key aspect of the "hypothetical" damages analysis.................................21

CONCLUSION......................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

A. **There Was No Need To Conduct A "Hypothetical" Negotiation When The Parties' *Actual* Negotiation Established The Real-World Value Of 4DD's Infringed Software—And The Government's Contrary Arguments Are Meritless**

    *1.*    *The government's attempts to short-circuit this Court's review fall woefully short*

a. According to the government, 4DD somehow waived its lead argument by "failing to properly present it" to the trial court. Gov't Br. 26-27. The government admits 4DD contested the idea that a "hypothetical negotiation" could supplant the parties' *actual* agreements, but it insists 4DD focused on 4DD's *list* prices—rather than the real-world rates the government negotiated (and accepted) twice on separate occasions (Appx20327, Appx20385). And because 4DD supposedly waited to raise the latter argument until reconsideration, "th[is] Court should deem the argument waived." Gov't Br. 26-27.

The government's argument is frivolous in every respect—and its attempt to hide behind "waiver" merely reflects its inability to defend its substantive position on the merits.[1]

---

[1] While the least of its problems, the government's nomenclature is also wrong. A *waiver* is the voluntary relinquishment of a known right; a *forfeiture* is the

[Footnote continued on next page]

First and foremost, the government's position is factually frivolous: at each stage below, 4DD argued the published list prices should control, but *alternatively* the *discounted negotiated prices* should control. Appx19243 ("the best measure of damages is either the contracts in effect at the time of each infringement (referred to herein as the 'Standard Price'), or what 4DD actually charged under the TETRA Contract to license TETRA * * * for the precise copyrighted works at issue (referred to herein as the 'Discount Price')"). An alternative argument is still an *argument*. It is every bit as preserved as a primary contention. As even a quick skim confirms, 4DD raised both arguments unambiguously in its trial briefing:

- "4DD is entitled to actual damages based on contracts between the parties with the prices agreed upon prior to infringement and still in force during each infringement" (Appx19227) (actual *heading* in the brief);

- "the relevant contracts in the case were in full force and effect, including the purchase order * * * and the SEWP contract"; "the Government now attempts to escape its damages obligations by claiming that it is not liable for the prices it *already agreed upon* in these contracts" (Appx19243);

failure to assert a right at the proper time. The government here is (frivolously) arguing forfeiture, not waiver. And if it were serious about forfeiture, it presumably would have led with it—not buried it as a throwaway near the end of its submission.

- "there are multiple contracts in place between the parties covering the copyrighted works at issue that reflect *actual* arms-length negotiations"; "[t]he contracts provide the least speculative measure of damages," and "the Court should *only* rely on the actual contracts in this case as they provide the best measure of reasonable and entire compensation" (Appx19330);

- "speculating on what the parties would have done had they engaged in a hypothetical negotiation would be wholly improper because an *actual negotiation* took place in which the Government twice purchased licenses to the very copyrighted works that the Government infringed" (Appx19503);

- "actual license prices negotiated by the parties for the infringed work at issue provide a superior basis for calculating damages than does a hypothetical negotiation approach in a copyright infringement matter" (Appx19503);

- "the very purpose of a hypothetical negotiation approach is to 'ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began'"; "[w]hen an actual agreement between the parties already exists covering the very copyrighted works at issue, resort to a hypothetical negotiation is unnecessary and inappropriate" (Appx19504); and

- "[t]he proper measure of damages are the per core price and per seat price, as appropriate, contained within the *several contracts that the parties actually agreed to*"; "[n]o hypothetical negotiation process, which would necessarily be more speculative than what actually occurred, is appropriate as a matter of law" (Appx19518) (emphasis added).

It is a mystery how the government could responsibly review these briefs and still maintain 4DD's position was not preserved. The government's

raw contrary assertion is baseless, and it cannot simply wish away 4DD's arguments.

In any event, the government's position is also legally frivolous—*thrice* over. First, it is "well-established" that a waiver defense *itself* can be waived. *Tokatly* v. *Ashcroft*, 371 F.3d 613, 618 (9th Cir. 2004) ("'the government can "waive waiver" implicitly by failing to assert it'"); accord, *e.g.*, *Westefer* v. *Snyder*, 422 F.3d 570, 584 n.20 (7th Cir. 2005) ("hold[ing] fast to the principle that a defense of waiver may itself be waived if not raised"). The government does not mention where it asserted waiver below—because it never did. Presumably because the issue was obviously preserved and the trial court (who had confronted it repeatedly) would have responded with disbelief—or worse. If 4DD somehow had waited until reconsideration to press this precise point, it was the government's responsibility to immediately object that the argument was made too late. Yet (again) it never did. The ship has sailed for the government to belatedly conjure up a (forfeited) forfeiture argument.[2]

---

[2] Indeed, the government's only authority (Gov't Br. 27) involved a situation where waiver was established *in the trial court*: "[a]s the trial court noted in denying the motion, an argument made for the first time in a motion for reconsideration comes too late, and is ordinarily deemed waived and not preserved for appeal." *Bluebonnet Sav. Bank, FSB* v. *United States*, 466 F.3d 1349, 1361

[Footnote continued on next page]

Second, as the government admits, the trial court squarely resolved this issue (however it was raised), which makes it fair game for appeal. The pertinent question is whether an issue was "'pressed *or* passed upon below.'" *United States* v. *Williams*, 504 U.S. 36, 41 (1992) (emphasis added). "[T]his rule operates (as it is phrased) in the disjunctive, permitting review of an issue not pressed so long as it has been passed upon." *Ibid.* Issues are preserved whenever raised *or* resolved, and the government itself admits the trial court resolved it here. See Gov't Br. 15-16 (citing Appx56-59), 29 (citing Appx57). The fact that 4DD also pressed the argument (repeatedly and unambiguously) is thus irrelevant.

Finally, the general rule is that parties forfeit *issues*, not arguments. "Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below." *Yee* v. *City of Escondido*, 503 U.S. 519, 534 (1992); see also *U.S. Nat'l Bank of Ore.* v. *Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 446 (1993) ("'[w]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the

---

(Fed. Cir. 2006). There was no such finding here—for each of these obvious reasons.

independent power to identify and apply the proper construction of governing law'").[3]

At its core, the *issue* here is whether a "hypothetical" negotiation can override *actual* negotiations establishing fair-market value at arm's length in the real world—the very question the "hypothetical" inquiry tries to replicate. The answer (legally and logically) is no:  post-hoc fiction cannot replace objective reality—and that is true whether value is set by the parties' (twice) negotiated binding deals or the parties' published list prices (once accepted and certified *by the actual parties* as "fair and reasonable," see Opening Br. 5-6, 18, 20-21). Under traditional forfeiture principles, that readily preserves the full question.

At bottom, the government is wrong to sidestep the legal flaws in its analysis with baseless "waiver" arguments. Waiver (or forfeiture) is no obstacle here.

b. As its next dodge, the government accuses 4DD of "fundamentally mischaracteriz[ing]" the "agreement[s]" as "directly between the Government

---

[3] A contrary view would leave this Court applying a stricter standard than the Supreme Court and invite a circuit conflict. *E.g.*, *United States* v. *Pallares-Galan*, 359 F.3d 1088, 1095 (9th Cir. 2004) ("As the Supreme Court has made clear, it is claims that are deemed waived or forfeited, not arguments.").

and 4DD." Gov't Br. 27. Indeed, the government declares, "*none* of the relevant contracts in this litigation directly involved the Government and 4DD as parties to the same contract." *Ibid.* Because each contract was supposedly between "Immix" and the government, no real-world negotiations between the "direct parties" established market rates in binding agreements. *Ibid.*

This is frivolous—squared. There is a reason not one whiff of this argument appears anywhere in the trial court. As the government assuredly knows, "4DD engaged with [Immix]" as "an authorized reseller[] to enable 4DD to license TETRA to the Government." Appx19282. The trial court plainly understood the relationship: "4DD Licenses Tetra to the Government." Appx20. Even the *government* (previously) understood the relationship. *E.g.*, Appx19363 ("4DD, Immix, and DHA agreed to licenses for 168 additional cores of TETRA"); Appx19365 ("DHA, 4DD and Immix agreed on a contract modification * * * which represented the same per-core price for TETRA licenses as in the original 2013 contract"). Indeed, even the government here cannot keep its story straight across its whole brief: "4DD demanded that DHA 'buy the 168 excess cores at the SEWP [list] price,' but DHA rejected the demand, '4DD relented, and *the parties settled at the original contract price.*'" Gov't Br. 11 (emphasis added).

No one (until apparently now) failed to understand this situation: the government and 4DD negotiated these prices at every turn, and the real-world value was dictated by binding agreements struck at arm's length in a fair market between the actual litigating parties. The trial court never suggested otherwise—it simply accepted the (undisputed) backdrop but disagreed about the legal framework. If the court (or the government) felt the true flaw was a lack of binding agreements between these actual parties, that critical statement would assuredly would have appeared *somewhere* in the decisions below.

The government cannot play fast and loose to duck review of these exceptionally important questions. The government should operate at a higher level—especially after being found to have "lied," engaged in "fraud[]," "intentionally destroyed evidence," and "hid[]" its misconduct. Appx18, 30-32.

> 2. *The parties' actual negotiations dictate the controlling damages rate—and there is no reason to conduct a* hypothetical *negotiation when the parties'* actual *negotiation establishes fair-market value in an arm's-length transaction*

As 4DD previously established (Opening Br. 14-33), the real-world license controls, and the trial court should have applied that established rate (twice reaffirmed in arm's-length negotiations) to determine damages—as other courts routinely do. The trial court's contrary decision—conducting a

"hypothetical" negotiation in the face of an actual, binding license between the actual litigating parties—was reversible error.

a. The government insists a hypothetical negotiation was appropriate, but it never bothers to rationalize its theory. The trial court's view lets fiction trump reality. It embraces a post-hoc, litigation-driven, battle-of-the-experts in place of actual fair-market negotiations conducted at arm's length between sophisticated actors. It eliminates bright-light certainty that provides fair notice to everyone about the price of infringement (just read the license)—and instead favors undue speculation requiring months (or years) of costly litigation and waste. There is no point in constructing an elaborate "hypothetical" universe when the parties (in the real world) already supplied a clear answer— one that directly responds to the "hypothetical" inquiry: what agreement *would the parties have reached* had they negotiated an agreement? Where the parties *did* reach an agreement, there is no work left to do. See, *e.g.*, *Lucent Techs., Inc.* v. *Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).

In short, there is a reason that courts repeatedly enforce binding agreements and refuse to engage in hypothetical speculation unless there is no alternative—which is true only where *no actual real-world negotiation exists*.

See Opening Br. 25-33. There is nothing more reliable, workable, or administrable than the fair-market price assigned by the parties themselves—and there is nothing more speculative than asking a fact-finder to conduct a hypothetical exercise embracing a fictional world shaped by litigation-driven incentives.

b. The government has no answer for any of these serious flaws. It has no analytical justification for its approach—none obviously exists. It is instead left with a mechanical plea to precedent: the mistaken claim that this Court (inexplicably) requires hypothetical negotiations—even where the parties have twice agreed to identical rates in fair-market transactions.

The government's position is premised on a plain misreading of this Court's decisions. The language it plucks from *Gaylord II* and *Gaylord III* addresses what to do *when no binding agreement exists between the parties*. See Gov't Br. 21. In *that* scenario, a "hypothetical" negotiation may be inevitable. But that says nothing about this situation—or why a hypothetical analysis is necessary when a real-world answer already exists.

Nor did this Court take issue with applying a binding license in the circumstances present here. Contrary to the government's contention (Gov't Br.

22), the *Gaylord II* court faulted the trial court for considering licenses *between third parties involving unrelated works*. There was *no* license between the actual parties that otherwise determined fair-market value. In that context, where a hypothetical negotiation is necessary, the trial court was required to take into account all relevant evidence—rather than presume rates established between one party and *third parties* (involving different works) would necessarily be the same as rates established between *these* parties and *this* work.

That unremarkable principle has absolutely nothing to do with this case. Here, there *is* an agreement between the parties. It *does* involve these works. The parties *twice* negotiated to establish the fair-market value of the software in this setting—and there is every reason to believe the government and 4DD took into account "all relevant evidence" in their *real-world* negotiations and *real-world* agreement.

There is not one whit of rationale in *Gaylord* (*I*, *II*, or *III*) suggesting courts know best in deciding fair-market value via fictional post-hoc exercises—or that courts should disregard the *actual* fair-market value established (here, twice) by the parties themselves. The government simply repeats the obvious error committed by the court below: it presumes a hypothetical

negotiation is required despite the parties themselves, ex ante, in the real world, doing the work to address precisely the question the post-hoc fictional inquiry attempts to answer.

In the end, the government is left saying the incomprehensible: what the parties actually did is not what they hypothetically would have done. That *defines* counterfactual. It invites costly artificial disputes to replace real-world facts with imaginary answers. It is less reliable, more speculative, and far more burdensome. And it has no advantages of any kind. The plain answer for "the fair market value of a license to which the parties *would have agreed*" is found in—*the actual agreement. Gaylord II*, 678 F.3d at 1343.[4]

_____

[4] The government maintains that 4DD's position is foreclosed by *Leesona Corp.* v. *United States*, 599 F.2d 958 (Ct. Cl. 1979). See Gov't Br. 20-21. This is puzzling. *Leesona* read Section 1498 to limit damages going *beyond* "reasonable compensation"—but it did require *full* compensation per an infringed work's "fair market value." *Leesona*, 599 F.2d at 250, 269. And it stressed the "preferred method" of determining that value was comparing "royalties charged others by the injured party for rights in the same or similar [works]." *Id.* at 259. Here, there is an obvious answer for the "royalties charged" for "the same or similar" works, because *an actual, binding license* dictates the royalties for *exactly* these works. Anything less than that amount does *not* provide "reasonable and entire compensation." 28 U.S.C. 1498(b).

In any event, Congress spoke plainly in providing "*reasonable and entire* compensation as damages for [the government's] infringement." 28 U.S.C. 1498(b). Whatever the Court of Claims found in the "legislative history" (Gov't

[Footnote continued on next page]

c. Nor could the government distinguish other cases that have adopted these common-sense propositions. See Gov't Br. 23-26. Those decisions speak for themselves. They have no "inherent" limitations. The Sixth Circuit, for example, recognized that a license between the parties assigning value to the very work in question dictated the damages rate. *Thoroughbred Software Int'l, Inc.* v. *Dice Corp.*, 488 F.3d 352, 358-360 (6th Cir. 2007). The Ninth Circuit enforced a proposed rate "actually quoted" to the infringing party—and found that rate binding because "[n]othing suggests that the fee was contrived or artificially inflated." *Polar Bear Prods., Inc.* v. *Timex Corp.*, 384 F.3d 700, 709 (9th Cir. 2004). The Second Circuit declared it "need not speculate" on fair-market value because the parties, "in free bargaining, set value on plaintiff's work." *Szekely* v. *Eagle Lion Films, Inc.*, 242 F.2d 266, 268 (2d Cir. 1957).

In all of these cases, there was no hint of any hedging: the courts recognized that plaintiffs were entitled to the fair-market value of their works, and the licensing agreement reflected that value. None of these cases adopted the government's contrary view—requiring all courts in every case to conduct a

---

Br. 21) to exclude *non-compensatory* damages, it nowhere suggested something *less* than "reasonable *and entire*" compensation was permitted. And it would face a difficult audience in today's Supreme Court were *Leesona* read to endorse the government's atextual position.

"hypothetical" analysis asking whether the parties knew what they were doing when negotiating an *actual* agreement at arm's length in a fair market.

d. The government finally maintains that the real-world agreements are irrelevant because they are different in scope: the existing deals targeted a few hundred copies, whereas the government's infringement campaign involved tens of thousands of copied works. Gov't Br. 29-31.

This is mistaken. The government overlooks that this case involves the same course of infringement the government itself assessed at the same real-world rates it originally paid. The government knew at that point (during the true-up) exactly what it had done. It knew it had vastly exceeded the licensing agreements, and it still insisted upon paying the same price (as fair and reasonable) for its excess use that it paid for the initial license.

It is a bit much for the government to maintain that the very deal it struck—twice—was too high because it was *lying* about the true extent of its infringement, and it never would have agreed to its own proposal had it not fraudulently understated the extent of its own misappropriation.

In any event, the government overlooks more context. The parties negotiated at the outset anticipating a *worldwide* deployment. There is no indi-

cation these same rates would not apply on a broader scale. And yet the government itself certified the *higher* list prices as "fair and reasonable"—covering potentially thousands of sales. NASA did not drop a footnote suggesting the same pricing was suddenly excessive if purchased at larger quantities (rather than in blocks of 512 licenses). Nor is there any indication that 4DD's competitors (major players like IBM) anticipated ceding away massive discounts—much less that they would invest resources in an intense bidding process in the hope of generating a few million in funds.

In short: the government agreed to the *same* discounted pricing *after* infringing on a massive scale. It was satisfied with the price at the time when it should have known its actual scope. It is too late to object to its own arm's-length deal after the fact.

### B. Even If A Hypothetical Negotiation Were Permissible, Multiple Legal And Logical Errors Infected The Trial Court's Analysis—And The Government's Contrary Arguments Are Meritless

#### 1. *Multiple overarching errors undermine the trial court's "hypothetical" framework*

As 4DD previously established (Br. 33-38), three global errors skewed the hypothetical negotiation and vastly diminished 4DD's proper damages. Each error independently warrants reversal.

a. The trial court wrongly understood the so-called "book of wisdom" to permit *future* events to color *ex ante* negotiations—letting a glimpse into the future badly distort the hypothetical negotiation. This analytical error violated this Court's decisions: the "date of first infringement" controls (Appx43), and the "hypothetical" negotiation is "not * * * an after-the-fact assessment" (*Unisplay, S.A.* v. *American Elec. Sign Co., Inc.*, 69 F.3d 512, 518 (Fed. Cir. 1995)). "Were we to permit a later notice date to serve as the hypothetical negotiation date, the damages analysis would be skewed" (*LaserDynamics, Inc.* v. *Quanta Computer, Inc.*, 694 F.3d 51, 76 (Fed. Cir. 2012))—just as it was here.

The government's response is doubly flawed. It first apparently believes the "book of wisdom" indeed affords perfect 20-20 hindsight. Br. 31-34. But it cannot square that position with this Court's insistence that hypothetical negotiations take place ex ante, not ex post. And, in fact, it is difficult to discern how any aspect of the government's analysis might change if it instead ran its hypothetical negotiation after-the-fact—in direct contravention of this Court's decisions. Compare, *e.g.*, *Carnegie Mellon Univ.* v. *Marvell Tech. Grp., Ltd.*, 807 F.3d 1283, 1304 (Fed. Cir. 2015) ("[a] key inquiry in the analysis is what it

would have been worth to the defendant, *as it saw things at the time*, to obtain the authority to use the patented technology") (emphasis added).

Properly understood, the "book of wisdom" accomplishes an important task: it specifies the context to confirm the subject-matter over which *the parties ex ante would be negotiating*. It does not permit those parties to predict future outcomes with perfect hindsight, but it does allow the parties to decide what exactly they would be negotiating about. See, *e.g.*, *Gaylord* v. *United States*, 777 F.3d 1363, 1366 (Fed. Cir. 2015) (*Gaylord III*) (examining how infringing stamps were used to identify *extent* of infringement and "categories of infringing goods"); *Lucent Technologies, Inc.* v. *Gateway, Inc.*, 580 F.3d 1301, 1334 (Fed. Cir. 2009) (analyzing "how often consumers use[d] the patented date-picker invention"—*i.e.*, the "extent to which the infringing method ha[d] been used"). That nails down the (fictional) negotiation without wrongly converting ex ante negotiations into ex post, strong-arm, crystal-ball settlements.[5]

---

[5] This further explains the government's error in thinking *Lucent* somehow cuts against 4DD's position. See Gov't Br. 37 n.16. The "extent" of usage suggests how many licenses the government may need—it does not tip off the government to the ultimate success of an ongoing project. That would result in "a hypothetical negotiation far-removed from what parties regularly do during real-world licensing negotiations." *Lucent*, 580 F.3d at 1334.

In short, a simple truth is clear: a court can conduct a hypothetical negotiation ex ante or it can presume full knowledge of future events. It cannot do both. Unless this Court abandons the essential rule that the "date of first infringement" controls, the government cannot insist on placing bets only after learning a game's outcome. See, *e.g.*, *Hanson* v. *Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1081 (Fed. Cir. 1983) (hypothetical negotiations conducted "not on the basis of a hindsight evaluation of what actually happened, but on the basis of what the parties to the hypothetical license negotiations would have considered at the time of the negotiations"); contra Appx44 ("most damaging to 4DD's bargaining position is that the government's use of Tetra [ultimately] provided it with little value"—while ignoring TETRA's ex ante potential to solve a billion-dollar, high-priority problem).

Nor can the government square its position with objective reality: it says the trial court properly considered things like the termination of the DMiX project, the development-only use of the TETRA software, and the value of that use. Yet the government cannot answer this question: each listed factor was also at the government's disposal when *actually* negotiating the true-up— and yet the government *still* declared the initial contract rate the proper fair-

market rate. Why would the "hypothetical" negotiation vary from the *actual* negotiation based on the *identical* set of factors? The government never says.

b. Nor can the government justify the trial court's reliance on a so-called "alternative" software (Rhapsody) without first establishing it was an *actual* alternative. It is puzzling to suggest the government could leverage software that could *not* perform the equivalent function. Opening Br. 37-38; see also Appx45 (Rhapsody was not a data federator like TETRA, but only an Enterprise Service Bus—two fundamentally different kinds of software).[6]

In response, the government highlights cases suggesting TETRA's value must be linked to its "distinct and protectible features." Gov't Br. 35; *Standard Havens Prods., Inc.* v. *Gencor Indus., Inc.*, 953 F.2d 1360, 1373 (Fed. Cir. 1991). This is bizarre: 4DD's entire point is that TETRA *has those very features* (its rare ability to achieve interoperability) that Rhapsody did

---

[6] As a data federator, TETRA is capable of accessing and collating information from disparate systems and presenting that information as if it exists in a single record—exactly what the government needed to reconcile its scattered health records. Appx17382–17384, 608:8-609:5, 609:13-610:15 (Myers testimony). An Enterprise Service Bus, by contrast, merely moves information between databases or systems; it transfers and synchronizes it but without federating the data. Appx17383-17384, 609:13-610:15 (Myers).

*not*. In short: no one would want Rhapsody for interoperability, which is presumably why no one *actually* favored Rhapsody over TETRA—despite its availability throughout the entire period when TETRA was operational. See Gov't Br. 35; see also, *e.g.*, Appx21039-20140 (Rhapsody omitted from "Initial Candidate List").

This should be dispositive on this point. But if the government disagrees, it at least first needs specific fact-findings establishing the relevant points— and Rhapsody's potential to replace TETRA in performing the relevant tasks. As it now stands, no such findings exist; non-existent findings cannot support the judgment; and this Court has no fact findings to review.

c. As the discussion above illustrates, the trial court's analysis was repeatedly premised on *counterfactual* presumptions—believing, oddly, the parties would have done the *opposite* of what they actually did when confronting identical considerations in real life. See Opening Br. 38 (describing this error).

In response, the government says—effectively nothing. Br. 36-37. It trots out a random series of assertions that fail to confront the pertinent point: if the court wished to suggest, hypothetically, that certain outcomes made sense, the court had to explain, non-hypothetically, why the parties adopted

the *opposite* position during their actual negotiations. See, *e.g.*, *Bitmanagement Software GmBH* v. *United States*, 124 F.4th 1368, 1374 (Fed. Cir. 2025) (examining "the parties' past dealings" and refusing to deviate from those dealings to "adopt[] a different approach in a hypothetical negotiation"). If the *hypothetical* inquiry truly says the government wants a development license, prefers Rhapsody, etc., the government must explain why the *real-world* negotiation reached the opposite conclusion.

The hypothetical analysis inherently suffers from an element of fiction, but it cannot repudiate "the parties' past dealings" to flout reality. *Bitmanagement*, 124 F.4th at 1374.

### 2. Additional errors infect each key aspect of the "hypothetical" damages analysis

a. *Production versus development licenses.* The government insists it was proper to presume the parties "hypothetically" would have adopted development licenses despite *not* pursuing those licenses in real life. Gov't Br. 37-38. This is bizarre. Indeed, it is perplexing to say the hypothetical negotiation can discard the government's *actual* preferences during the *actual* negotiations settling the *very* infringement the hypothetical negotiation is supposed

to address—in the opposite way. Which presumably is why this Court just refused to embrace the government's counterfactual methodological approach. *Bitmanagement*, 124 F.4th at 1374.

The facts are ultimately simple. The government bought a production license. Twice. It refused to pursue a lesser version of the software. Twice. It never suggested it pay only "development-license" rates during the true-up—despite assigning value *to the same infringing works*. On the contrary, it reaffirmed the original license rate and declared that specific rate was "fair"—and the proper measure of the government's infringing use. It is hard to fathom even a *hypothetical* universe that insists the government would have done an about-face and take the polar-opposite position than it actually did (twice)—especially with no articulable, concrete explanation.

In any event, the government ignores that the government indeed copied *production* software—and so it should be asked to pay for what it copied (rather than a fictional alternative that does not exist). And at the date of infringement, the government anticipated using TETRA to achieve real-world

*production* interoperability goals—an aim that would be frustrated by development software. Appx20993; Appx24897.[7]

The government bought production licenses at every turn, and there is no basis for presuming the government would abandon that preference in an imaginary world alone.

b. *Volume discounts on top of discounted development licenses.* Adding insult to injury, the trial court engaged in extreme double-counting: it first presumed the government would negotiate for a *90%-discounted* development license, and then presumed the *production-license volume discount* would apply in addition to that minimal baseline—reducing the market rate from $10,447 (the figure the government twice agreed to pay in the real-world) to the tiniest fraction of that amount—$305.22. Opening Br. 42-43.

The trial court's analysis was pure fiction. The unrefuted record evidence established the 90% initial discount was the *only* discount 4DD ever offered on a freestanding development license. It confirmed this in the pricing

---

[7] The government claims "4DD offered to match its competitors' quotes 'all the way to totally free.'" Br. 37. This is highly misleading. That offer was limited to "hot spares" (Appx20994), not the basic software. The fact that 4DD was willing to throw in a product where it lacked "established pricing" says nothing about its willingness to give away a billion-dollar solution for free.

exercise—where every paired quote (a production license and development license) showed volume discounts for the former but never for the latter—which always held constant at $2,400. See Appx24793-24798. The trial court's contrary presumption is not just raw speculation—it is speculation directly at odds with concrete record evidence.

In response, the government trots out a single e-mail that 4DD previously refuted (Opening Br. 43): the offhand remark from 4DD's CEO that the "typical[]" discount is indeed limited to 90% "from the production list price," but "*if you purchase the production licenses at the same time*, I can do a deeper discount on the development licenses." Appx20994 (emphasis added); see also Gov't Br. 40. This language is not difficult to understand: if the government was willing to buy production licenses (in the plural), 4DD would be willing to *add* development licenses at a deeper discount. At no point did 4DD suggest that buying *any* production licenses would immediately trigger massive discounts on tens of thousands of development licenses—an irrational proposition at odds (again) with 4DD's uniform pricing exercise.

It is clear error (and clearly irrational) for the trial court to extrapolate from a single sentence in a single e-mail a massive double-discounting initiative that would leave 4DD's software with a vanishing fraction of its original

value—especially when that conclusion directly flouts each and every pricing quote 4DD produced on this issue.

c. *20% backup convenience fee assessed against the wrong non-backup baseline.* On this single issue, the parties are apparently in agreement: the government concedes that a 20% convenience fee applies to the proper total for the non-backup copies. Opening Br. 44-45; Gov't Br. 40-41. If the Court adjusts that baseline (by recalculating amounts owed as *production* licenses or *non-volume-discounted* development licenses), it becomes necessary to reapply the 20% fee to that correct baseline.

d. *Refusal to provide actual damages for TETRA Enterprise Studio.* As previously explained (Opening Br. 45-47), the trial court erred in refusing to provide true compensation for the "41,925 infringing copies" of TETRA Enterprise Studio—all because it felt the copies made "no economic sense" and added "no value." Appx48-49.

The trial court was both legally and factually wrong. It was legally wrong because unused copied software is still *copied* software. *Thoroughbred Software Int'l, Inc.* v. *Dice Corp.*, 488 F.3d 352, 358-360 (6th Cir. 2007); *Wall Data Inc.* v. *Los Angeles Cnty. Sheriff's Dep't*, 447 F.3d 769, 779 (9th Cir. 2006). Because there is no basis for excusing infringing copies, there is also no basis for

excluding those copies from a hypothetical negotiation. Other circuits hold that "[t]he lost licensee fee * * * used to measure actual damages for the used software copies is also the proper measure of actual damages for the unused copies." *Thoroughbred Software*, 488 F.3d at 360. This Court cannot affirm the trial court's contrary decision without creating a square circuit conflict.

In response, the government insists "there is no 'square circuit conflict' because other circuits necessarily consider the defendant's use in determining actual damages." Gov't Br. 42-43. This is puzzling: the government cannot support that contention without distinguishing—*the cases comprising the circuit conflict*. It instead dropped parentheticals addressing various issues arising in *other* decisions. It goes without saying that a circuit conflict can exist even if some decisions, somewhere, resolved other issues without wading into the relevant issue.

In any event, the trial court was also factually wrong. The government did indeed benefit from the "unused" copies—which is presumably why it made them. It enabled the government to efficiently replicate any computer (including any software on that computer) without excluding certain programs. This accommodated the government's intense pressure to advance the project as quickly as possible—which resulted in maximum value placed on

options that expedite work. See, *e.g.*, *Wall Data*, 447 F.3d at 779 (holding government's use of software was commercial, even though the software was not actually used, because "[b]y using hard drive imaging, the [government] saved man-hours and eliminated possible errors associated with separately installing the individual software packages onto each computer"). Put simply: "[s]uch flexibility could only have been achieved by purchasing licenses for each of the computers on which the software was loaded, or by negotiating with [the copyright owner] for a less restrictive license." *Ibid.*

The government has no response to these benefits. It instead baldly insists the licensing value hovered around $1 a license—despite a negotiated rate of $3,337 per seat. It is a curious claim that paying for 50 additional seats at the real-world rate would somehow adequately compensate *41,000 unauthorized copies* made by the government.

## CONCLUSION

The trial court's judgment should be reversed, and the case should be remanded with the instructions set forth in the opening brief (at 48).

Respectfully submitted.

*/s/ Daniel L. Geyser*

Angela M. Oliver
HAYNES AND BOONE, LLP
800 17th Street N.W., Ste. 500
Washington, DC  20006
(202) 654-4552
*angela.oliver@haynesboone.com*

Daniel L. Geyser
HAYNES AND BOONE, LLP
2801 N. Harwood Street, Ste. 2300
Dallas, TX  75201
(303) 382-6219
*daniel.geyser@haynesboone.com*

*Counsel for Plaintiffs-Appellants*
*4DD Holdings, LLC, and*
*T4 Data Group, LLC*

March 10, 2025

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE
## REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. Cir. R. 32(b)(1) because it contains [INSERT] words, as determined by the word-count function of Microsoft Word 2016, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Expanded BT font.

Respectfully submitted.

*/s/ Daniel L. Geyser*
Daniel L. Geyser
HAYNES AND BOONE, LLP
2801 N. Harwood Street, Ste. 2300
Dallas, TX  75201
(303) 382-6219
*daniel.geyser@haynesboone.com*

*Counsel for Plaintiffs-Appellants*
*4DD Holdings, LLC, and*
*T4 Data Group, LLC*

March 10, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2025, an electronic copy of the foregoing Reply Brief was filed with the Clerk of Court for the U.S. Court of Appeals for the Federal Circuit, using the appellate CM/ECF system. I further certify that all parties in the case are represented by lead counsel who are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Respectfully submitted.

/s/ Daniel L. Geyser
Daniel L. Geyser
HAYNES AND BOONE, LLP
2801 N. Harwood Street, Ste. 2300
Dallas, TX 75201
(303) 382-6219
daniel.geyser@haynesboone.com

Counsel for Plaintiffs-Appellants
4DD Holdings, LLC, and
T4 Data Group, LLC

March 10, 2025